**GLANCY PRONGAY & MURRAY LLP**
Robert V. Prongay (SBN 270796)
rprongay@glancylaw.com
Charles H. Linehan (SBN 307439)
clinehan@glancylaw.com
Garth Spencer (SBN 335424)
gspencer@glancylaw.com
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: info@glancylaw.com

*Lead Counsel for Lead Plaintiff Mejgan Mirbaz*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

IN RE MULLEN AUTOMOTIVE, INC. SECURITIES LITIGATION

Case No. 2:22-cv-03026-DMG-AGR

**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

Honorable Dolly M. Gee

## TABLE OF CONTENTS


I. NATURE OF THE ACTION AND OVERVIEW .......... 1

II. JURISDICTION AND VENUE .......... 6

III. PARTIES .......... 7

IV. RELEVANT NON-PARTY FORMER EMPLOYEES .......... 8

V. BACKGROUND REGARDING MULLEN .......... 8

A. Mullen Was A Small Startup With No Saleable Electric Vehicles, No Ability To Mass Produce Vehicles, And No Revenue .......... 8

B. Mullen Was Constantly Short On Cash And Failed To Pay Employees, Suppliers, And Even Its Payroll Taxes .......... 11

C. Former Employees And Business Partners View Mullen And Defendant Michery As Dishonest About Mullen's Business .......... 13

VI. DEFENDANTS MISREPRESENTED AND FAILED TO DISCLOSE MATERIAL FACTS REGARDING MULLEN'S BUSINESS .......... 14

A. Defendants Made Up Fake "Orders" From Purported Mullen "Customers" .......... 15

B. Defendants Conducted Very Limited Testing Of Mullen's Battery, Which Produced Unremarkable Results .......... 16

C. Mullen's Manufacturing Facilities Were In Poor Condition And Not Useable For Defendants' Stated Purposes .......... 20

D. Mullen Was Years Away From Being Able To Sell Vehicles Due To Its Failure To Meet Regulatory, Testing, And Manufacturing Requirements .......... 23

E. Commercial Partnerships Heavily Touted By Mullen Were Soon Defunct, Or Never Existed At All .......... 26

VII. DEFENDANTS HAD STRONG MOTIVES TO MISLEAD INVESTORS ABOUT MULLEN'S TRUE PROSPECTS .......... 32

A. Defendants Needed To Persuade Net Element Shareholders To Approve The Reverse Merger .......... 32

B. Defendants Sold Tens Of Millions Of Dollars Of Artificially Inflated Mullen Stock....34

VIII. MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD....38

A. June 15-16, 2020 Announcement Of Planned Reverse Merger Between Net Element And Mullen Technologies....38

B. August 10, 2020 Announcement Regarding Battery Test Results....41

C. September 24, 2020 Announcement Regarding Monrovia, California Manufacturing Facility....43

D. October 1, 2020 Announcement Regarding Production And Sale Schedule For Mullen SUVs....44

E. December 30, 2020 Announcement Regarding Purchase Order For 1,500 Mullen SUVs....45

F. March 8, 2021 Announcement Regarding Battery Partnership With Nextech Batteries....46

G. March 11, 2021 Announcement Regarding Tunica, Mississippi Manufacturing Facility....47

H. March 18, 2021 Announcement Regarding Memphis, Tennessee Manufacturing Facility....48

I. August 3, 2021 Announcement Regarding Purchase Order For 1,200 Mullen Cargo Vans....49

IX. THE TRUTH BEGINS TO EMERGE....50

X. DEFENDANTS CONTINUED TO MAKE MATERIALLY FALSE AND MISLEADING STATEMENTS....52

A. February 28, 2022 Announcement Regarding Battery Testing....52

B. March 30, 2022 Announcement Regarding Order From A “Major Fortune 500 Company”....52

XI. THE TRUTH FULLY EMERGES, CAUSING MULLEN’S STOCK PRICE TO PLUMMET....54

A. April 6, 2022 Hindenburg Report .... 54

B. April 18, 2022 Mullen Announcement Confirming Key Aspects Of The Hindenburg Report .... 55

XII. CLASS ACTION ALLEGATIONS .... 57

XIII. UNDISCLOSED ADVERSE FACTS .... 58

XIV. LOSS CAUSATION .... 59

XV. ADDITIONAL SCIENTER ALLEGATIONS .... 60

A. After The Hindenburg Report, Mullen Attempted To Carry Out A Cover-Up Through A Related Party .... 61

B. A Key Mullen Officer Quit Or Was Fired For Challenging Defendant Michery Regarding Defendants' Public Statements .... 63

XVI. APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE) .... 64

XVII. NO SAFE HARBOR .... 66

XVIII. FIRST CLAIM .... 66

XIX. SECOND CLAIM .... 69

XX. PRAYER FOR RELIEF .... 70

XXI. JURY TRIAL DEMANDED .... 71

## EXHIBIT LIST

**Exhibit A** – Hindenburg Research LLC, "Mullen Automotive: Yet Another Fast Talking EV Hustle" (Apr. 6, 2022), *available at* https://hindenburgresearch.com/mullen/

**Exhibit B** – Letter from Mark V. Hesuel, Esq. to Frank McMahon and William L. Miltner, Esq., (Nov. 11, 2019), as filed at Dkt No. 5-6 in *Mullen Technologies, Inc. v. Qiantu Motor (Suzhou) Ltd.*, Case No. 3:19-cv-01979-W-DEB (C.D. Cal.)

**Exhibit C** – Certification of Lead Plaintiff Mejgan Mirbaz (Sept. 22, 2022)

Lead Plaintiff Mejgan Mirbaz ("Plaintiff"),[1] individually and on behalf of all others similarly situated, by and through her attorneys, alleges the following based upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, her counsel's investigation, which includes, without limitation: (a) review and analysis of regulatory filings made by Defendant Mullen Automotive Inc. ("Mullen" or the "Company")[2] or its predecessor Net Element Inc. ("Net Element") with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued and disseminated by Mullen; (c) interviews with former employees and former business associates of Mullen; and (d) review of other publicly available information concerning Mullen.

## I. NATURE OF THE ACTION AND OVERVIEW

1. This is a federal securities class action on behalf of a class consisting of all persons and entities who purchased or otherwise acquired the publicly traded securities of Mullen Automotive Inc., or its predecessor Net Element Inc., between June 15, 2020 and April 18, 2022, both dates inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by violations of the federal securities laws by Defendant Mullen Automotive Inc., its predecessor Defendant Mullen Technologies Inc. ("Mullen Technologies"), and their CEO, Defendant David

---

[1] While preparing this amended complaint, Plaintiff's counsel learned that the certification (Dkt No. 16-2) filed in connection with her motion for appointment as Lead Plaintiff inadvertently listed certain transactions in Mullen stock twice, which resulted in an overstatement of Plaintiff's Class Period Mullen stock purchases and resulting financial losses. Those duplicate transactions have been removed from the revised certification filed herewith as **Exhibit C**.

[2] References herein to "Mullen" or the "Company" include both Defendant Mullen Automotive Inc. and its predecessor company, prior to the November 5, 2021 reverse merger, Defendant Mullen Technologies Inc.

Michery (together, "Defendants"). Plaintiff seeks to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder.

2. Defendant Mullen is a small, startup company in the electric vehicle industry. Defendant Michery is Mullen's CEO, founder, President, Chairman, largest shareholder, and public face.

3. According to Defendants' constant stream of materially misleading promotional press releases, the Company is on the very cusp of fulfilling millions of dollars of vehicle orders for blue chip customers, revolutionizing the field of battery technology, creating over 1 million square feet of state of the art manufacturing facilities, and generally becoming overnight one of the most successful companies in the crowded electric vehicle industry.

4. In reality, throughout the Class Period Defendant Mullen had no revenue, no vehicle orders, no advanced battery technology, and no facilities useable for large scale vehicle manufacturing.

5. The Class Period begins on June 15, 2020, when Mullen's corporate predecessor, Net Element, announced that it planned to merge with Defendant Mullen Technologies (which at that time operated Mullen's business), subject to the merger's approval by vote of Net Element's shareholders.

6. Net Element was a struggling payment processing company whose stock was publicly traded and listed on the NASDAQ exchange. Mullen Technologies was a privately owned company, controlled by Defendant Michery. The planned merger was not an actual combination of two businesses, but a so-called "reverse merger," used by small private companies that would likely be unable to complete a traditional IPO, like Mullen Technologies, as a backdoor to obtain a public stock market listing.

7. From this very first June 15, 2020 press release regarding Mullen as a future public company, Mullen materially misrepresented its business prospects,

stating that it would bring an electric luxury sports car to market "in the first half of 2021," that it would also begin selling a mid-size luxury SUV in "Q3-Q4 of 2021", and that it had "unique battery technology . . . capable of maintaining full capabilities after 500,000 cycles." Like many of its other Class Period statements, Mullen had no reasonable basis for these assertions.

8. In the weeks following this announcement, Net Element's publicly traded stock price soon rocketed to over $15 per share, as compared to the range around $2 that it had traded in during the months leading up to the announcement.

9. Defendants had strong incentives to falsely inflate Mullen's prospects in order to persuade Net Element shareholders to vote in favor of the merger. Without the approval of Net Element shareholders, the merger would not be completed, and Mullen would not obtain access to public investors' funds, which Mullen badly needed to support its failing business.

10. The reverse merger was not consummated until November 5, 2021, due in substantial part to Mullen Technologies' inability to produce audited financial statements or the other information necessary to file the required SEC Form S-4 registration statement. In the interim, Mullen continued to publish numerous promotional press releases misleadingly hyping "orders" for its vehicles, its battery technology, its manufacturing facilities, its near-term production and sales timelines, and its commercial partnerships.

11. On November 5, 2021, with the closing of the reverse merger, Net Element Inc. changed its name to Mullen Automotive Inc., and its NASDAQ stock ticker symbol changed from NETE to MULN. Defendant Michery was now in control of a publicly traded company, Defendant Mullen. On November 5, 2021 Mullen's stock closed trading at $11.77 per share.

12. Because Mullen lacked any revenues and had almost no cash on hand, its only way to fund operations was through financing activities. This primarily took the form of Mullen issuing its common stock, usually at steep discounts to market

prices, to third parties. Such sales totaled at least tens of millions of dollars over the Class Period. Whereas Net Element had only 5.4 million common shares outstanding prior to the reverse merger in August 2021, by year-end Mullen had over 23 million shares outstanding, which exploded to over 332 million by May 2022. Because the amount of funding that Mullen would receive from stock sales was directly linked to Mullen's publicly traded stock price by formula, Defendants had strong incentives to artificially inflate Mullen's stock price. Defendant Michery also sold over $1 million of Mullen stock personally held by him during the Class Period, giving Defendants further motives to artificially inflate Mullen's stock price.

13. And so they did. After Mullen took over Net Element's public stock market listing on November 5, 2021, Mullen and Defendant Michery continued to publish numerous promotional press releases and other public statements misleadingly hyping "orders" for its vehicles, its battery technology, its manufacturing facilities, its near-term production and sales timelines, and its commercial partnerships.

14. However, Defendants' fraud was partially revealed on April 6, 2022. On that date, Hindenburg Research LLC ("Hindenburg Research"), a research firm that had earlier gained fame for correctly exposing widespread fraud at electric truck company Nikola Corporation, published a report titled "Mullen Automotive: Yet Another Fast Talking EV Hustle" (the "Hindenburg Report," reproduced as **Exhibit A** to this Complaint). Through a detailed, 32-page analysis based on research including interviews with Mullen "customers", ex-employees and business associates, Hindenburg meticulously exposed various aspects of Defendants' fraud. Hindenburg detailed Mullen's fake orders, over-hyped battery technology, unusable manufacturing facilities, unrealistic production timelines, and defunct commercial partnerships. Over the following two days, Mullen's stock price fell by 2.6%, and 10.2% respectively, to close at $2.38 per share on April 7, 2022.

15. Defendants have never issued a public response to the Hindenburg Report or publicly denied any of its claims, though they did engage in a cover-up to try to have a related party discredit the Hindenburg Report.

16. Shortly following the Hindenburg Report's publication, Defendant Mullen issued yet another promotional press release on April 18, 2022, which confirmed key aspects of the Hindenburg Report. The press release revealed that Mullen would now resort to attempting to manufacture its own batteries, meaning that Mullen's heavily touted "partnerships" with battery companies were apparently being discarded. The press release also revealed that Mullen's Monrovia, California facility would be used for battery production, meaning that Mullen was apparently abandoning its previously touted plans to manufacture luxury SUVs at that site. On the day of this news Mullen's stock fell by 14.8%, and over the next two days continued falling by another 8.2% and 16.6%.

17. By April 20, 2022, when the effects of Defendants' fraud had finally been removed from the market, Mullen's stock traded at only $1.41 per share. This represents a loss of 88.0% as compared to Mullen's $11.77 stock price on the November 5, 2021 date of the reverse merger's closing. Mullen's stock has never recovered these losses, closing at $0.37 cents per share as of the date prior to the filing of this Complaint, as Mullen's failing business continues to languish.

18. Throughout the Class Period, Defendants made material misrepresentations and failed to disclose material adverse facts about the Company's business, operations and prospects. Specifically, Defendants: (1) fabricated enormous, illusory "orders" for Mullen vehicles that were unlikely to ever be fulfilled; (2) grossly overstated the capabilities of Mullen's unremarkable battery and the results of its testing; (3) touted Mullen manufacturing facilities that were not actually useable for Mullen's stated purposes and which could not be converted to such use without exorbitant time and cost; (4) hyped aggressive timelines for the near term production and sales of Mullen vehicles while omitting material facts that

gravely undermined those timelines; and (5) promoted Mullen's purported relationships with commercial partners which had broken down, which had never existed, or which Mullen was incapable of fulfilling. As a result of the foregoing material misrepresentations and omissions, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and lacked a reasonable basis.

19. As a result of Defendants' scheme, misrepresentations and omissions, and the resulting precipitous decline in the market value of Mullen's securities, Plaintiff and other Class members have suffered significant losses and damages.

## II. JURISDICTION AND VENUE

20. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

21. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

22. Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa) as the alleged misstatements entered and subsequent damages took place within this judicial district. Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Defendants Mullen Automotive Inc. and Mullen Technologies Inc. maintain their principal executive offices in this District at 1405 Pioneer Street, Brea, California, 92821.

23. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III. PARTIES

24. Lead Plaintiff Mejgan Mirbaz, as set forth in her certification, filed herewith as **Exhibit C** and incorporated by reference herein, purchased Mullen shares during the Class Period, and suffered damages as a result of the federal securities law violations alleged herein.

25. Defendant Mullen Automotive Inc. is a small, startup company in the electric vehicle industry. It is incorporated in Delaware and maintains its principal executive offices at 1405 Pioneer Street, Brea, California, 92821. Mullen's shares are listed and trade on the NASDAQ exchange under the ticker symbol MULN. Prior to a reverse merger completed on or about November 5, 2021, the Company was named Net Element Inc., which then changed its name to Mullen Automotive Inc. upon the completion of the reverse merger. From the beginning of the Class Period up until November 5, 2021, the Company's shares were listed and traded on the NASDAQ under the symbol NETE. Prior to the reverse merger, the business that is now Mullen operated under Defendant Mullen Technologies Inc., and consisted of various related companies and subsidiaries under the control of Defendant Michery.

26. Defendant Mullen Technologies Inc. is incorporated in California and maintains its principal executive offices at 1405 Pioneer Street, Brea, California, 92821. Prior to the November 5, 2021 reverse merger, the business currently operated by Mullen Automotive Inc. was operated by Mullen Technologies Inc. Defendant Michery serves as CEO and director of Mullen Technologies Inc. until at least the time of the November 5, 2021 reverse merger.

27. Defendant David Michery is Mullen's CEO, founder, President, Chairman, largest shareholder, and public face. Until at least the time of the November 5, 2021 reverse merger, Defendant Michery served in similar roles for Defendant Mullen Technologies Inc., which at the time operated the business now operated by Defendant Mullen.

## IV. RELEVANT NON-PARTY FORMER EMPLOYEES

28. Former Employee 1 ("FE1") worked at Mullen during approximately January 2018 to 2020 as Vice President, Marketing & Creative. FE1 left Mullen for a time, then returned as a subcontractor in early 2021, leaving again in mid-2021.

29. Former Employee 2 ("FE2") worked for Mullen during approximately January 2021 to April 2021 as a consultant in the role of SEC Financial Reporting Accountant.

30. Former Employee 3 ("FE3") worked for Mullen during approximately October 2018 to September 2020 as General Marketing Manager.

## V. BACKGROUND REGARDING MULLEN

### A. Mullen Was A Small Startup With No Saleable Electric Vehicles, No Ability To Mass Produce Vehicles, And No Revenue

31. At all relevant times, Mullen has been a small startup with no saleable electric vehicles, no ability to mass produce vehicles, and no revenue. At all relevant times, Mullen's business plans and future prospects have focused on and primarily depended on eventual production and sales of electric vehicles.

32. Mullen's business began in 2012 when Defendant Michery acquired the assets of bankrupt electric vehicle company Coda Automotive.

33. As of December 31, 2020, Mullen employed 49 full-time employees and 14 consultants based primarily in Mullen's headquarters and engineering office, respectively, in Brea and Anaheim, California.

34. As of September 30, 2021, Mullen employed 44 full-time employees based primarily in Mullen's headquarters and engineering offices, in Brea and Anaheim, California, respectively.

//

//

//

//

35. The following table shows the revenue, expenses, and net loss reported by Mullen for the periods indicated:

| | **Six months ending March 31, 2022** | **Year ending September 30, 2021** | **Year ending September 30, 2020** | **Year ending September 30, 2019** |
|---|---|---|---|---|
| **Revenue** | $0 | $0 | $0 | $0 |
| **Operating expenses** | $44,511,277 | $22,402,968 | $12,094,218 | $12,199,660 |
| **Net loss** | $69,037,323 | $44,240,580 | $30,177,962 | $40,839,809 |

36. The following table shows the cash and cash equivalents, total assets, and total liabilities reported by Mullen as of the dates indicated:

| | **March 31, 2022** | **September 30, 2021** | **September 30, 2020** | **September 30, 2019** |
|---|---|---|---|---|
| **Cash and cash equivalents** | $65,150,095 | $42,174 | $33,368 | $2,221,824 |
| **Total assets** | $105,206,180 | $17,172,494 | $21,987,430 | $22,892,891 |
| **Total liabilities** | $55,649,512 | $78,884,141 | $64,491,451 | $56,768,599 |

37. The apparent improvement in Mullen's cash position and assets by March 31, 2022 was not driven by Mullen's business operations, but rather was due entirely to financing activities, primarily consisting of Mullen's sale of its securities:

| | **Six months ending March 31, 2022** | **Year ending September 30, 2021** | **Year ending September 30, 2020** | **Year ending September 30, 2019** |
|---|---|---|---|---|
| **Net cash provided by financing activities** | $100,849,172 | $17,692,704 | $9,160,012 | $5,716,672 |

38. At all relevant times, Mullen's financial statements have included a note stating that there is substantial doubt about the Company's ability to continue as a going concern.

39. FE3 stated that during his October 2018 to September 2020 time working at Mullen, "[w]e only had one vehicle from China. That was kept at headquarters and not available for sale."

40. Electric vehicle industry expert Tom Gage also noted Mullen's likely lack of functioning and saleable versions of its SUV as late as November 2021. Gage was the CEO of a company called EV Grid that performed a test of Mullen's battery in 2018 or 2019. The Los Angeles Times has referred to Gage as an "[e]lectric vehicle guru" and "[e]lectric car pioneer," in an article reporting that he holds a Stanford engineering degree and that he worked on electric vehicles for Chrysler in Detroit.

41. Mullen displayed a show room version of its planned SUV (at that time branded as the "FIVE") at the November 2021 Los Angeles International Auto Show. According to a recent interview with Gage:

> I saw the car last year at the LA auto show and you could tell it wasn't a running prototype, and they probably didn't have a running prototype. And they probably need to produce dozens, if not hundreds, of prototypes before you go into production. You have prototypes to do confirmatory crash testing, to test durability, to test each system of the car. And they didn't have a manufacturing facility. You tend to hear things over the grapevine – and there hadn't been any news.

According to Gage, "[f]rom the test to the auto show, it certainly didn't seem like they were going at a pace that was extraordinary and that would shape production in 2022."

42. Mullen imported one electric cargo van from China in November 2021, and another one in February 2022.

43. Mullen does not appear to have produced or otherwise possessed electric vehicles during the Class Period, apart from the very small number of vehicles that it imported from China and used for research or display purposes.

44. Based on information and belief, at no time during the Class Period was Mullen capable of mass-producing electric vehicles for sale.

**B. Mullen Was Constantly Short On Cash And Failed To Pay Employees, Suppliers, And Even Its Payroll Taxes**

45. For the vast majority of the Class Period, until selling vast amounts of its securities in 2022, Mullen was perpetually short on cash. Mullen routinely failed to pay its employees and suppliers, and even failed to remit payroll taxes to federal and state governments.

46. FE2 stated regarding the Company:

> They were defaulting on a lot of their loans. They weren't paying income tax on payroll. They just didn't do proper business. They withheld payroll tax but didn't pay it. Stuff like that. The debt that they were acquiring wasn't being paid off. . . . they were taking out loans to pay off other loans. And then the feds put a lien on all their assets due to the back taxes that were owed from payroll and that stuff.

47. FE1 similarly stated regarding Defendant Michery, "he didn't even pay me for the last month and a half" that FE1 worked at Mullen. FE1, who was Mullen's Vice President, Marketing & Creative, stated "I wasn't ever given a proper budget to do proper marketing."

48. FE1 stated regarding one of Mullen's vendors, "[t]he company that put together some event-related production lighting, I think they also didn't get some invoices paid. Lots of subcontractors and suppliers didn't get paid." Due to Mullen's frequent failure to pay, when working with vendors for the Company FE1 would "make sure to get a payment [from Mullen] in advance – because I didn't trust David [Michery]."

49. What money Mullen did have was often spent by Defendant Michery with little business reason or accountability.

50. FE3 stated that Defendant Michery, "just wanted to spend his own CEO money – whatever he got from wherever he got it." Regarding the 2019 New York International Auto Show, FE3 stated:

> He [Michery] spent a lot of money on the show that he didn't have to spend – like $250,000 on a blimp in downtown New York, where there are high-rise buildings and narrow streets. Nobody could see it. It would've been better to spend that on ads on TV or the Internet, and get into the parameters of who can afford a vehicle like that….He was just splurging money the second it came in.

51. FE3 similarly stated, "David [Michery] was blowing through investor money. As money came in, money went out." FE3 recalled how Defendant Michery's spending negatively impacted the budget that had supposedly been allocated for other projects:

> If I'm expecting to be able to spend $40,000 on something and I only had $28,000 or something, where'd it go. It was allotted to something out there. You've got 15% to 20% of your money leaving – and I'd say, 'We've already planned on this. We worked on it, it's ready to go to print and now we can't afford it. What do we do?' And David [Michery] would say, 'So what.'

FE3 stated that such budget shortfalls occurred "more often than not."

52. According to a former battery specialist who worked for Mullen at its Monrovia, California facility, as quoted by Hindenburg Research, he left the company when Defendant Michery failed for months to pay his salary:

> The owner wasn't paying us…he wasn't paying us our salary. We were like 3 months behind on paychecks and there was too many empty promises…So we had to file a claim with the state to get paid. So we filed a claim against him, most of us, the employees. There was other people.
>
> That's the way the owner is…if you don't say anything, he won't pay you, he could care less. So that's the kind of person he is…He's not

> ethical at all…besides being that of my opinion, that's my experience…

53. FE1 stated regarding Mullen's funds, "a lot of money was used for personal usage."

54. FE2 stated "The CEO had 26 cars parked in the company garage. It was just a very odd place to work. Why would you, as the owner of the company, park 26 cars – some of them Lamborghinis – parked all over?"

### C. Former Employees And Business Partners View Mullen And Defendant Michery As Dishonest About Mullen's Business

55. Multiple Mullen former employees and business partners have described Defendant Michery, and the Company more generally, as dishonest regarding Mullen's business.

56. FE1 stated that one of the reasons he left Mullen was "I couldn't work in a place where everything you say is untrue." FE1 stated regarding Defendant Michery and Mullen's relationship with Qiantu Motors, "you hear David say, 'We're going to do this.' At that point, I already knew that most of what he was saying was unlikely to be true." FE1 stated:

> If you follow the trail of press releases, that will be a great trail of statements that had no foundation. Every single press release was David [Michery] saying, 'I need to say this, put it out tomorrow.' And, almost every single time, it was not true. He would just overwrite anything.

FE1 also stated regarding Defendant Michery, "I didn't trust David." FE1 stated regarding his work at Mullen, "I did so much work towards things that made no sense. [Like] a plan of marketing for a car that you know is never going to be sold."

57. FE3 stated, regarding Mullen's acquisition of a car dealership in Oceanside, California, that Defendant Michery "basically stole… from the owner, knowing he couldn't afford to sue him."

58. According to the Hindenburg Report, Hindenburg Research interviewed a senior executive knowledgeable about Mullen's supposed battery partnership with Ukrainian company NextMetals Ltd. The Hindenburg Report quotes the executive as stating:

> It didn't exist at all [the joint venture]. Not a single piece of paper. And he [Defendant Michery] proudly goes and shows the Tweet—and about that time was when [the Nextmetals representatives] did get up and walk out. And [they] said, you know, "you're nothing but a hustler. You have no substance"…

The Hindenburg Report continued, "[d]escribing his impression of Michery during those business negotiations, the senior executive said: '[Michery] is . . . fast talking. Just a hustler…a sales type character, always stretching the truth. Or maybe there wasn't any [truth]'.".

59. As discussed below in Part VI.B, EV Grid CEO Tom Gage stated regarding certain of Mullen's claims about its battery in a press release, "I can see how an investor who may have believed these claims or not understood the misleading information – it certainly could be construed as misinformation."

## VI. DEFENDANTS MISREPRESENTED AND FAILED TO DISCLOSE MATERIAL FACTS REGARDING MULLEN'S BUSINESS

60. Throughout the Class Period, Defendants made material misrepresentations and failed to disclose material adverse facts about the Company's business, operations and prospects. Specifically, Defendants: (1) fabricated enormous, illusory "orders" for Mullen vehicles that were unlikely to ever be fulfilled; (2) grossly overstated the capabilities of Mullen's unremarkable battery and the results of its testing; (3) touted Mullen manufacturing facilities that were not actually useable for Mullen's stated purposes and which could not be converted to such use without exorbitant time and cost; (4) hyped aggressive timelines for the near term production and sales of Mullen vehicles while omitting material facts that gravely undermined those timelines; and (5) promoted Mullen's purported

relationships with commercial partners which had broken down, which had never existed, or which Mullen was incapable of fulfilling. As a result of these material misrepresentations and omissions, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and lacked a reasonable basis.

### A. Defendants Made Up Fake "Orders" From Purported Mullen "Customers"

61. Regarding Mullen's December 30, 2020 announcement of an order for 1,500 (and up to 10,000) electric SUVs (*see infra* Part VIII.E), in the Hindenburg Report published at the end of the Class Period, Hindenburg Research revealed that the purported customer, Unlimited Electrical Contractors Corp ("UEC"), "is an electrical contracting firm based in South Florida with roughly 30 employees listed on LinkedIn," and that:

> We called UEC and repeatedly attempted to speak with its CEO. We also called UEC's legal representative and asked them to clarify whether their client had in fact pre-ordered half a billion dollars-worth of EVs but they did not respond.
>
> Instead, we spoke with the company receptionist who said she had the insurance information for the company's vehicles and told us UEC has only around 11 vehicles at present, mostly pick-ups and none of which are electric.
>
> Following its initial announcement, we have seen no update provided by Mullen on the UEC mega-deal.

Hindenburg Research thus revealed that the purported customer never had any ability or need to purchase 1,500, let alone 10,000, Mullen SUVs, and therefore that this purported "order" was simply fake. To this day, over one and a half years later, there is no public indication that any vehicles have been paid for or delivered pursuant to this "order."

62. Regarding Mullen's August 3, 2021 announcement of an order for 1,200 electric cargo vans (*see infra* Part VIII.I), Hindenburg Research similarly revealed facts showing that the purported customer never had any ability or need to actually purchase the vehicles. Hindenburg Research revealed that the purported customer, Heights Dispensary Ltd, is a retail hemp dispensary in Texas with only one retail location in a small strip mall and a small online store. Hindenburg Research revealed that it "talked to employees at a guitar store in the same strip mall as [dispensary managing partner James] Gooch's dispensary. They told us they had seen Gooch 'in the last few days' but said the dispensary only open by appointment." Hindenburg Research revealed that the dispensary's online store "carries about 25 products, 5 of which are t-shirts," and that "according to Heights' website, its preferred method of delivery is not by its own fleet of vans but by mail, to avoid having to fill out a 'manifest'." Hindenburg highlighted text from the dispensary's website:

> Why through the mail?
> - Moving cannabis requires a document called a manifest that lets authorities know the commercial movement of cannabis. This document usually costs more than your order making direct delivery a challenge.
> - USPS does not need manifest documents.

As shown by the Hindenburg Report, the cargo van order, like the SUV order before it, was simply fake. To this day, over a year later, there is no public indication that any vehicles have been paid for or delivered pursuant to this "order."

63. As of the filing of this Complaint, Mullen has never reported revenue from the sale of an electric vehicle.

### B. Defendants Conducted Very Limited Testing Of Mullen's Battery, Which Produced Unremarkable Results

64. Regarding Mullen's February 28, 2022 announcement regarding battery test results (*see infra* Part X.A), Hindenburg Research revealed this to be

merely a rehash of years-old results previously announced by Mullen, and that Mullen had repeatedly made unfounded claims based on the test results, which the results did not support.

65. Although Mullen's February 28, 2022 press release was framed as "an update," supposedly presenting the results of new testing, Hindenburg Research revealed that Defendant Michery himself had recently admitted that the test referred to occurred in approximately 2020, and that the same test was also the subject of Mullen's August 10, 2020 battery test results press release (*see infra* Part VIII.B).

66. Hindenburg Research revealed that it had interviewed Tom Gage, the CEO of EV Grid, Inc. ("EV Grid"), the company that Mullen stated conducted the battery test. As reported by Hindenburg Research, Tom Gage described Hindenburg's battery as follows, "[i]t was big, which created question marks in my mind too. And it was misshapen and really kind of an ugly thing." Hindenburg asked Gage "if the press release statements were the types of statements they [EV Grid] would have signed off on," and quoted his response as follows, "[n]o we would never have said that. We never did say it and certainly wouldn't have said it based on the results of testing that battery…"

67. Hindenburg Research quoted Gage discussing the timing of the test performed by EV Grid:

> but the timing is a little off. EV Grid more or less ceased operations by June or July of 2020 and for the first half of the year it was basically shut down and I was moving out storing stuff in a warehouse because I had this other job at Indi EV. So that makes me think that whatever testing we did probably was in 2019 or even 2018. That's my timeline as I recall it.

(emphasis removed).

68. The investigation of Plaintiff's attorneys also included an interview with Tom Gage, in which he confirmed key aspects of the statements attributed to

him in the Hindenburg Report. According to Gage, EV Grid carried out "just one test" for Mullen, which he believed took place in "2018 or 2019." Gage continued:

> Basically, we did a charge and discharge test on the cell . . . We wrote up the test results. Mullen should have a copy. It was a two- or three-page report, and stated the conditions of the test results, which were the number of ampere hours we got out of the cell. The range was 300 or 320; I can't remember the exact number.

According to Gage, after submitting its findings, EV Grid had no further contact with Mullen until the Hindenburg report was published.

69. Gage stated that the battery tested appeared "handmade" and like a "prototype cell." Gage continued:

> I'm not really a battery expert in terms of production, but it takes a long time to develop the chemistry inside a battery and build a larger example of the size you might want in a car – and to develop the equipment to build a production-level cell and perfect the production process . . . The fact that I was testing prototypes didn't mean they hadn't done those things – but that's what I assumed. I assumed that if they had one they would've tested it many times over and wouldn't be dealing with EV Grid.

Gage similarly stated, "the test cell we tested was clearly handmade. Normally, a production battery cell's appearance is smooth and regular in shape and size. This was a bulgy pouch with inconsistent dimensions. To me, it looked like it was handmade and amateurish."

70. Gage commented on the following language from Mullen's August 10, 2020 press release regarding its battery (*see infra* Part VIII.B):

> The results provided support that the Company's licensed battery technology may be capable of enabling an electric vehicle to travel 640 miles at a cruising speed of 55 mph on a flat surface, and 550 miles at a cruising speed of 75 mph, which could allow for significantly longer driving distances on a single charge than commercially available lithium batteries offer today.

According to Gage, "[t]hat kind of claim is, I think, what gets Mullen into trouble. Because the two things don't equate. I tested one cell and found it was more or less as-advertised." Gage explained, however, that several additional variables would need to be taken into consideration in order to reach the conclusion set forth in Mullen's statement. Gage continued, "I can see how an investor who may have believed these claims or not understood the misleading information – it certainly could be construed as misinformation."

71. Gage commented on the language from Mullen's February 28, 2022 press release describing its battery as a "significant advancement over today's current lithium-ion batteries" (*see infra* Part X.A). Gage stated:

> Nothing we tested would demonstrate that. One of the major and important qualities of a battery is its energy density. I believe Mullen claimed this was a solid state battery. A lot of people are working on solid state batteries. If or when one is developed, it will lead to an increase in energy density. We didn't have a way to test if it was solid state, and we didn't measure size and weight. I don't know if the battery we tested exceeded the energy of a normal, current cell. I had no information on that.

72. Gage commented on the language from Mullen's February 28, 2022 press release stating that "Mullen is also conducting extensive research and development into other advanced battery technologies, including lithium-sulfur and lithium-iron-phosphate." Gage stated that, while he did not know about Mullen's research capability, "Lithium-sulfur has never made it into production, so far. Lithium-iron-phosphate is already widely in production. It kind of seems like they're throwing buzzwords out there, to maintain investor interest or something."

73. FE1 confirmed Mullen's lack of battery research capability and poor battery technology. Concerning Mullen's efforts to build a battery, FE1 stated:

> I heard that they were saying that, but when I was there, there was no indication that they were doing that. I think, at one point, a press release was removed – but it was publicized at his office – a terrible battery as a revolutionary thing, and it was like – to anybody who knows anything

> – it was laughable . . . A terrible battery with dents in it. I just remember it was laughable, the photo. Nobody had the guts to say a thing but it's laughable to people who know. But a lot of people don't know. Anybody who knows, yes, would laugh at it. Frank [McMahon, Mullen's Chief Technology Officer] and I did laugh together."

### C. Mullen's Manufacturing Facilities Were In Poor Condition And Not Useable For Defendants' Stated Purposes

74. Regarding Mullen's multiple Class Period announcements concerning its various manufacturing facilities (*see infra* Parts VIII.C, G, and H), the Hindenburg Report summarized as follows:

> In just two years, between April 2019 and March 2021, Mullen made frequently conflicting announcements of at least 4 separate locations for the site of its vehicle production facility.
>
> According to media reports, Mullen abandoned its first 3 planned facilities. At present, Mullen owns what it previously characterized as an R&D facility, contrary to its current claims of having a manufacturing facility with advanced production equipment.

75. First, as detailed in the Hindenburg Report, in 2019 (prior to the Class Period) Mullen announced a 1.3 million square foot manufacturing facility near Spokane, Washington, which it promptly abandoned.

76. Second, regarding Mullen's Monrovia, California site, Hindenburg Research revealed this to be a small, aging facility that lacked the necessary equipment for Mullen's stated purposes:

> In reality the Monrovia R&D center, according to a former battery specialist who worked for Mullen at that site, is an aging 22,000 sq. foot industrial unit. It was used to assemble Chinese battery packs for Coda cars – a bankrupt EV that Mullen sought to return from the dead as the Mullen 700e from 2014.
>
> The ex-employee told us:
>
> "It's pretty small…it's an old industrial building."

> "What I was brought on board to help them with is going over the batteries on the assets he purchased for the Coda car… but it was really difficult since he didn't really purchase the correct equipment, you know the power cycler – so [that] you could actually cycle the batteries and test them…so we were in limbo on that."

77. FE1 also confirmed that Defendants' announced plans for the Monrovia, California facility went nowhere. FE1 stated regarding the Monrovia facility, "I spent months on interior design – to house designers and things. We had architects and designers lined up and what did David [Michery] do? He killed the project. Of course, he probably knew he'd never do it."

78. Third, regarding Mullen's Memphis, Tennessee site, Hindenburg Research revealed that despite only announcing this facility in March 2021, "as of November 2021, Mullen had failed to pay an $817,274 licensing fee to secure the Memphis facility, abandoning the plans almost immediately."

79. FE2 stated that Mullen quickly learned the Memphis facility was in poor condition. FE2 stated that he overheard Mullen engineers discussing the facility, "[t]he engineers said the place was so rusty. They said it would take years to manufacture there – because it was so dilapidated." FE2 continued, "I think it was an old Nike facility, and they left because of wiring and structural problems." FE2 further stated, "I was privy to investigations there. The wires – the roof was leaking – it was going to take years to get it into shape."

80. FE2 recalled:

> I remember there was a big announcement on TV. They were promising the world on the evening news – the local channel – and the reality was the facility was so near to scrap that there was no way they were going to be able to accomplish their goals. It was embarrassing.

According to FE2, approximately one week after this TV segment aired, he heard Mullen engineers and IT personnel discussing the facility saying that "it's in bad

shape – that we're probably not going to be able to create a manufacturing facility any time soon."

81. FE2 similarly stated regarding the Memphis facility:

> Now, behind the scenes, when the engineers went over there, they came back and said, 'That place is a rat trap. Rats running around; leaks; it would never hold up to the standards of a manufacturing facility that we required. The facility would have to be severely re-fitted.'

82. Fourth, regarding Mullen's Tunica, Mississippi site, Hindenburg Research revealed that the plant it acquired was never designed to produce vehicles like the ones Mullen claimed it would manufacture, and that it in fact had never even produced a functioning, saleable vehicle:

> The facility previously belonged to a company called GreenTech Automotive, which intended to produce a micro two-seater electric vehicle, named MyCar, at Tunica. In fact, the car was so small that the first sales deal announced was as an on-campus pizza delivery vehicle – far different from the SUV Mullen is now proposing.
>
> According to the Mississippi State Auditor, Greentech's electric car plant closed "before it ever produced a car." An article quoted the state auditor as saying:
>
> "On the day when they cranked up those energy-efficient electric cars and blue smoke bellowed out, you knew that this was a sham from the very beginning."
>
> * * *
>
> Other media reports, citing federal documents, said Greentech may have produced a total of 25 vehicles at the Tunica plant, but not a single one was reportedly sold.

83. Hindenburg research further revealed that, contrary to Defendants' claims, the Tunica, Mississippi facility appeared to contain little if any advanced manufacturing equipment:

> However, a 2017 review by the Mississippi State Auditor mentioned assembly equipment and car parts offered as loan collateral by Greentech amounting to only $3.4 million. It is not clear if that was the total value of assembly equipment at the factory when Greentech went bankrupt.
>
> Mullen's website has a brief video that shows the interior of the factory. It looks to have storage space, tables and chairs for employees, and several lifting cranes. It does not appear from the video that there are any assembly lines, or robotic manufacturing machines.

The Hindenburg Report also revealed that the image of advanced manufacturing robots on Mullen's website was in fact a stock photo available from Adobe.

84. Hindenburg Research further revealed regarding the Tunica, Mississippi facility that "Mullen originally said the 124,700 sq/ft facility would serve as a pilot plant, but after abandoning several other plant projects, Mullen now claims it intends to expand the plant 10x, or an additional 1.2 million sq/ft, with no details on how this will even be physically possible."

### D. Mullen Was Years Away From Being Able To Sell Vehicles Due To Its Failure To Meet Regulatory, Testing, And Manufacturing Requirements

85. The Hindenburg Report also revealed that the timeline for production and sales of vehicles touted by Defendants lacked any reasonable basis and was not achievable.

86. Specifically, Hindenburg Research exposed the falsity of Defendant Michery's March 30, 2022 announcement of a purported order from "a very large company that is going to buy a lot of these vehicles," which company he characterized as "a major major Fortune 500 company," and for which Michery claimed Mullen was manufacturing the vehicles in the United States and would deliver vehicles to the customer "in the second quarter of this year" (*see infra* Part X.B). Hindenburg Research revealed facts showing that Defendants materially

misrepresented facts relating to the timeline for production and sales relating to this order, if the "order" ever existed at all.

87. Hindenburg Research revealed that despite Michery's claims that Mullen would manufacture these cargo vans itself, "Mullen's current van offerings seem to entirely consist of 2 electric vans imported from China, made by Chinese manufacturers," and that:

> Import records via ImportGenius reveal that Mullen imported 2 vans, one in November 2021 and one in February 2022.
>
> In November 2021, Mullen imported a single "Pure Electric Logistics Vehicle", manufactured by Tenglong out of China. Pictures of the Tenglong vehicle correspond precisely to Mullen's claimed Class 2 Commercial EV Fleet van.
>
> In March 2022, Mullen imported a single model C35 City Delivery Vehicle, manufactured by DFSK out of China. Pictures of the DFSK model correspond precisely to Mullen's claimed Class 1 Commercial Cargo Van.
>
> We strongly doubt that Mullen's claims to be designing and manufacturing its own EV vans are true.

88. Regarding the "order" from the "major major Fortune 500 company," Hindenburg Research further revealed that "[e]ven if Mullen does choose to surreptitiously import and/or assemble and rebrand Chinese vehicles, additional hurdles prevent its claimed near-term U.S. customer deliveries."

89. First, Hindenburg Research revealed that Mullen and its Chinese manufacturers lacked EPA certificates required to sell the vehicles, which certificates take on average 12 to 18 months to obtain. As revealed by the Hindenburg Report:

> According to the EPA website, neither Mullen, Tenglong nor DFSK have certificates required to sell vehicles in the U.S. We also checked with the EPA press office who wrote us they had received no certificate applications for any Mullen vehicles.

> The EPA makes it clear these certificates are compulsory:
>
> * * *
>
> We consulted an Independent Commercial Importer (ICI), one of 6 entities that have obtained official EPA credentials to legally import vehicles into the United States, about how long it could take Mullen to obtain certificates of conformity for Chinese passenger vehicles and light vans. A representative for the ICI told us:
>
> "Cost and time to be determined – after inspection average 12 to 18 months."

90. Second, Hindenburg Research revealed that Mullen had not disclosed whether the cargo vans had even begun the mandatory Federal Motor Vehicle Safety Standards ("FMVSS") testing process. Hindenburg Research stated that:

> According to experts we consulted, in order to qualify, vehicles must go through crash testing and inspections. Vehicles sold in Europe or China must often be reworked to suit the safety requirements of the U.S. market, such as adding airbags, changing belts, and modifying wheels and other components.
>
> * * *
>
> All vehicles sold in the U.S. must also comply with Federal Motor Vehicle Safety Standards (FMVSS) testing required by the NHTSA. Mullen has yet to disclose whether its vans have begun this process, let alone satisfied these criteria.

91. Third, Hindenburg Research revealed that significant hiring had not yet even begun at the Tunica, Mississippi facility that would supposedly manufacture the cargo vans. As revealed by the Hindenburg Report:

> Beyond its need for regulatory approvals, significant hiring for assembly plant workers will not even begin until after midyear 2022, according to Charles Finkley, the president of Tunica County Chamber of Commerce and Economic Development Foundation. He told us:

> "We were selected for this project and Mullen has been a great community partner. I would say (hiring will start) mid-year."
>
> Job board Indeed currently shows only 5 openings for Mullen in the Tunica area, which appear to be focused on basics like front-desk admin and managerial positions like "Director of Vehicle Integration".

92. As such, despite Michery's March 2020 claim that Mullen was manufacturing cargo vans in the United States in response to an order from a "major major Fortune 500 company" for delivery in the next three months, Hindenburg Research concluded "[g]iven that Mullen has no apparent EPA certificates, no apparent FMVSS testing and no apparent adequately staffed factory, we estimate that the company is years away from ever delivering a vehicle should it actually take genuine steps to do so."

93. To this day, there is no public indication that any vehicles have been paid for or delivered pursuant to this "order," and Defendants have not publicly disclosed any Fortune 500 customer.

**E. Commercial Partnerships Heavily Touted By Mullen Were Soon Defunct, Or Never Existed At All**

94. The Hindenburg Report also revealed that Defendants had materially misrepresented certain of their touted commercial partnerships, including those with Qiantu Motors, Linghang Boao Group Ltd ("Linghang Boao"), NextMetals Ltd. ("NexMetals"), and Nextech Batteries ("Nextech") (*see infra* Parts VIII.A, B, C, F).

95. First, regarding the Chinese company Qiantu Motors, the Hindenburg Report revealed that Mullen's plans to sell Qiantu sportscars in the United States had ended soon after they began, while Defendants continued hyping these plans to investors. Mullen entered a cooperation agreement with Qiantu in 2018 to sell the Qiantu K50 sports car in the U.S. Mullen planned to import the car from China, put its logo on the car, and rebrand it as the "DragonFly." In April 2019 Defendants

presented a show room version of the car at the New York International Auto Show and stated that sales would begin in 2020.

96. As revealed in the Hindenburg Report:

> Behind the scenes, the partnership quickly went south. Subsequent litigation records reveal that Mullen immediately defaulted on its obligations, missing its first payment to Qiantu to cover pre-launch costs.
>
> With an outstanding balance owed by Mullen to Qiantu of almost $23 million, Qiantu terminated the agreement in November 2019. . . It also expressed surprise in its earlier Notice of Termination to Mullen that "Mullen could so badly miss the mark immediately out of the gate."
>
> Rather than acknowledge the end of the deal, Mullen continued to market the partnership as if it were ongoing, Qiantu alleged in legal documents. It even continued soliciting reservations for the vehicle, calling it the "Mullen K50" on social media posts.

97. Documents filed in ongoing litigation between Qiantu and Mullen confirm the breakdown and termination of their relationship. For example, Qiantu's lawyers wrote a letter dated November 11, 2019 to Mullen and its lawyers (this letter is reproduced as **Exhibit B** to this Complaint.), stating that "Mullen defaulted in its performance of the Agreement for failing to make two separate installment payments for the pre-launch 'Costs and Expenses' described in Sections 4.2 and 4.4 of the Agreement," and further stating that "on October 4, 2019, Qiantu provided the Termination Notice pursuant to Section 6.4(a) regarding its intent to terminate the Agreement effective November 2, 2019." The letter further stated that "Mullen, in fact, has now requested the Agreement to be rescinded."

98. FE1 also indicated that Mullen's relationship with Qiantu quickly failed. From the start of Mullen's relationship with Qiantu, FE1 "assumed that the company didn't have money to execute the contract." FE1 stated, "[y]ou can hear from conversations in the office that the money isn't there." According to FE1, "I

was not surprised when, later, the contract didn't go through." FE1 stated that he "heard around the office" that "deadlines were not met" with respect to the Qiantu contract, because "[t]here's no money in the company to make that happen." FE1 stated that Mullen Chief Operating Officer Jerry Alban "was walking around with a face of, 'How are we going to make this happen, with no money?'."

99. FE1 further stated that a "very short time" passed between Qiantu sending a promotional car to the U.S. and Mullen reneging on the contract. FE1 continued:

> It showed there was no intention to carry it out. No internal initiatives toward that project, except planning it. We'd be close to deadlines and there would be no indication that it'd be paid. And it would soon end – and that's what happened. And then I heard they were still promoting the car online, and I was like, 'Why am I not surprised?'

100. The Hindenburg Report further revealed additional reasons why the purported Mullen/Qiantu "partnership" could not live up to Mullen's hype:

> A closer look at the timing and subsequent collapse of the Qiantu-Mullen deal reveals a Chinese company that lacked finances to build the vehicle negotiating with an American company that didn't have the cash to buy it.
>
> Chinese-based media viewed the K-50 as a low volume, expensive product that sold less than 60 units in its first year of production. Other media outlets described the K-50 as having quality control issues and calculated Qiantu only ever sold 200 K-50s before production ceased in 2020, just months after the Mullen deal headed to litigation.
>
> By Spring 2020, Qiantu appeared to be teetering on bankruptcy and was laying off workers.

101. Second, the Hindenburg Report revealed that Mullen materially misrepresented its plans to develop batteries with Chinese company Linghang Boao, and that this relationship also ended soon after it began. According to Hindenburg Research:

> In November 2019, Mullen entered into a three-year Strategic Cooperation Agreement ("SCA") with Linghang Boao Group Ltd to co-develop a solid-state battery management system with a 480-720-mile driving range. . .
>
> The Company's total financial commitment under the agreement was $2,196,000. On December 3, 2019, the Company paid the first installment of $390,000. It would be the only payment made in the agreement. . .
>
> *  *  *
>
> Just months later, around September 2020, Mullen terminated the relationship, claiming that COVID was a force majeure event.

102. The Hindenburg Report further revealed facts showing that Linghang Boao likely lacked the technology or operations required to live up to Defendants' hype regarding their partnership:

> Linghang Boao was registered in China in November 2018, just one year before its agreement with Mullen, according to Chinese corporate records. It shares a cell phone number with at least 99 other companies and listed its address inside a high-rise building (not a factory).
>
> Its U.S. website, registered just 9 months prior to its agreement with Mullen, no longer works. Nor does its Chinese website. An online slide deck about the company, uploaded 2 years ago, claims it "has been continuously breaking through in the field of power and energy storage batteries".

103. Hindenburg Research further revealed that, according to its interview with "a senior executive with detailed knowledge of the supposed JV" between Mullen and NextMetals, Mullen's licensing agreement with Linghang Boao did not allow Mullen to use Linghang Boao's technology to manufacture batteries in the United States, and the licensing agreement lacked key details regarding the batteries' technical specifications:

> Mullen initially declined to show any agreement with its battery technology licensing partner, Linghang Boao, citing confidentiality. . . When NextMetals was grudgingly shown a few sheets of the agreement, the executive said:
>
> "Clearly they had no rights to do it in the U.S. So when it finally goes in production the Chinese would make it and sell it to them. But there was no defining spec sheet and the whole thing was beyond ludicrous… What a can of worms."

104. Third, regarding the Ukrainian company NextMetals Ltd., the Hindenburg Report revealed that Mullen's supposed partnership with the company never even existed, despite multiple tweets from Defendant Michery hyping the relationship and further discussion of it in a Mullen press release. According to the knowledgeable senior executive interviewed by Hindenburg Research, the joint venture was a "nonstarter" and "didn't exist." Quoting the executive, Hindenburg further revealed that:

> "It didn't exist at all [the joint venture]. Not a single piece of paper. And he [Defendant Michery] proudly goes and shows the Tweet—and about that time was when [the Nextmetals representatives] did get up and walk out. And [they] said, you know, 'you're nothing but a hustler. You have no substance'…"
>
> Commenting on Mullen's vehicle at the time, the senior executive told us he thought it was "a joke":
>
> "And then of course they had a mockup car which had regular batteries in it and was the copy of some car. It was a Chinese sports thing he brought over and dropped some batteries in. A kind of plastic thing. I thought you're kidding me, this is a joke."

105. The Hindenburg Report further quoted the executive, "… he (Michery) couldn't produce the specs and finally pulled out this battery which was bent. And as you know if you use a solid-state battery, you should not bend it at all because usually you'll damage this…either a ceramic or polymer electrolyte in the middle." The Hindenburg Report included photos that Defendant Michery had previously

posted to his Twitter account of himself holding the battery, with text and arrows added by Hindenburg Research to point out the deformations:






106. The Hindenburg Report continued, "[d]escribing his impression of Michery during those business negotiations, the senior executive said: '[Michery] is . . . fast talking. Just a hustler…a sales type character, always stretching the truth. Or maybe there wasn't any [truth]'."

107. Fourth, regarding Nextech Batteries, the Hindenburg Report revealed that it is "a small Nevada-based R&D firm with about 17 employees on LinkedIn." Contrary to Defendants' promises of near-term large-scale production, Hindenburg Research revealed that Nextech is still in preliminary testing stages for its batteries:

> We spoke with Nextech's CEO, Bill Burger, and found him to be straightforward about the stage of his technology. He explained that while they are optimistic, they are presently in the prototype and R&D phase, and aiming to secure financing in order to build out a manufacturing facility, continue testing, and move toward higher volume.
>
> We suspect that Mullen is once again attempting to borrow credibility from others in order to make grandiose claims to investors, pitching aggressive short-term timelines that bear little resemblance to reality.

108. On April 18, 2022 Mullen itself confirmed that it would attempt to produce its own batteries, apparently abandoning its heavily touted battery partnerships with Linghang Boao, NextMetals, and Nextech Batteries.

## VII. DEFENDANTS HAD STRONG MOTIVES TO MISLEAD INVESTORS ABOUT MULLEN'S TRUE PROSPECTS

### A. Defendants Needed To Persuade Net Element Shareholders To Approve The Reverse Merger

109. From the outset of Mullen Technology's planned reverse merger with Net Element to create Mullen as a public company, Defendants had strong motives to inflate Mullen's prospects, because completion of the merger required approval of Net Element's shareholders.

110. Prior to the reverse merger between Mullen and Net Element (completed in November 2021), Mullen was a failing, private company with no

means to raise funds from public investors and with almost no cash. Mullen's financial statements disclosed that its ability to continue as a going concern was in substantial doubt. Net Element's stock was publicly traded on the NASDAQ exchange. Pursuant to the planned merger, Mullen would take over Net Element's corporate form and NASDAQ stock market listing, with a change of corporate name and stock ticker symbol (from NETE to MULN). This would enable Mullen to raise substantial funds, ultimately derived from public investors, in order to support its failing business.

111. Without the approval of Net Element shareholders, the merger would not be completed, and Mullen would not obtain access to public investors' funds.

112. The June 12, 2020 Binding Letter of Intent regarding the reverse merger between Net Element and Mullen Technologies included the following under the heading "Conditions to Occur Prior to or at Closing," among others:

> d. NETE shall have received its shareholders' approval, and Nasdaq approval, for the Transaction and the Form S-4 shall have been declared effective. Nasdaq shall have approved the continued listing of the company's common stock post-Closing.
>
> e. The Transaction and election of MULLEN's nominated directors shall have been approved by NETE's board of directors and NETE's shareholders.

113. The registration statement on Form S-4 filed with the SEC by Net Element on May 14, 2021, which was prepared in substantial part by Mullen, prominently stated in bold, all capital letters on top of the first page of the document, "MERGER PROPOSED—PLEASE VOTE, YOUR VOTE IS VERY IMPORTANT."

114. That S-4 further stated, "The Merger Agreement Proposal (and consequently, the Merger Agreement and the Merger) will be approved and adopted only if we obtain the affirmative vote of the majority of the outstanding shares of our capital stock entitled to vote thereon. An abstention will have the same effect as

a vote 'AGAINST' the proposal. Failure to instruct your bank, broker, or other nominee will result in a broker non-vote which will also have the effect of a vote 'AGAINST' the proposal."

115. A special meeting of Net Element shareholders was held on August 26, 2021 to vote on the merger and related proposals. That meeting was adjourned to August 31, 2021, apparently to allow for additional solicitation and voting of proxies due to insufficient votes to approve certain proposals. On August 31, 2021 Net Element announced that on that date, its shareholders had voted to approve the merger and related proposals.

116. On November 5, 2021 Net Element and Mullen closed the merger. On the same day, Mullen issued a press release titled, "Mullen Automotive Commences Trading on NASDAQ," announcing that it was "pleased to announce that the Company begins trading today on the Nasdaq Stock Market LLC ('Nasdaq') under the new stock ticker symbol 'MULN'."

### B. Defendants Sold Tens Of Millions Of Dollars Of Artificially Inflated Mullen Stock

117. Mullen, Defendant Michery, and other Company insiders collectively sold tens of millions of dollars of Mullen stock during the Class Period in order to benefit from the artificially inflated price of the Company's stock.

118. Whereas Net Element had only 5.4 million common shares outstanding prior to the reverse merger in August 2021, by year-end Mullen had over 23 million shares outstanding, which exploded to over 332 million by May 2022.

119. In the six months ended March 31, 2022, Mullen raised over $100 million in net cash from financing activities, including $40 million from issuance of common stock. This was a dramatic increase as compared to Mullen's prior financing activities and common stock issuance.

120. On September 1, 2021, shortly after Net Element shareholders approved the merger with Mullen, and in anticipation of Mullen obtaining a public

stock market listing, Mullen and Esousa Holdings LLC ("Esousa") entered into a Securities Purchase Agreement (the "$30 Million SPA") whereby Esousa committed to purchase up to an aggregate of up to $30,000,000, or $2.5 million per month, in Mullen Common Stock over a twelve-month period.

121. Key features of the $30 Million SPA included that: (i) Esousa would buy stock from Mullen at a discount to prevailing market prices; (ii) the amounts of cash to be received by Mullen were linked by formula to Mullen's publicly traded stock price, meaning that a higher publicly traded stock price provided a direct financial benefit to Mullen; and (iii) Esousa had no obligation to provide any funds to Mullen unless Mullen filed a registration statement with the SEC to allow Esousa to resell Mullen stock to the public. Mullen SEC filings summarize the relevant $30 Million SPA provisions as follows:

> The number of shares of Common Stock issued by the Company at each draw down date is calculated by multiplying 125% by the amount of each draw down (up to $2,500,000) and then dividing by the closing sale price of the Common Stock on the principal securities exchange or trading market on which the Common Stock is listed or trading on the trading day immediately prior to the draw down. The number of Common Shares issued is then subject to adjustment and will be issued at a purchase price per share equal to 95% of the dollar volume-weighted average price per share of Common Stock during the ten trading days following the draw down date.
>
> As a condition to the obligation of the investor to fund the [$30 Million SPA], the Company must file an SEC registration statement covering the sale of the Common Stock issued under the [$30 Million SPA] and such registration statement must be declared effective.

122. Similar to Mullen's $30 Million SPA with Esousa, during the Class Period Mullen entered into various additional financing arrangements with other persons in anticipation of obtaining a public stock market listing in the merger. Like the $30 Million SPA, these other financing arrangements would provide Mullen with millions or tens of millions of dollars of cash, in exchange for Mullen stock or

securities convertible into Mullen stock, which would ultimately be sold by the financing parties to public investors. Such other arrangements include a $20 Million SPA dated May 7, 2021.

123. Shortly after becoming a public company in the November 2021 reverse merger, on January 11, 2022 Mullen filed with the SEC a registration statement on Form S-3, in order to register for public sale over 61 million shares of Mullen stock beneficially owned by Mullen's insiders and financiers including millions of shares to be sold by Defendant Michery and millions more to be sold by Esousa pursuant to the $30 Million SPA.

124. On January 18, 2022 Defendant Michery sold 30,000 shares of Mullen common stock at an average price of $3.885 per share, for a total of $116,550. He had not previously reported selling any of Mullen's publicly traded stock.

125. On February 2, 2022 Mullen amended its Form S-3 registration statement to increase the total number of registered shares to over 228 million. The registration statement became effective on February 3, 2022.

126. On February 4, 2022 Mullen sold Esousa 1,144,688 common shares for $1,125,000 pursuant to the $30 Million SPA. This represented a price of approximately $0.98 per share, as compared to the previous day's publicly traded closing price of $2.73 per share.

127. On February 23, 2022 a wholly owned subsidiary of Mullen entered into a Loan Commitment to NuBridge Commercial Lending to borrow $5.0 million. Defendant Michery signed the Loan Commitment, which stated that Michery "will be required to guarantee the prompt payment and performance when due of all obligations due under the loan." Defendant Michery was thus personally liable if Mullen should fail to make required payments under the loan.

128. On March 16, 2022 Defendant Michery sold 200,000 shares of Mullen common stock for a total of $330,730, at an average price of approximately $1.65 per share.

129. On March 18, 2022 Mullen director Kent Puckett sold 31,067 shares of Mullen common stock for a total of $93,201, at an average price of $3.00 per share, which was all of the Mullen common stock owned by him. Of these shares, 12,456 were indirectly owned by Puckett through PCS Mastermind LLC, of which Puckett is the managing member. The remaining 18,611 shares were owned directly by Puckett. Neither Puckett nor PCS Mastermind LLC had previously reported selling any of Mullen's publicly traded stock.

130. On March 28, 2022 Defendant Michery sold 300,000 shares of Mullen common stock for a total of $744,116, at an average price of approximately $2.48 per share.

131. Over January 18, 2022 to March 28, 2022, Defendant Michery's sales of Mullen common stock totaled $1,191,396.

132. On March 28, 2022 Mullen filed with the SEC another registration statement on Form S-3, in order to register for public sale another 253 million shares of Mullen stock beneficially owned by Mullen's insiders and financiers including millions of additional shares to be sold by Esousa pursuant to the $30 Million SPA. The registration statement became effective on April 15, 2022.

133. On March 31, 2022 Mullen director Jonathan New sold 10,000 shares of Mullen stock at an average price of $2.9902 per share, totaling $29,902. He had not previously reported selling any of Mullen's publicly traded stock. Following this sale New owned 8,611 shares of Mullen common stock, meaning that he had sold 53.7% of his Mullen shares on March 31.

134. Mullen disclosed that as of March 31, 2022 it had received $29.6 million from Esousa under the $30 Million SPA, in exchange for 54,811,504 common shares. This represented an average price of approximately $0.54 per share, which was dramatically lower than the average public trading range of Mullen's stock over the February-March period of the sales.

## VIII. MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

135. Defendants made numerous, similar material misrepresentations and omissions over the Class Period. This section details Defendants' key misstatements, and representative examples of other repeated misstatements.

### A. June 15-16, 2020 Announcement Of Planned Reverse Merger Between Net Element And Mullen Technologies

136. The Class Period begins on June 15, 2020. On that day, Net Element issued a press release titled "Net Element Enters into a Letter of Intent to Merge with Electric Vehicle Company Mullen Technologies." The information in the press release concerning Mullen was supplied to Net Element by Defendants, with the intent and understanding that Net Element would publish this information to investors.

137. The June 15 press release described Mullen as follows, "[f]ounded in 2014, Mullen expects to launch the Dragonfly K50, a luxury sports car, in the first half of 2021 through ICI (Independent Commercial Importers)." Immediately below this paragraph was the following picture:



The press release continued, "Mullen is launching this car in conjunction with a cooperation agreement with Qiantu Motor, a wholly-owned subsidiary of CH-Auto, a leading automotive design and manufacturing company in China. Due to the

COVID-19 pandemic, Mullen pushed the targeted date for ICI release of the Dragonfly K50 for 2nd quarter of 2021."

138. The June 15 press release quoted Defendant Michery as stating that the merger "comes on the preparation of our launch of the Dragonfly K50, which will be available in Q2 of 2021 . . . and the development of a new EV model, the MX-05 Sport Utility Vehicle, that we expect the start of production next year."

139. The June 15 press release further quoted Defendant Michery stating, "becoming public at this time should allow us to accelerate the development of our unique battery technology which is non-flammable, puncture proof, capable of maintaining full capabilities after 500,000 cycles, and is synthetic, requiring no mining of natural resources."

140. The June 15 press release stated that, "[a]ccording to Mullen, Mullen expects to be entering the market with a Sport Utility Vehicle (SUV) using an established and proven product, manufacturing and advanced technologies, and to be produced in the United States." The press release continued, "According to Mullen, the first SUV Mullen expects to introduce will be the MX-05, a mid-size luxury SUV that will be featured as a battery electric vehicle. . . The MX-05 is expected to fit the Mid-Size SUV segment. Mullen projects for pre-launch to have several hundred units produced in 2021 and kickoff into full production in 2022." This text was accompanied by the following image:



141. Shortly following Net Element's June 15, 2020 press release, on June 16, 2020, Mullen Technologies issued a press release titled, "NETE: Net Element Announces LOI for Reverse Merger With Mullen Technologies, Maker of EVs." The press release featured Mullen's logo at the top, and listed a location of Brea, California (the location of Mullen's headquarters) in its date line. The press release stated, "For Information, Please Contact: Mullen Technologies, Inc.," and went on to provide Mullen's contact information. Mullen maintains the press release on its website through the present.

142. The June 16 press release stated that "Mullen Technologies plans to sell Qiantu Motors' electric vehicles. Qiantu is a Chinese manufacturer that is a subsidiary of CH Auto based in Beijing. It already sells vehicles in China. Mullen has an agreement to sell those vehicles in the US and plans to assemble them here. It needs capital to pay for an assembly plant. Mullen is expected to deliver its first vehicle, the Dragonfly K50, in Q2 2021." This text was followed by a picture captioned "Figure 1. Dragonfly K50 at the 2019 New York Auto Show":




The press release continued, "Mullen Technologies . . . currently sources cars from its Chinese OEM partner Qiantu Motor."

143. Regarding Mullen's battery technology and partnerships, the press release stated:

> Mullen Technologies is rumored to be highly valued based both on its business prospects and it intellectual property. It has valuable lithium battery patents to create batteries rivaling Tesla's technology. It has a joint venture with Ukrainian company NextMetals Ltd. to create a solid-state battery under a new division called "Mullen Next."

144. The above statements identified in ¶¶136-143 were materially false and/or misleading, and/or failed to disclose material adverse facts because (i) the timelines disclosed for production and sales of Mullen's sports car and SUV lacked a reasonable basis given the significant regulatory, testing, and manufacturing requirements that Mullen had not met; (ii) Mullen had already defaulted on its agreement with Qiantu, and Qiantu had already terminated that agreement; (iii) Mullen lacked advanced or valuable battery technology, and had performed only very limited testing on its battery which did not support its claims; and (iv) Mullen's "joint venture" with NextMetals Ltd. did not exist.

**B. August 10, 2020 Announcement Regarding Battery Test Results**

145. On August 10, 2020, Mullen Technologies issued a press release titled, "Mullen Technologies Announces Further Test Results of Its Licensed Solid-State Polymer Battery Technology."

146. The August 10 press release stated that Mullen was announcing "results from the independent testing of its licensed solid-state polymer battery technology undertaken by EV Grid, Inc. ('EV Grid'), an independent lab based in San Dimas, California." The press release stated, "The results provided support that the Company's licensed battery technology may be capable of enabling an electric vehicle to travel 640 miles at a cruising speed of 55 mph on a flat surface, and 550 miles at a cruising speed of 75 mph, which could allow for significantly longer driving distances on a single charge than commercially available lithium batteries offer today." This was accompanied by the following image:

//

//

//

//




147. The August 10 press release stated “Previous testing results from tests conducted by BOAO indicated that the Cell suffered no degradation when operating from -40 degrees Celsius to 60 degrees Celsius. In addition, under extreme driving conditions the battery pack suffered less than 2% degradation over 10,000 charge/discharge cycles. Charging from empty to full takes approximately 35 minutes utilizing a fast charger.”

148. The August 10 press release quoted Defendant Michery as stating, “We believe our licensed solid-state battery technology should provide us with an advantage over many other companies in the EV space as it could have the ability to provide vehicle owners with significantly increased range from a single charge.”

149. The above statements identified in ¶¶145-148 were materially false and/or misleading, and/or failed to disclose material adverse facts because the results of EV Grid's very limited testing did not support Defendants' statements.

**C. September 24, 2020 Announcement Regarding Monrovia, California Manufacturing Facility**

150. On September 24, 2020, Mullen Technologies issued a press release titled "Mullen Technologies to Begin Construction of Electric Vehicle Pilot Facility."

151. The September 24 press release stated "Mullen Technologies' high voltage battery R&D center in Monrovia, California, begins its transformation into a state-of-the-art pilot facility for its line of fully electric SUVs on the first of October. The construction is slated for completion by April 2021 with the first MX-05 SUVs, each assembled in America by American workers, expected to be delivered to customers by the second quarter of 2022."

152. The September 24 press release further stated, "Pre-orders continue as well for the Company's Dragonfly K50, a limited production super sports car being imported under Independent Commercial Importers ('ICIs')."

153. The September 24 press release stated "The pilot facility will be used to assemble up to 1,000 MX-05 fully electric vehicles per year and subsequently for all other upcoming models such as the MX-07 and MX-03. The operation consists of general assembly, battery assembly, R&D facility and warehouse."

154. The September 24, press release quoted Defendant Michery as stating:

> We are excited to begin the build-out of our pilot facility and pre-sales of our MX-05 SUV in October. We plan on completing the build-out by April 2021 and to begin assembly of certification prototypes by July 2021. These vehicles will be used for homologation which is expected to take 16 months and be completed by May of 2022, at which time we expect to begin delivering the first vehicles to the public.

155. The above statements identified in ¶¶150-154 were materially false and/or misleading, and/or failed to disclose material adverse facts because (i) Mullen lacked the ability to convert the Monrovia, California site into a state of the art SUV manufacturing facility by April 2021; (ii) the timelines disclosed for production of Mullen's SUV lacked a reasonable basis given the significant regulatory, testing, and manufacturing requirements that Mullen had not met; and (iii) Qiantu had already terminated its agreement with Mullen, so Mullen could not produce the K50 sports car.

**D. October 1, 2020 Announcement Regarding Production And Sale Schedule For Mullen SUVs**

156. On October 1, 2020, Mullen Technologies issued a press release titled, "Mullen Technologies is Now Accepting Pre-Orders for Its MX-05 Pure Electric All-Wheel Drive SUV."

157. The October 1 press release stated "Mullen announced earlier this month that development of its pre-production facility in Monrovia, California, will begin today, October 1. This facility will be fully operational in mid-2021 and is scheduled to begin the pre-production process of the MX-05 in the third quarter 2021."

158. The October 1 press release further stated, "First deliveries to the public should be in the second quarter 2022."

159. The October 1 press release stated "The five passenger MX-05 pure electric all-wheel drive SUV, featuring a range of 325 miles with a 0 to 60 mph time of 3.2 seconds, is designed to outperform vehicles in its class. In order to reserve the MX-05, simply make the $100 deposit and review the terms and conditions at https://mullenusa.com/mullen-mx-05/."

160. The above statements identified in ¶¶156-159 were materially false and/or misleading, and/or failed to disclose material adverse facts because (i) Mullen lacked the ability to convert the Monrovia, California site into a SUV

manufacturing facility that would be fully operational by mid-2021; (ii) the timelines disclosed for production of Mullen's SUV lacked a reasonable basis given the significant regulatory, testing, and manufacturing requirements that Mullen had not met; and (iii) Mullen had not conducted testing sufficient to verify its statements regarding the SUV's purported technical capabilities.

### E. December 30, 2020 Announcement Regarding Purchase Order For 1,500 Mullen SUVs

161. On December 30, 2020, Mullen Technologies issued a press release titled, "Mullen Technologies Receives Letter of Intent for Purchase Order of 1,500 MX-05 Electric Vehicles."

162. The December 30 press release stated, "the Company has executed a non-binding Letter of Intent with Unlimited Electrical Contractors Corp (UEC) to enter definitive agreements for the purchase of up to 10,000 MX-05 electric vehicles."

163. The December 30 press release further stated:

> UEC's mission is to be the first electrical contractor with an all-electric service fleet and intends on executing a definitive agreement with the Company for the purchase of 1,500 MX-05 electric vehicles for its Florida operations. To follow by up to an additional 8,500 by 2025 for its U.S. West Coast expansion. The initial purchase order is estimated at $75 million. The vehicles are based on a modified variant of the MX-05, an electric crossover SUV based on a skateboard EV platform and a unibody frame that comes in a single or dual electric motor configuration.

164. The December 30 press release quoted Defendant Michery as stating "We're very excited to work with UEC and are very fortunate that they see the value in Mullen and the MX-05 for their business. UEC's order is the first of many commercial fleet relationships we are currently working on."

165. The above statements identified in ¶¶161-164 were materially false and/or misleading, and/or failed to disclose material adverse facts because UEC was

a small company with approximately 11 vehicles, which never had the ability or need to purchase 1,500, let alone 10,000, Mullen SUVs.

### F. March 8, 2021 Announcement Regarding Battery Partnership With Nextech Batteries

166. On March 8, 2021, Mullen Technologies issued a press release titled, "Mullen Technologies and Nextech Batteries Will Deliver the Most Advanced Lithium Sulphur Battery Technology Available Today."

167. The March 8 press release stated "Mullen plans to produce more than 100,000 vehicles over 5 years using NexTech lithium sulfur (Li-S) pouch format batteries, which are 60% lighter than today's EV's, improving vehicle efficiency and reducing overall energy consumption."

168. The press release quoted Defendant Michery as stating:

> With NexTech's advanced lithium sulfur battery technology, cost savings compared to conventional batteries and readily available materials, Mullen has competitive advantage over all EV manufacturers. Not to mention a 2.5X higher specific energy compared to today's lithium-ion batteries, they are capable of operating without losses in extremely high and low temperatures with minimal conditioning which improves the overall efficiency . . .
>
> Mullen will launch our first-generation vehicle in late 2023 with NexTech's current cells and will work in parallel to phase in their next generation solid state battery technology into our pack designs. This will keep Mullen as a leader in this space for generations of vehicles.

169. The above statements identified in ¶¶166-168 were materially false and/or misleading, and/or failed to disclose material adverse facts because (i) Nextech remained in preliminary testing stages for its batteries, and so Defendants' statements regarding the batteries' technical specifications and production timeline lacked a reasonable basis; and (ii) the timelines disclosed for production of Mullen's vehicles lacked a reasonable basis given the early stage of NexTech's technology

and the significant regulatory, testing, and manufacturing requirements that Mullen had not met.

**G. March 11, 2021 Announcement Regarding Tunica, Mississippi Manufacturing Facility**

170. On March 11, 2021, Mullen Technologies issued a press release titled, "Mullen Technologies Announces Purchase of Advanced Engineering and Manufacturing Center in Tunica, MS."

171. The March 11 press release stated that Mullen had entered an agreement to purchase what it referred to as "a EV manufacturing facility in Tunica, Mississippi." The press release continued, "This five-year-old, turn-key facility affords Mullen the opportunity to innovate its manufacturing processes, while having the availability to assemble vehicles now and optimize product design with simultaneous engineering efforts."

172. The March 11 press release further stated that the facility "will employ approximately 50+ people in the first year, with the objective of expanding to 200+ employees in three years."

173. The March 11 press release quoted Defendant Michery as stating "Our goal is to sustain 100% of our manufacturing processes in the US and by US workers. With the establishment of AMEC in Tunica, we are among the very few EV companies that have a manufacturing presence in the US." Defendants called the Tunica, Mississippi facility the "Advanced Manufacturing Engineering Center," or AMEC.

174. The March 11 press release further quoted Defendant Michery as stating "Tunica will allow us to perfect the engineering and manufacturing processes involved in building our EVs, while affording us the ability to assemble vehicles now. This facility is ideal for Mullen's upcoming initiatives and will be pivotal in allowing us to get to the production of our vehicles in less than typical time."

175. The above statements identified in ¶¶170-174 were materially false and/or misleading, and/or failed to disclose material adverse facts because (i) the Tunica, Mississippi facility was not "advanced," "turn-key," or immediately operational, but rather needed substantial work and additional equipment before electric vehicle manufacturing could begin; (ii) Mullen lacked the ability to retain over 50 new hires to staff the facility in its first year; and (iii) Mullen had no realistic path to conducting 100% of its manufacturing in the United States, and its plans always substantially depended on importing and re-branding vehicles primarily manufactured in China.

### H. March 18, 2021 Announcement Regarding Memphis, Tennessee Manufacturing Facility

176. On March 18, 2021, Mullen Technologies issued a press release titled, "Mullen Set to Rock 'n' Roll in Memphis." The press release stated "Memphis, Tennessee, to Become US Manufacturing Hub for Mullen's EVs."

177. The March 18 press release announced Mullen's "intent to execute a long-term lease on an 820,000-square-foot facility in Memphis, Tennessee," stating that "Mullen plans to create up to 800 jobs and deliver 100,000 vehicles over a five-year period, commencing in Q4 of 2023."

178. The March 18 press release continued:

> The 2P6 SUV crossover (formerly MX-05) will be the first in Mullen's line of fully electric vehicles that will be manufactured at this facility. Mullen is currently working on midstage design efforts for the 2P6 in Southern California. Once completed, Mullen will begin building prototype vehicles in its newly acquired facility in Tunica, Mississippi, for initial engineering development and certification. Simultaneously, Mullen will spend the next 33 months creating the necessary infrastructure and installing the required machinery and equipment for the Memphis facility to support large-scale EV production.

179. The March 18 press release quoted Defendant Michery as stating, "Our pilot facility in Monrovia, California, has now been moved to Tunica, Mississippi.

Tunica is more cost-effective and efficient, with close proximity to Memphis. Ultimately, this will produce significant savings in time and money."

180. The March 18 press release further stated:

> On March 11, 2021, Mullen announced the purchase of a facility located 50 miles away from Memphis, Tennessee, in Tunica, Mississippi, which will provide advanced engineering and manufacturing capabilities. Both facilities will support Mullen's manufacturing requirements for the next 10-plus years.

181. The above statements identified in ¶¶176-180 were materially false and/or misleading, and/or failed to disclose material adverse facts because (i) Defendants either had not determined whether the Memphis, Tennessee facility was in adequate condition to serve their stated purposes and their stated timeline, or already knew that it was not; (ii) the timelines disclosed for production of Mullen's vehicles lacked a reasonable basis given the significant regulatory, testing, and manufacturing requirements that Mullen had not met; (iii) Mullen had no reasonable basis for statements regarding how "advanced," "cost-effective," or "efficient" the Tunica, Mississippi facility was because Mullen was nowhere close to commencing production of electric vehicles at that facility, and that facility needed substantial work and additional equipment before electric vehicle manufacturing could begin.

**I. August 3, 2021 Announcement Regarding Purchase Order For 1,200 Mullen Cargo Vans**

182. On August 3, 2021, Mullen Technologies issued a press release titled, "Heights Dispensary Enters Into $60 Million Agreement to Purchase 1,200 Mullen ONE Electric Delivery Vans."

183. The August 3 press release stated that "the Company has entered into a Letter of Agreement with Height Dispensary, LTD., to purchase 1,200 Mullen One electric vans and has selected Mullen as its exclusive provider for electric vehicles. The total vehicle purchase order is valued at over $60 million."

184. The August 3 press release further stated, "The initial Mullen ONE vehicle order will consist of 200 EV vans for Heights Dispensary's Houston and Dallas operations, to be delivered on or before the end of third quarter 2023. Additionally, Heights will purchase 1,000 Mullen ONEs by second quarter 2025. The Mullen ONE EV Cargo Van vehicles are a modified variant of the Mullen FIVE, an electric crossover SUV."

185. The August 3 press release quoted Defendant Michery as stating "The Heights order is the second, among many other companies we are currently working on, to select Mullen as their EV provider. The FIVE skateboard platform allows us to configure and offer the vehicle for many different types of commercial trade uses."

186. The above statements identified in ¶¶182-185 were materially false and/or misleading, and/or failed to disclose material adverse facts because (i) Heights Dispensary primarily used USPS to deliver its products, and never had the ability or need to purchase 200, let alone 1,200, cargo vans from Mullen; and (ii) Mullen was not capable of manufacturing electric cargo vans as a variant of its planned SUV platform.

## IX. THE TRUTH BEGINS TO EMERGE

187. On September 21, 2021, Mullen Technologies issued a press release titled "Mullen and CRRC Group's Subsidiary, Tenglong Automotive, Sign Definitive Agreement for Class 1 and Class 2 EV Cargo Vans for Assembly and Sales in US and Mexico Market With Deliveries Commencing March 2022." Defendants' statements in the press release were materially false and misleading, but also partially revealed the truth to investors, causing a substantial decline in Net Element's publicly traded stock price.

188. The announcement revealed that, despite Mullen's bold claims only two months earlier that it would soon manufacture large numbers of electric cargo vans for Heights Dispensary based on Mullen's SUV platform, Mullen in fact

planned to simply import electric cargo vans from China and rebrand them. According to the September 21 press release:

> [Mullen] has entered into a definitive agreement with Tenglong Automotive, a subsidiary of CRRC Group, for manufacturing, distribution and retail sales of Class 1 and Class 2 EV Cargo Vans in the U.S. and Mexico. The agreement provides Mullen with an effective solution for the fast-developing EV cargo van market and its existing EV fleet van orders. Mullen will homologate and assemble the vans at its Advanced Manufacturing and Engineering Facility (AMEC), located in Tunica, Mississippi. Vehicles will be assembled in the United States and branded: "Assembled in the United States."

189. The September 21 press release quoted Defendant Michery as stating:

> EV Cargo Vans are a natural segment for us and is a perfect fit for our Tunica AMEC facility. This is also a win-win for us and our investors. We can begin to fulfill existing fleet orders in the first quarter of 2022, which will generate revenue and begin our manufacturing process in Tunica, Mississippi.

190. Following Defendants' admission that Mullen now planned to simply import Chinese electric cargo vans instead of manufacturing them, Net Element's share price fell $0.66 as compared to the prior day closing price, or 7.4%, to close at $8.25 per share on September 21, 2022, on heavy trading volume.

191. However, Defendants lacked a reasonable basis even for their dramatically diminished purported plans for electric cargo vans. As of the filing of this Complaint, there is no indication that Mullen has imported any substantial number of electric cargo vans, or that it has fulfilled any customer orders for electric cargo vans. As later revealed by Hindenburg Research, Mullen imported one Tenglong Automotive van from China in November 2021, and a second van in February 2022.

192. The above statements identified in ¶¶187-189 were materially false and/or misleading, and/or failed to disclose material adverse facts because (i) Mullen had no genuine "existing EV fleet van orders"; and (ii) the timelines

disclosed for sales of Mullen-branded, Chinese-import vehicles lacked a reasonable basis given the significant regulatory, testing, and manufacturing requirements that Mullen had not met.

## X. DEFENDANTS CONTINUED TO MAKE MATERIALLY FALSE AND MISLEADING STATEMENTS

### A. February 28, 2022 Announcement Regarding Battery Testing

193. On February 28, 2022, Mullen Automotive issued a press release titled, "EV Manufacturer Mullen Announces Progress on Solid-State Polymer Battery Pack Development." The press release stated that Mullen was announcing "an update on Mullen's next-generation solid-state polymer battery technology."

194. The February 28 press release stated, "Data collected from solid-state cell testing shows impressive results, including a range of 600-plus miles on a full charge and over 300 miles of range delivered in 18 minutes with DC fast charging."

195. The February 28 press release quoted Defendant Michery as stating:

> We've conducted successful testing and will begin pack level development next . . . The test data collected shows an impressive outcome and future for solid-state batteries. To sum up, we tested our 300 Ah (ampere hour) cell which yielded 343 Ah at 4.3 volts, and the results surpassed all expectations. We can say with almost certainty that this technology, once implemented on the Mullen FIVE, will deliver over 600 miles of range on a full charge.

196. The above statements identified in ¶¶193-195 were materially false and/or misleading, and/or failed to disclose material adverse facts because (i) while presented as new information, the test results reported were in fact approximately two or more years old and previously disclosed; and (ii) the results of Defendants' very limited testing did not support their statements in the press release.

### B. March 30, 2022 Announcement Regarding Order From A "Major Fortune 500 Company"

197. On March 30, 2022, Defendant Michery gave an interview to the online program Benzinga Listmaker Series, which was streamed live on that date. The

interview is available for replay on YouTube at the following URL: https://www.youtube.com/watch?v=6GhU2X8pGXs.

198. The March 30 interview includes the following exchange, beginning at 2:00:55 of the video:

> Q. I am seeing a lot of questions just about the vans, do you have an update on the vans?
>
> A. Sure, again we released a public information not too long ago that we're going to be delivering our class one vehicle in the second quarter of this year. We're excited about that. We can't disclose to who – that hasn't been publicly made available yet. But we plan on doing that shortly and we plan on announcing that it is a very large company that is going to buy a lot of these vehicles . . . We're doing it here in America. We're doing it in Tunica Mississippi. And we're going to show the world that the dependency on outside entities no longer exists. We can do it ourselves here in America.
>
> Q. Is that order confirmed? That's not like a pre-order, right?
>
> A. No, no, we're actually building for them. So, we're, we're excited. We're going to deliver the pilot vehicles to them in the second quarter, as we stated, and we're excited about it. This is a major major Fortune 500 company, I'll put it that way.
>
> Q. If you had to ballpark it because Q2 starts on Friday, if you had to ballpark it would you say like earlier Q2 or later Q2?
>
> A. Oh I don't … It's gonna be in Q2.
>
> Q. OK, fair enough.
>
> A. We're going to turn it into a press event I promise. . . Everyone will know and they will see and will be part of it.

199. The above statements identified in ¶¶197-198 were materially false and/or misleading, and/or failed to disclose material adverse facts because (i) the timelines disclosed for production of Mullen's vehicles lacked a reasonable basis given the significant regulatory, testing, and manufacturing requirements that

Mullen had not met; (ii) Mullen planned to import electric cargo vans primarily manufactured in China and re-brand them, rather than manufacturing them in the United States; and (iii) based on information and belief, Mullen did not have a committed order from a "major major Fortune 500 company" for "a lot" of cargo vans.

## XI. THE TRUTH FULLY EMERGES, CAUSING MULLEN'S STOCK PRICE TO PLUMMET

200. On April 6, 2022 with the publication of the Hindenburg Report, and again on April 18, 2022 with Mullen's publication of a press release confirming certain aspects of the Hindenburg Report, information entered the market correcting Defendants' misrepresentations and omissions. As a result, Mullen's stock price suffered steep losses.

### A. April 6, 2022 Hindenburg Report

201. On April 6, 2022, Hindenburg Research published online a report titled "Mullen Automotive: Yet Another Fast Talking EV Hustle." The 32-page report detailed Defendants' fraud, and was based on Hindenburg's comprehensive research, including its consultation with industry experts, and its interviews with Mullen "customers", ex-employees and business associates. The Hindenburg Report is reproduced in **Exhibit A** to this Complaint.

202. As described above in Part VI, The Hindenburg Report revealed detailed facts showing that (i) the large customer orders Defendants had touted to investors were fake; (ii) Defendants made unsubstantiated claims about Mullen's battery testing; (iii) Defendants materially misrepresented the state of Mullen's manufacturing facilities; (iv) Defendants' sales and production timelines lacked any basis in reality; and (v) many of Mullen's touted commercial partnerships were defunct or fake.

203. Following publication of the Hindenburg Report, independent market observers noted a large drop in Mullen's publicly traded stock price, and attributed it

to the Hindenburg Report. For example, the investing website Seeking Alpha published an article on the morning of April 6, 2022 titled "Mullen Automotive slides after Hindenburg Research calls it an EV hustle." The Seeking Alpha article summarized certain of the Hindenburg Report's findings, and stated "[s]hares of Mullen Automotive (MULN) slid 8.27% in early trading." Similarly, on the same day Bloomberg published an article titled "Short Seller Hindenburg Calls Electric Car Startup Mullen a 'Hustle'." The Bloomberg article also summarized certain of the Hindenburg Report's findings, and stated "Mullen's shares fell 3.3% at 10:56 a.m. Wednesday in New York after an earlier decline of 9.9%."

204. For unknown reasons, during the trading day on April 6, Mullen's publicly traded stock price recovered a portion of the losses caused by the Hindenburg Report. On April 6, 2022, the Company's share price fell $0.07 as compared to the prior day closing price, or 2.6%, to close at $2.65 per share, on heavy trading volume. In the next trading session, the Company's share price continued falling on heavy trading volume by an additional $0.27, or 10.2%. In total, by the end of April 7, 2022 the Company's share price had fallen by $0.34, or 12.5% as compared to its closing price on April 5, 2022.

205. In an April 8, 2022 podcast conducted and promoted by a major Mullen shareholder, which appears to have been part of a cover-up secretly coordinated by Defendants in an effort to discredit the Hindenburg Report (*see infra* Part XV.A), one of the podcast's hosts stated that the Hindenburg Report, "caused the Company's stock to decline as much as 25%."

206. Defendants have never issued a public response to the Hindenburg Report or publicly denied any of its claims.

**B. April 18, 2022 Mullen Announcement Confirming Key Aspects Of The Hindenburg Report**

207. Despite its usual frenetic pace of publishing press releases to hype its prospects, Mullen was largely silent in public from April 6, 2022 to April 18, 2022.

During this time, it did not issue any press releases, or otherwise publicly respond to the Hindenburg Report.

208. Then, on April 18, 2022 Mullen published a press release titled "Mullen Automotive to Begin Construction for EV Battery Pack Production at High Voltage R&D Facility in Monrovia, California." The press release confirmed certain key aspects of the Hindenburg Report.

209. The press release stated that Mullen "plans to begin EV battery pack production out of its high voltage battery R&D facility located in Monrovia, California," and further elaborated that:

> Mullen is retrofitting its Monrovia facility to accommodate the production of EV battery packs destined for Mullen's EV vehicle lineup, including the ONE EV Cargo Van, FIVE EV Crossover, and DragonFLY EV Sportscar programs. Mullen is undertaking this effort to reduce dependency on third-party suppliers.

The press release contained no mention of Mullen's previously touted plans to produce SUVs at the Monrovia, California facility, or of Mullen's previously touted battery "partnerships" with Linghang Boao Group Ltd, NextMetals Ltd., and Nextech Batteries.

210. Through this announcement, Mullen essentially confirmed the Hindenburg Report's claims that its battery partnerships were either fake or defunct. Also, through this announcement, Mullen revealed that its previous statements that it would assemble SUVs at the Monrovia, California facility were false.

211. On this news, the Company's share price fell $0.32 as compared to the prior day closing price, or 14.8%, to close at $1.84 per share on Monday April 18, 2022, on heavy trading volume. In the next trading session, the Company's share price continued falling on heavy trading volume by an additional $0.15, or 8.2%. And on the following day the Company's share price continued falling on heavy trading volume by an additional $0.28, or 16.6%. In total, by the end of Wednesday

April 20, 2022 the Company's share price had fallen by $0.75, or 34.7% as compared to its closing price on Friday April 14, 2022.

## XII. CLASS ACTION ALLEGATIONS

212. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities who purchased or otherwise acquired the publicly traded securities of Mullen Automotive Inc., or its predecessor Net Element Inc., between June 15, 2020 and April 18, 2022, both dates inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

213. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Net Element's shares, and then after the November 5, 2021 reverse merger, Mullen's shares, actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class. Millions of Net Element and Mullen shares were traded publicly during the Class Period on the NASDAQ. Record owners and other members of the Class may be identified from records maintained by Mullen or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

214. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

215. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

216. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Mullen; and

(c) to what extent the members of the Class have sustained damages and the proper measure of damages.

217. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XIII. UNDISCLOSED ADVERSE FACTS

218. The market for Net Element's shares, and then after the November 5, 2021 reverse merger, the market for Mullen's shares, was open, well-developed and efficient at all relevant times. As a result of Defendants' materially false and/or misleading statements, and/or failures to disclose, Net Element's and Mullen's shares traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired Net Element's and/or Mullen's shares relying upon the integrity of the market price of those shares and market information relating to Mullen and have been damaged thereby.

219. During the Class Period, Defendants materially misled the investing public thereby inflating the price of Net Element's and Mullen's shares, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading. The statements and omissions were materially false and/or misleading for the reasons set forth herein and because they failed to disclose material adverse information and/or misrepresented the truth about Mullen's business, operations, and prospects as alleged herein.

220. At all relevant times, the material misrepresentations and omissions and undisclosed scheme particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Mullen's prospects and engaged in a scheme to do the same. These material misstatements and/or omissions and/or conduct had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its prospects, thus causing Net Element's and Mullen's shares to be overvalued and artificially inflated at all relevant times. Defendants' materially false and/or misleading statements and/or conduct during the Class Period resulted in Plaintiff and other members of the Class purchasing Net Element and/or Mullen shares at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## XIV. LOSS CAUSATION

221. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

222. During the Class Period, Plaintiff and the Class purchased Net Element's and/or Mullen's shares at artificially inflated prices. The price of the Company's shares significantly declined when the misrepresentations made to the

market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## XV. ADDITIONAL SCIENTER ALLEGATIONS

223. The scienter of Defendant Michery is imputable to Defendants Mullen Automotive Inc. and Mullen Technologies Inc. because he was a director and officer of those companies acting within the scope of his authority.

224. The misrepresentations and omissions of Mullen as alleged herein are of such a nature that they would have been approved by corporate officials sufficiently knowledgeable about Mullen to know that those statements and omissions were misleading.

225. As alleged herein, Defendants acted with scienter because Defendants: knew that the public documents and statements issued or disseminated in the name of Mullen were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

226. As set forth elsewhere herein in detail, Defendant Michery, by virtue of his receipt of information reflecting the true facts regarding Mullen, his control over, and/or receipt and/or modification of Mullen's allegedly materially misleading misstatements and/or his associations with the Company which made him privy to confidential proprietary information concerning Mullen, participated in the fraudulent scheme alleged herein.

227. The positions of Defendant Michery, including as CEO and director of Mullen, give rise to a strong inference of his scienter with respect to the false and/or misleading statements alleged herein. Specifically, Defendant Michery was knowledgeable regarding Mullen's customer orders, battery technology, manufacturing facilities, production and sales timelines, and commercial partnerships.

228. As alleged herein, Defendant Michery repeatedly held himself out as knowledgeable regarding the operational details of Mullen and the subject matter of Defendants' misrepresentations and omissions, which gives rise to a strong inference of his scienter.

229. During the Class Period Mullen was an extremely small organization. This allowed Defendant Michery to have in-depth knowledge of all aspects of Mullen's operations.

230. During the Class Period, the planned production and sale of electric vehicles was Mullen's core operation, which gives rise to a strong inference of Defendant Michery's scienter.

**A. After The Hindenburg Report, Mullen Attempted To Carry Out A Cover-Up Through A Related Party**

231. Shortly after publication of the Hindenburg Report on April 6, 2022, Mullen engaged in a cover up, attempting to discredit Hindenburg Research while concealing Mullen's role in that effort.

232. According to EV Grid CEO Tom Gage, after the publication of the Hindenburg Report, "Mullen called and asked me to do a podcast. The podcast appeared to be associated with Mullen, somehow, but I'm not sure what the relationship was."

233. On April 8, 2022, Todd Ault interviewed Tom Gage on Ault's podcast titled "Risk On." Ault made the podcast available on his website (https://toddault.com/shows/risk-on/) and on YouTube. Ault heavily promoted the podcast episode on his Twitter account, @ToddAultIII.

234. In a Schedule 13G/A filed with the SEC on February 14, 2022, Ault's company BitNile Holdings, Inc. reported that it was considered for SEC reporting purposes to beneficially own over 2.4 million shares of Mullen's common stock, which it reported was 9.33% of the total amount outstanding as of January 7, 2022.

That SEC filing was signed by Milton C. Ault, III (also known as Todd Ault), in his role as Executive Chairman of BitNile Holdings, Inc.

235. In the podcast Ault admits substantial connections with Defendants, while attempting to downplay the significance of those connections. Ault admitted that he has met Defendant Michery, toured a Mullen facility, interviewed Michery on Ault's podcast, and spoken with Michery on the phone.

236. During the podcast, Ault repeatedly asserted without substantiation that the Hindenburg Report "misquoted" Gage, and repeatedly asked leading questions to attempt to get Gage to say that Hindenburg Research "misquoted" him. Gage did not take the bait. At no point in the interview did Gage say that Hindenburg Research "misquoted" him, or otherwise indicate that the Hindenburg Report misrepresented his statements.

237. Nonetheless, even after Gage failed to adopt the premise of Ault's leading questions, during the interview Ault repeatedly persisted in stating that Gage was misquoted or that his comments were misrepresented. Ault continued to do so when promoting the interview. For example, on April 8, 2022 Ault tweeted:

> We are hosting a special podcast in today. Our guest will be one of the parties Hindenburg claims it spoke with in supporting its claim that $MULN was a fraud. Seems Hindenburg may have misrepresented what he said. You won't want to miss this exclusive important interview.

Similarly, when posting a version of the podcast episode to YouTube, Ault provided the following description, claiming to "[d]ebunk" the Hindenburg Report: "🔥 RISK ON 📈 - Episode 209 - (Short Version) Todd Ault and Jason Bartholomew interview Special Guest Tom Gage - Debunking Hindenburg Report On Mullen!!🔥".

238. However, in a recent investigatory interview for Plaintiff's counsel, Gage stated regarding the Hindenburg Report "I was not misquoted." Gage continued:

> I was not misquoted, but I said the test cell we tested was clearly handmade. Normally, a production battery cell's appearance is smooth and regular in shape and size. This was a bulgy pouch with inconsistent dimensions. To me, it looked like it was handmade and amateurish. To the Hindenburg people, I think they made a big deal of this as not ready for production. But the appearance doesn't take away from the testing we did on amp hour capacity. Appearance was a factor in my assessment of its readiness for production, not ampere-hour capacity.

239. Based on information and belief, Ault's repeated (and unsuccessful) efforts to get Gage to state that he was misquoted by Hindenburg Research, and Ault's framing of the interview as "[d]ebunking" the Hindenburg Report or showing that Hindenburg Research somehow "misrepresented" Gage's comments, was part of a clandestine, coordinated effort directed by Mullen to discredit the Hindenburg Report.

### B. A Key Mullen Officer Quit Or Was Fired For Challenging Defendant Michery Regarding Defendants' Public Statements

240. Frank McMahon was Mullen's Chief Technology Office and Chief Engineer from September 2017 to May or June of 2021, at which point he appears to have left the company to start his own business, 1.5 Degrees -C, LLC.

241. According to FE1, "Frank [McMahon] was constantly saying to David [Michery], you're not doing things right or you need to think twice before you say things. And David went and got mad at it. It was an authoritarian kind of office."

242. According to FE1, McMahon left Mullen following an argument with Defendant Michery. FE1 heard from McMahon about a meeting involving Defendant Michery, McMahon, Vice President of Engineering Marian Petrelecan, Vice President of Electrical Systems Ranier Schulz, and President of Automotive Electric Vehicles Calin Popa. FE1 also heard about this meeting from either Petrelecan or Schulz. According to FE1, an exchange occurred at this meeting where McMahon asked a question along the lines of "Are we even ready, as a company, to

demonstrate what we have said we're doing?" Defendant Michery responded, in essence, "I don't agree; you're out."

## XVI. APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

243. The market for Net Element's shares, and then after the November 5, 2021 reverse merger, Mullen's shares, was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, Net Element's and Mullen's shares traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired Net Element and/or Mullen shares relying upon the integrity of the market price of those shares and market information relating to Mullen, and have been damaged thereby.

244. During the Class Period, the artificial inflation of Net Element's and Mullen's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Mullen's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of Mullen and its business, operations, and prospects, thus causing the price of Net Element's and Mullen's shares to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing Net Element's and/or Mullen's shares at such artificially inflated prices, and each of them has been damaged as a result.

245. At all relevant times, the market for Net Element's shares, and then after the November 5, 2021 reverse merger, Mullen's shares, was an efficient market for the following reasons, among others:

(a) Net Element and Mullen shares met the requirements for listing, and were listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b) As a regulated issuer, Net Element and Mullen filed periodic public reports with the SEC and/or NASDAQ; and

(c) Mullen regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases and through other wide-ranging public disclosures.

246. As a result of the foregoing, the market for Net Element's and Mullen's shares promptly digested current information regarding Mullen from all publicly available sources and reflected such information in Net Element's and Mullen's share price. Under these circumstances, all purchasers of Net Element's and Mullen's shares during the Class Period suffered similar injury through their purchase of those shares at artificially inflated prices and a presumption of reliance applies.

247. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of

the Class Period material omissions set forth above, that requirement is satisfied here.

## XVII. NO SAFE HARBOR

248. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Mullen who knew that the statement was false when made.

## XVIII. FIRST CLAIM

**Violation of Section 10(b) of The Exchange Act and**
**Rule 10b-5(a) -- (c) Promulgated Thereunder**
**<u>Against All Defendants</u>**

249. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

250. During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Net

Element's and Mullen's shares at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

251. Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of Net Element's and Mullen's shares in an effort to maintain artificially high market prices for those shares in violation of Section 10(b) of the Exchange Act and Rule 10b-5(a)—(c). All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

252. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Mullen's financial well-being and prospects, as specified herein.

253. Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Mullen's value, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Mullen and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Net Element's and Mullen's shares during the Class Period.

254. Defendant Michery's primary liability and controlling person liability arises from the following facts: (i) he was a high-level executive and directors at

Mullen Automotive and Mullen Technologies during the Class Period, and was the controlling member of Mullen's management team; (ii) by virtue of his responsibilities and activities as a senior officer and director of Mullen, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) he was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) he was aware of the Company's dissemination of information to the investing public which he knew and/or recklessly disregarded was materially false and misleading.

255. Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Mullen's prospects from the investing public and supporting the artificially inflated price of Net Element's and Mullen's shares. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

256. As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Net Element's and Mullen's shares was artificially inflated during the Class Period. In ignorance of the fact that market prices of the shares were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in

which the shares trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Net Element's and/or Mullen's shares during the Class Period at artificially high prices and were damaged thereby.

257. At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were unaware of their falsity and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding Mullen, which was not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Net Element and/or Mullen shares, or, if they had acquired such shares during the Class Period, they would not have done so at the artificially inflated prices which they paid.

258. By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

259. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of Net Element's and Mullen's shares during the Class Period.

## XIX. SECOND CLAIM

### Violation of Section 20(a) of The Exchange Act
### Against Defendant Michery

260. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

261. Defendant Michery acted as a controlling person of Mullen within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of his high-level positions and his ownership and contractual rights, participation in, and/or awareness of Mullen's operations and intimate knowledge of the false

statements disseminated to the investing public, Defendant Michery had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. Defendant Michery was provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

262. In particular, Defendant Michery had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular decisions giving rise to the securities violations as alleged herein, and exercised the same.

263. As set forth above, Mullen Automotive, Mullen Technologies, and Defendant Michery each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of his positions as a controlling person of Mullen Automotive and Mullen Technologies, Defendant Michery is liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of Net Element's and/or Mullen's shares during the Class Period.

## XX. PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a) Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b) Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages

sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) Such other and further relief as the Court may deem just and proper.

## XXI. JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED: September 23, 2022 **GLANCY PRONGAY & MURRAY LLP**

By: */s/ Garth Spencer*
Garth Spencer
gspencer@glancylaw.com
Robert V. Prongay
rprongay@glancylaw.com
Charles H. Linehan
clinehan@glancylaw.com
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

*Lead Counsel for Lead Plaintiff Mejgan Mirbaz*

**PROOF OF SERVICE BY ELECTRONIC POSTING**

I, the undersigned say:

I am not a party to the above case, and am over eighteen years old. On September 23, 2022, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Central District of California, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on September 23, 2022, at Los Angeles, California.

*s/ Garth A. Spencer*
Garth A. Spencer