Robert V. Prongay (SBN 270796)
  *rprongay@glancylaw.com*
Charles Linehan (SBN 307439)
  *clinehan@glancylaw.com*
Garth Spencer (SBN 335424)
  *gspencer@glancylaw.com*
GLANCY PRONGAY & MURRAY LLP
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

*Lead Counsel for Lead Plaintiff Mejgan Mirbaz*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE MULLEN AUTOMOTIVE, INC. SECURITIES LITIGATION | Case No. 2:22-cv-03026-DMG-AGR<br><br>Honorable Dolly M. Gee<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**<br><br>Hearing Date:  April 14, 2023<br>Time:          9:30 a.m.<br>Courtroom:     8C |

## TABLE OF CONTENTS

I.    INTRODUCTION ...................................................................................1

II.   STATEMENT OF FACTS ......................................................................2

    A.   Background Regarding Mullen And Defendant Michery ...................2

    B.   Defendants Made Misleading Statements Leading Up To Mullen's Reverse Merger With Net Element ........................................2

    C.   After The Reverse Merger, Defendants Continued To Mislead Investors While Selling Large Amounts Of Mullen Stock..................3

    D.   Hindenburg Research Revealed Defendants' Fraud, Causing Large Declines In Mullen's Stock Price................................................4

III.  LEGAL STANDARDS DISFAVOR DEFENDANTS' MOTION ...............4

IV.   DEFENDANTS OMITTED MATERIAL FACTS FROM THEIR MISLEADING STATEMENTS.................................................................5

    A.   Fake Customer "Orders".......................................................................6

        1.   Unlimited Electrical Contractors Order For 10,000 SUVs ........6

        2.   Heights Dispensary Order for 1,200 Cargo Vans......................7

        3.   "Major Major Fortune 500 Company" Order For "A Lot Of These Vehicles".........................................................................8

    B.   Misleading Battery Testing Claims ......................................................9

        1.   Original 2020 Battery Test Results Press Release ....................9

        2.   Rehashed 2022 Battery Test Results Press Release .................10

    C.   Defunct, Or Nonexistent, "Commercial Partnerships".......................11

        1.   Broken Down Relationship With Sports Car Maker Qiantu....11

        2.   Fake Relationship With Battery Maker NextMetals ...............12

V.    DEFENDANTS' ARGUMENTS FAIL TO DISPROVE FALSITY ..........13

    A.   Defendants' Statements Were Not "Accurate"...................................13

B.    Defendants' Statements Were Not Mere "Corporate Optimism".......14

C.    Neither The PSLRA Safe Harbor Nor The Bespeaks Caution Doctrine Protect Defendants' Misleading Statements........................14

VI.    THE AMENDED COMPLAINT PLEADS A STRONG INFERENCE OF DEFENDANTS' SCIENTER..................................................................16

A.    Defendant Michery Knew The Omitted Facts....................................16

B.    At A Minimum, Michery Acted With Deliberate Recklessness.........18

C.    Defendant Michery's Scienter Is Imputed To Mullen........................19

D.    Defendants Had Strong Financial Motives To Hide The Truth From Investors.................................................................................19

E.    The Amended Complaint Pleads Further Evidence Adding To The Strong Inference Of Defendants' Scienter..........................................21

F.    Plaintiff's Scienter Allegations Are Highly Reliable .........................22

VII.    DEFENDANTS' FRAUD CAUSED INVESTORS' LOSSES....................25

VIII.    DEFENDANT MICHERY CONTROLS MULLEN ..................................27

IX.    PLAINTIFF HAS STANDING TO BRING CLAIMS AGAINST ALL DEFENDANTS .........................................................................................28

A.    Investors Have Standing Against Defendants Whose Misstatements Directly Relate To The Purchased Securities.............28

B.    Old Mullen's Misleading Statements Have A Direct Relationship To The Price Of Net Element Stock ....................................................30

C.    The Out-Of-Circuit *Frutarom* Opinion Is Not Persuasive .................32

D.    Defendants' Proposed Rule Would Authorize Blatant Fraud.............34

X.    PLAINTIFF REQUESTS LEAVE TO AMEND, IF NECESSARY ...........35

XI.    CONCLUSION........................................................................................35

## TABLE OF AUTHORITIES

<u>**CASES**</u>

*Abdo v. Fitzsimmons*,
2021 WL 616324 (N.D. Cal. Feb. 17, 2021)..........................................................................20

*Affiliated Ute Citizens of Utah v. United States*,
406 U.S. 128 (1972).................................................................................................................29

*Ambassador Hotel Co. v. Wei-Chuan Inv.*,
189 F.3d 1017 (9th Cir. 1999)..................................................................................................30

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)..............................................................................................................4, 5

*Batwin v. Occam Networks, Inc.*,
2008 WL 2676364 (C.D. Cal. July 1, 2008) ..........................................................................22

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008)...............................................................................................5, 18

*Blue Chip Stamps v. Manor Drug Stores*,
421 U.S. 723 (1975) ................................................................................................................29

*Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
511 U.S. 164 (1994) ................................................................................................................28

*Cutler v. Kirchner*,
696 F. App'x 809 (9th Cir. 2017)............................................................................................14

*Eminence Cap., LLC v. Aspeon, Inc.*,
316 F.3d 1048 (9th Cir. 2003).................................................................................................35

*ESG Capital Partners, LP v. Stratos*,
828 F.3d 1023 (9th Cir. 2016).................................................................................................16

*Farrar v. Workhorse Grp., Inc.*,
2021 WL 5768479 (C.D. Cal. Dec. 2, 2021) ......................................................................8, 24

*Henning v. Orient Paper, Inc.*,
  2011 WL 2909322 (C.D. Cal. July 20, 2011) .......................................................23

*Herman & MacLean v. Huddleston*,
  459 U.S. 375 (1983) ...............................................................................................28

*Hunt v. Bloom Energy Corp.*,
  2021 WL 4461171 (N.D. Cal. Sept. 29, 2021)......................................................26

*In re Alphabet, Inc. Sec. Litig.*,
  1 F.4th 687 (9th Cir. 2021)................................................................................18, 19

*In re Atossa Genetics Inc Sec. Litig.*,
  868 F.3d 784 (9th Cir. 2017).................................................................................14

*In re BofI Holding, Inc. Sec. Litig.*,
  977 F.3d 781 (9th Cir. 2020)............................................................................25, 27

*In re China Educ. All., Inc. Sec. Litig.*,
  2011 WL 4978483 (C.D. Cal. Oct. 11, 2011) .......................................................23

*In re CytRx Corp. Sec. Litig.*,
  2017 WL 5643161 (C.D. Cal. Aug. 14, 2017).......................................................27

*In re Daou Sys., Inc.*,
  411 F.3d 1006 (9th Cir. 2005)...............................................................................24

*In re MannKind Sec. Actions*,
  835 F. Supp. 2d 797 (C.D. Cal. 2011)...................................................................21

*In re Quality Sys., Inc. Sec. Litig.*,
  865 F.3d 1130 (9th Cir. 2017)..........................................................................15, 20

*In re QuantumScape Sec. Class Action Litig.*,
  580 F. Supp. 3d 714 (N.D. Cal. 2022) ...........................................................*passim*

*In re Questcor Sec. Litig.*,
  2013 WL 5486762 (C.D. Cal. Oct. 1, 2013) ...................................................*passim*

*In re Romeo Power Inc. Sec. Litig.*,
  2022 WL 1806303 (S.D.N.Y. June 2, 2022).........................................................12

*In re Romeo Power Inc. Sec. Litig.*,
  2022 WL 3701095 (S.D.N.Y. Aug. 25, 2022) ......................................................15

*In re Turquoise Hill Res. Ltd. Sec. Litig.*,
  2022 WL 4085677 (S.D.N.Y. Sept. 2, 2022) ........................................................34

*In re VeriFone Holdings, Inc. Sec. Litig.*,
  704 F.3d 694 (9th Cir. 2012) .................................................................................18

*In re XL Fleet Corp. Sec. Litig.*,
  2022 WL 493629 (S.D.N.Y. Feb. 17, 2022) .........................................................23

*Khoja v. Orexigen Therapeutics, Inc.*,
  899 F.3d 988 (9th Cir. 2018) ...................................................................................5

*Klein v. Altria Grp., Inc.*,
  525 F. Supp. 3d 638 (E.D. Va. 2021) .....................................................................30

*Lea v. TAL Educ. Grp.*,
  837 F. App'x 20 (2d Cir. 2020) ..............................................................................26

*Lloyd v. CVB Fin. Corp.*,
  811 F.3d 1200 (9th Cir. 2016) ...............................................................................24

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011) ..............................................................................5, 16, 17, 22

*Mauss v. NuVasive, Inc.*,
  2016 WL 3681831 (S.D. Cal. July 12, 2016) ........................................................25

*McGann v. Ernst & Young*,
  102 F.3d 390 (9th Cir. 1996) .................................................................................29

*Menora Mivtachim Ins. Ltd. v. Frutarom Indus. Ltd.*,
  49 F.4th 790 (2d Cir. 2022) ...................................................................................32

*Menora Mivtachim Ins. Ltd. v. Frutarom Indus. Ltd.*,
  54 F.4th 82 (2d Cir. 2022) ...............................................................................33, 34

*Ontario Pub. Serv. Emps. Union Pension Tr. Fund v. Nortel Networks Corp.*,
369 F.3d 27 (2d Cir. 2004)..........................................................................33

*Or. Pub. Emps. Ret. Fund v. Apollo Grp., Inc.*,
774 F.3d 598 (9th Cir. 2014)......................................................................14

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
856 F.3d 605 (9th Cir. 2017)......................................................................19

*Plumley v. Sempra Energy*,
2017 WL 2712297 (S.D. Cal. June 20, 2017).........................................30

*Provenz v. Miller*,
102 F.3d 1478 (9th Cir. 1996)....................................................................16

*Reese v. Malone*,
747 F.3d 557 (9th Cir. 2014)......................................................................19

*Roberts v. Zuora, Inc.*,
2020 WL 2042244 (N.D. Cal. Apr. 28, 2020) .........................................24

*S. Ferry LP, No. 2 v. Killinger*,
542 F.3d 776 (9th Cir. 2008)......................................................................22

*S.E.C. v. M & A W., Inc.*,
538 F.3d 1043 (9th Cir. 2008)....................................................................35

*S.E.C. v. Mozilo*,
2009 WL 3807124 (C.D. Cal. Nov. 3, 2009) .............................................6

*S.E.C. v. Todd*,
642 F.3d 1207 (9th Cir. 2011)..............................................................6, 14

*Semerenko v. Cendant Corp.*,
223 F.3d 165 (3d Cir. 2000)......................................................................30

*Sgalambo v. McKenzie*,
739 F. Supp. 2d 453 (S.D.N.Y. 2010).......................................................17

*Siracusano v. Matrixx Initiatives, Inc.*,
585 F.3d 1167 (9th Cir. 2009)..............................................................17, 18

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

vi

*Snellink v. Gulf Res., Inc.*,
  870 F. Supp. 2d 930 (C.D. Cal. 2012)......................................................13, 23, 26

*Strasburger v. Blackburne & Sons Realty Cap. Corp.*,
  2020 WL 6128223 (C.D. Cal. June 25, 2020)......................................... 16, 18-19

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
  551 U.S. 308 (2007) ...............................................................................................19

*Zelman v. JDS Uniphase Corp.*,
  376 F. Supp. 2d 956 (N.D. Cal. 2005) .......................................................29, 30, 33

*Zhou v. Faraday Future Intelligent Elec. Inc.*,
  2022 WL 13800633 (C.D. Cal. Oct. 20, 2022) ...........................................6, 22, 24

*Zucco Partners, LLC v. Digimarc Corp.*,
  552 F.3d 981 (9th Cir. 2009)................................................................................24

**<u>RULES</u>**

Fed. R. Civ. P. 15(a)(2) ..............................................................................................35

Plaintiff respectfully submits this opposition to Defendants' motion to dismiss (Dkt No. 52) ("MTD") the amended complaint (Dkt No. 42) ("AC" or "¶__").[1]

## I.    INTRODUCTION

Defendant David Michery and his startup electric vehicle company, Mullen, knowingly misled the public about Mullen's failing business in a scheme to obtain millions of dollars from investors, in clear violation of federal securities fraud laws.

To name just a few examples, *first*, Defendants touted "orders" for thousands of vehicles which Mullen could not produce, for customers that could not purchase them. Now, years after such announcements, Mullen has still never recognized any revenue or sold any vehicles. *Second*, Defendants claimed that testing of Mullen's battery produced breakthrough results far superior to those of Mullen's larger, more established, and better funded competitors. But when the expert whose company conducted the battery test was shown Mullen's claims, he replied, "I can see how an investor who may have believed these claims or not understood the misleading information – it certainly could be construed as misinformation." *Third*, Defendants touted a partnership with Chinese carmaker Qiantu, despite knowing that Qiantu had already terminated their relationship, which was the subject of active litigation.

The long list of Defendants' egregious lies goes on, and on. As aptly summarized by one former Mullen employee:

> If you follow the trail of press releases, that will be a great trail of statements that had no foundation. Every single press release was David [Michery] saying, 'I need to say this, put it out tomorrow.' And, almost every single time, it was not true.

This action seeks to recover funds for harmed investors, and to hold Defendants accountable for their fraud.

---

[1] Terms not otherwise defined have the same meanings as in the AC. Unless otherwise noted, internal alterations, citations and quotations are omitted, and emphasis is added throughout this brief.

## II.   STATEMENT OF FACTS

### A.   Background Regarding Mullen And Defendant Michery

In the decade prior to his founding of Mullen,[2] Defendant Michery successively ran (and left) five failed penny stock companies, mostly operating in the music industry. *See* Dkt No. 42-1 ("Hindenburg Report") at 25-28. In 2012 Michery founded Mullen's electric vehicle business (an industry in which he had no experience) by acquiring the assets of bankrupt electric vehicle company Coda Automotive. *See* ¶¶32, 76. At all relevant times Defendant Michery has been Mullen's CEO, founder, President, Chairman, largest shareholder, and public face, closely controlling all aspects of Mullen's business, and establishing an "authoritarian" office environment. *See, e.g.*, ¶¶2, 25-27, 241.

Mullen was a small company, with fewer than 50 employees. *See* ¶¶33-34. Mullen earned no revenue, suffered large and increasing operating losses, and its financial statements noted substantial doubt about its ability to continue as a going concern. *See* ¶¶35-38. Mullen was always short on cash, and routinely failed to make required payments to its employees and suppliers, even failing to remit payroll taxes to the government. *See* ¶¶45-48. What little money Mullen did have was spent impulsively by Michery with little business reason or accountability. *See* ¶¶49-54.

### B.   Defendants Made Misleading Statements Leading Up To Mullen's Reverse Merger With Net Element

Due to Mullen's lack of any revenue, its survival entirely depended on obtaining funds from investors. Because Mullen was a privately owned company, its fundraising options were severely limited. Defendant Michery found a potential workaround to Mullen's cash problems, in June 2020 announcing a planned "reverse merger" with publicly traded Net Element Inc. *See* ¶¶110, 136-44. A reverse merger

---

[2] References to "Mullen" or the "Company" include Defendant Mullen Automotive Inc. ("New Mullen") and its predecessor company, prior to the November 5, 2021 reverse merger, Defendant Mullen Technologies Inc. ("Old Mullen").

is not an actual combination of two businesses, but rather a backdoor to obtain a public stock market listing, used by small private companies like Mullen that would be unable to complete a traditional IPO. ¶6. Pursuant to the reverse merger Net Element would divest its struggling payments processing business, Mullen would obtain Net Element's public stock market listing on the NASDAQ, and New Mullen would carry on Old Mullen's electric vehicle business just as before, merely in a new corporate form. *See* ¶¶25-26, 110; *see also* Dkt No. 53-4 at 16-17.

However, Net Element's shareholders had to vote to approve the reverse merger with Mullen before it could be completed. *See* ¶¶111-14. As detailed below (*see* Part IV), from the reverse merger's June 2020 announcement until its delayed completion in November 2021, Defendants made numerous public statements misleadingly promoting Mullen's customer "orders," its battery technology, and its commercial partnerships, all in an effort to secure approval from Net Element's shareholders for the reverse merger. *See* ¶¶7-10, 60, 135-86.

### C.    After The Reverse Merger, Defendants Continued To Mislead Investors While Selling Large Amounts Of Mullen Stock

In November 2021 the reverse merger closed, Net Element changed its name to Mullen Automotive Inc., and its NASDAQ stock ticker symbol changed from NETE to MULN. *See* ¶¶10, 115-16. Mullen, under Defendant Michery's control, was now a publicly traded company. Defendants promptly sold large amounts of Mullen stock to unsuspecting public investors. *See* ¶¶117-34. From October 2021 through March 2022, Mullen raised over $100 million in financing, dwarfing its previous totals. *See* ¶¶37, 119. At the same time, Defendant Michery personally sold over 500,00 Mullen shares, pocketing $1.1 million. *See* ¶¶124, 128, 130-31.

Because Defendants' proceeds from stock sales directly depended on Mullen's publicly traded stock price, they had strong motives to artificially inflate that stock price. And so they did. Just like in the lead up to the reverse merger, after Mullen took over Net Element's public stock market listing in November 2021, Defendants

---

Michery and Mullen continued to make public statements that similarly misled investors about the true state of Mullen's failing business. *See* ¶¶193-99.

### D. Hindenburg Research Revealed Defendants' Fraud, Causing Large Declines In Mullen's Stock Price

Defendants' fraud was revealed on April 6, 2022, when Hindenburg Research LLC ("Hindenburg"), which had earlier gained fame for correctly exposing widespread fraud at electric truck company Nikola Corporation, published a report titled "Mullen Automotive: Yet Another Fast Talking EV Hustle" (the "Hindenburg Report," Dkt No. 42-1). *See* ¶¶14, 201-02. Through a detailed, 32-page analysis based on research including interviews with Mullen "customers", ex-employees and business partners, Hindenburg exposed Mullen's fake orders, over-hyped battery, and defunct commercial partnerships. Over the following two days, Mullen's stock price fell by 12.5%, to close at $2.38 per share, with independent stock market observers and Defendants' own affiliates attributing large price declines to the Hindenburg Report. *See* ¶¶203-05. Defendants have never issued a public response to the Hindenburg Report, but they did secretly orchestrate a scheme for one of Mullen's largest shareholders to attempt to discredit it. *See* ¶¶206, 231-39.

Shortly following the Hindenburg Report's publication, Mullen inadvertently confirmed several of its key findings. *See* ¶¶207-210. On April 18, 2022, Mullen issued a press release stating that it would now resort to attempting to manufacture its own batteries, revealing that Mullen's heavily touted "partnerships" with battery companies were apparently being discarded. *See id.* On April 18 Mullen's stock fell by 14.8%, and continued its free fall over the next two days. ¶211. Due to Defendants' fraud, investors have suffered substantial losses.

### III.    LEGAL STANDARDS DISFAVOR DEFENDANTS' MOTION

To defeat a motion to dismiss, a complaint must "contain sufficient factual matter . . . to state a claim that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Plaintiffs need only plead facts "that allow[] the court to draw the

reasonable inference that the defendant is liable." *Id.* at 678. As such, "[a] complaint should not be dismissed unless it appears beyond a doubt that the plaintiff cannot prove any set of facts in support of the claim that would entitle him or her to relief." *In re Questcor Sec. Litig.*, 2013 WL 5486762, at *8 (C.D. Cal. Oct. 1, 2013) (Gee, J.); *see also Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1008 (9th Cir. 2018) ("Dismissal is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory."). It is a "fundamental rule" that "courts must interpret the allegations and factual disputes in favor of the plaintiff at the pleading stage." *Orexigen*, 899 F.3d at 1014.

To state a claim under Exchange Act §10(b) and SEC Rule 10b-5(b), a plaintiff must allege: (1) a material misrepresentation or omission; (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011). The AC more than sufficiently alleges each element.

## IV. DEFENDANTS OMITTED MATERIAL FACTS FROM THEIR MISLEADING STATEMENTS

"[O]nce defendants choose to tout positive information to the market, they are bound to do so in a manner that wouldn't mislead investors, including disclosing adverse information that cuts against the positive information." *Orexigen*, 899 F.3d at 1009 (cleaned up); *e.g.*, *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 987 (9th Cir. 2008) ("once defendants chose to tout the company's backlog, they were bound to do so in a manner that wouldn't mislead investors"). Even a literally true statement "may be misleading if it omits material information." *Orexigen*, 899 F.3d at 1009; *see also Questcor*, 2013 WL 5486762, at *11 ("the disclosure required by the securities laws is not measured by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers.").

"[T]he materiality and misleading nature of a misstatement or omission is usually a question for the trier of fact, and such an argument is rarely successful on a

motion for summary judgment, and even more rarely successful on a motion to dismiss." *S.E.C. v. Mozilo*, 2009 WL 3807124, at *9 (C.D. Cal. Nov. 3, 2009). "Accordingly, resolving an issue as a matter of law is only appropriate when the adequacy of the disclosure is so obvious that reasonable minds could not differ." *S.E.C. v. Todd*, 642 F.3d 1207, 1220 (9th Cir. 2011).

### A.    Fake Customer "Orders"

#### 1.    Unlimited Electrical Contractors Order For 10,000 SUVs

On December 30, 2020 Mullen issued a press release titled "Mullen Technologies Receives Letter of Intent for Purchase Order of 1,500 MX-05 Electric Vehicles" (Defendants referred to their promised, but not in production, luxury SUV as the MX-05). *See* ¶¶161-65; Dkt No. 53-10. The press release stated that Mullen "has executed a non-binding Letter of Intent with Unlimited Electrical Contractors Corp (UEC) to enter definitive agreements for the purchase of up to 10,000 MX-05 electric vehicles," and that UEC "intends on executing a definitive agreement with [Mullen] for the purchase of 1,500 MX-05 electric vehicles for its Florida operations. To follow by up to an additional 8,500 by 2025 for its U.S. West Coast expansion." ¶163. The press release went on to state, "[t]he initial purchase order is estimated at $75 million." *Id.* And it quoted Defendant Michery promoting the "order" and Mullen's relationship with UEC. ¶164.

These statements were highly misleading because of the material facts that Defendants concealed from investors. *See Zhou v. Faraday Future Intelligent Elec. Inc.*, 2022 WL 13800633, at *2, *6-7 (C.D. Cal. Oct. 20, 2022) (falsity alleged as to statement that company "ha[d] received over 14,000 reservations" for its electric vehicle, while omitting facts showing many of those reservations were unlikely to result in sales). As later revealed by Hindenburg, UEC is a small electrical contracting firm in South Florida, with only about 30 employees listed on LinkedIn, and possessing only around 11 vehicles. ¶61. There is simply no reasonable possibility that a firm of this size would purchase 1,500 new vehicles, let alone 10,000.

Confirming the illusory nature of this "order," over two years after Mullen's press release there is still no public indication that even a single vehicle or dollar has changed hands between Mullen and UEC. Mullen's most recently published financial statements still indicate that it has never recognized revenue from the sale of any electric vehicles. *See* Spencer Decl. **Ex. A** (filed herewith).

## 2.    Heights Dispensary Order for 1,200 Cargo Vans

Following the exact same pattern, on August 3, 2021 Mullen issued a press release titled "Heights Dispensary Enters Into $60 Million Agreement to Purchase 1,200 Mullen ONE Electric Delivery Vans" (like Mullen's SUV, the cargo van was not actually in production). *See* ¶¶182-86; Spencer Decl. **Ex. D**. The press release stated that Mullen "has entered into a Letter of Agreement with Height Dispensary, LTD., to purchase 1,200 Mullen One electric vans," and that "[t]he total vehicle purchase order is valued at over $60 million." ¶183. It went on to say "[t]he initial Mullen ONE vehicle order will consist of 200 EV vans for Heights Dispensary's Houston and Dallas operations, to be delivered on or before the end of third quarter 2023. Additionally, Heights will purchase 1,000 Mullen ONEs by second quarter 2025." ¶184. And this press release also quoted Defendant Michery hyping the purported "order" and Mullen's relationship with Heights Dispensary. ¶185.

Defendants' statements about Heights Dispensary's "order" for thousands of Mullen cargo vans similarly concealed material facts from investors. As later revealed by Hindenburg, Heights Dispensary is a small, retail hemp dispensary in Texas with a single strip mall storefront (open by appointment only) and a small online shop (carrying about 25 products, 5 of which are t-shirts). ¶62. Worse yet, Hindenburg revealed that Heights Dispensary does not deliver products itself, but instead mails them through the U.S. Postal Service, to avoid regulatory compliance costs relating to transporting cannabis (which costs would exceed the small dollar value of most Heights Dispensary customer orders). *See id.* As such, Heights Dispensary had no need or ability to purchase hundreds of Mullen vehicles for millions of dollars. As

with UEC, there remains no public indication that a single vehicle or dollar has changed hands between Mullen and Heights Dispensary.

### 3. "Major Major Fortune 500 Company" Order For "A Lot Of These Vehicles"

During a March 30, 2022 interview, Defendant Michery again made misleading claims about a purported order, this time from an unnamed mystery customer. ¶¶197-99. When asked for an update on Mullen's cargo vans, Michery replied, "we're going to be delivering our class one vehicle in the second quarter of this year," to a "very large company that is going to buy a lot of these vehicles," and stated the purchaser was a "major major Fortune 500 company." ¶198. When the interviewer asked for clarification ("Is that order confirmed? That's not like a pre-order, right?"), Michery reassured, "[n]o, no, we're actually building for them." *Id.* Michery stated that he could not presently disclose the customer's identity, but that "we plan on doing that shortly," and "[w]e're going to turn it into a press event I promise. . . Everyone will know and they will see and will be part of it." *Id.*

However, these statements were materially misleading because Michery concealed material information gravely undermining his claims. As Hindenburg later revealed, Mullen lacked EPA approval to sell the vehicles in the United States, which takes 12 to 18 months to obtain. ¶89. And Mullen apparently had yet to hire the specialized workers needed to manufacture an electric cargo van. *See* ¶90. These facts strongly suggest that the order from a "major major Fortune 500 company" never existed at all. In the unlikely event that such an order did exist, Michery's statements were still materially misleading for concealing facts undermining Mullen's ability to deliver "a lot of these vehicles" to any buyer "in the second quarter of this year," *i.e.*, within the three months after his March 30 statement. *See Farrar v. Workhorse Grp., Inc.*, 2021 WL 5768479, at *3-*4 (C.D. Cal. Dec. 2, 2021) (falsity alleged where "Defendants were aware of undisclosed facts tending to seriously undermine their ability to secure that contract" for electric vehicle purchases, including insufficient

personnel). True to form, Michery's promised second quarter deadline has come and gone with no announcement of a major Fortune 500 customer, and no reported sales. *See* Spencer Decl. **Ex. A**.

### B.       Misleading Battery Testing Claims

#### 1.       Original 2020 Battery Test Results Press Release

On August 10, 2020 Mullen issued a press release titled "Mullen Technologies Announces Further Test Results of Its Licensed Solid-State Polymer Battery Technology." ¶¶145-49; Dkt No. 53-7. The press release stated that Mullen was announcing "results from the independent testing of its licensed solid-state polymer battery technology undertaken by EV Grid," claiming that "[t]he results provided support that [Mullen's] licensed battery technology may be capable of enabling an electric vehicle to travel 640 miles at a cruising speed of 55 mph on a flat surface, and 550 miles at a cruising speed of 75 mph." ¶146. The press release featured an image of Mullen's (not actually in production) luxury SUV, stating that it had "500+ Mile Range" as compared to only "300+ Mile Range" for competing "Top Ev Companies." *Id.* And the press release quoted Defendant Michery touting Mullen's battery technology as a source of competitive advantage. ¶148.

However, these statements were highly misleading for omitting the extremely limited nature and unremarkable results of the testing performed by EV Grid. *See In re QuantumScape Sec. Class Action Litig.*, 580 F. Supp. 3d 714, 735 (N.D. Cal. 2022) (falsity alleged as to misrepresentations regarding electric vehicle battery testing). In an interview with Plaintiff's investigator in this action, EV Grid CEO Tom Gage stated that EV Grid carried out "just one test" for Mullen in or around 2018 or 2019, and had no further contact with Mullen until the Hindenburg Report was published. ¶68. Mullen provided EV Grid a battery that looked like a "clearly handmade" and "amateurish" prototype cell. ¶69. The sole test performed was "a charge and discharge test on the cell," based on which EV Grid provided Mullen a two- or three-page report stating "the conditions of the test results, which were the number of ampere hours we

---

got out of the cell," which Gage recalled as approximately 300 to 320 (an ampere hour is a unit for measurement of electric charge). Commenting on the statements about driving range in Mullen's press release, Gage stated, "[t]hat kind of claim is, I think, what gets Mullen into trouble. Because the two things don't equate." ¶70. Gage explained that several additional variables would need to be taken into consideration in order to reach the conclusion set forth in Mullen's statement. *Id.* Gage continued, "I can see how an investor who may have believed these claims or not understood the misleading information – it certainly could be construed as misinformation." *Id.*

Defendants' August 10, 2020 statements were additionally misleading for portraying Mullen's battery as a competitive advantage. Mullen's former Vice President of Marketing recalled laughing with Mullen's then-Chief Technology Officer about Mullen's battery technology and related public statements:

> [A] press release was removed – but it was publicized at his office – a terrible battery as a revolutionary thing, and it was like – to anybody who knows anything – it was laughable . . . A terrible battery with dents in it. I just remember it was laughable, the photo . . . Frank [McMahon, Mullen's CTO] and I did laugh together.

¶73. Thus, Mullen's third-party sourced prototype battery was not superior to competitors' technology, and in fact was not even close to being ready for commercial use, rendering Defendants' contrary statements materially misleading.

### 2.    Rehashed 2022 Battery Test Results Press Release

One and a half years later, Defendants repeated and embellished their prior misleading claims regarding Mullen's battery, falsely presenting these claims as if they were supported by new, additional testing. On February 28, 2022, Mullen issued a press release titled, "EV Manufacturer Mullen Announces Progress on Solid-State Polymer Battery Pack Development." ¶¶193-96; Dkt No. 53-16. Defendants claimed to announce "progress" and an "update" on Mullen's "next-generation" battery technology. ¶193. The press release went on to state "[d]ata collected from solid-state cell testing shows impressive results, including a range of 600-plus miles on a full

charge and over 300 miles of range delivered in 18 minutes with DC fast charging." ¶194. And the press release quoted Defendant Michery as stating that, "we tested our 300 Ah (ampere hour) cell which yielded 343 Ah . . . We can say with almost certainty that this technology, once implemented on the Mullen FIVE, will deliver over 600 miles of range on a full charge." ¶195.

However, these statements were extremely misleading both because no new testing had been conducted, and because the result of the EV Grid test did not support the claims Defendants were making. *See Questcor*, 2013 WL 5486762, at *11 ("By using the positive study results to tout Acthar's marketability, Defendants were bound to do so in a manner that wouldn't mislead investors."). As later revealed by Hindenburg, Defendant Michery himself admitted that the test referred to in the February 28, 2022 press release was the same as that discussed in the August 10, 2020 press release. ¶65. When Hindenburg asked Tom Gage if EV Grid would have signed off on the February 28, 2022 press release statements he replied, "[n]o we would never have said that. We never did say it and certainly wouldn't have said it based on the results of testing that battery." ¶66; *see also* ¶71.

### C.    Defunct, Or Nonexistent, "Commercial Partnerships"

#### 1.    Broken Down Relationship With Sports Car Maker Qiantu

On June 15, 2020, Net Element issued a press release (containing information supplied by Mullen and Defendant Michery) titled "Net Element Enters into a Letter of Intent to Merge with Electric Vehicle Company Mullen Technologies." ¶¶136-40; Dkt No. 53-5. The press release stated that "Mullen expects to launch the Dragonfly K50, a luxury sports car, in the first half of 2021," and that "Mullen is launching this car in conjunction with a cooperation agreement with Qiantu Motor . . . a leading automotive design and manufacturing company in China." ¶137. The next day Mullen issued a press release, titled "NETE: Net Element Announces LOI for Reverse Merger With Mullen Technologies, Maker of EVs." ¶¶141-44; Dkt No. 53-6. That press release stated that Mullen "plans to sell Qiantu Motors' electric vehicles. Qiantu . . .

already sells vehicles in China. Mullen has an agreement to sell those vehicles in the US." ¶142. The press release further stated that Mullen, "currently sources cars from its Chinese OEM partner Qiantu Motor." *Id.*

However, these statements were materially misleading due to the prior termination of the Qiantu relationship. *See In re Romeo Power Inc. Sec. Litig.*, 2022 WL 1806303, at *4 (S.D.N.Y. June 2, 2022) (falsity established for electric vehicle battery manufacturer's statement that "touted its close relationships with vendors of key components of [] battery products"). As Hindenburg later revealed, Mullen failed to make $23 million of payments owed to Qiantu and the agreement between Mullen and Qiantu was terminated by November 2019. ¶96. This is confirmed by documents filed in a lawsuit between Qiantu and Mullen (being actively litigated at the time of the June 2020 false statements), including a November 2019 letter from Qiantu to Mullen stating that "Mullen defaulted in its performance of the Agreement for failing to make two separate installment payments," and that "on October 4, 2019, Qiantu provided the Termination Notice . . . regarding its intent to terminate the Agreement effective November 2, 2019." ¶97; Dkt No. 42-2; *see also* ¶98-99 (former Mullen employee recounting Mullen's inability to fulfill Qiantu agreement).

### 2. Fake Relationship With Battery Maker NextMetals

Mullen's June 16, 2020 press release also misled investors regarding an ostensible relationship with battery company NextMetals. The press release stated that Mullen "has valuable lithium battery patents to create batteries rivaling Tesla's technology," and "has a joint venture with Ukrainian company NextMetals Ltd. to create a solid-state battery under a new division called 'Mullen Next'." ¶143.

Hindenburg spoke to "a senior executive with detailed knowledge of the supposed JV." ¶¶103-06. According to the senior executive, "[i]t didn't exist at all [the joint venture]. Not a single piece of paper." ¶104. On January 24, 2020 Michery tweeted a picture of a meeting between Mullen and NextMetals (*see* ¶105, captioned "Next Metals and Mullen Technologies team up to change the world!"), leading the

NextMetals personnel to end their discussions. *See* ¶104 ("And he [Defendant Michery] proudly goes and shows the Tweet—and about that time was when [the Nextmetals representatives] did get up and walk out. And [they] said, you know, 'you're nothing but a hustler. You have no substance'."). According to the senior executive, upon seeing Mullen's mockup Chinese sports car he thought, "you're kidding me, this is a joke," and he stated that Michery was unable to produce technical specifications for Mullen's (visibly damaged) prototype battery. ¶¶104-05. Describing his impression of Defendant Michery during those meetings, the senior executive stated, "[Michery] is . . . fast talking. Just a hustler . . . a sales type character, always stretching the truth. Or maybe there wasn't any." ¶106.

## V.   DEFENDANTS' ARGUMENTS FAIL TO DISPROVE FALSITY

### A.   Defendants' Statements Were Not "Accurate"

Defendants wrongly argue that certain of their challenged statements relating to commercial partnerships and battery testing were "accurate," and so not actionable. MTD at 13-15. As shown above, those statements were materially misleading. *See, e.g.*, *QuantumScape*, 580 F. Supp. 3d at 733-34 (rejecting argument that disclosure of test results rendered statements about battery not misleading). Defendants fail to engage with the text of the challenged statements, instead simply claiming that Plaintiff's allegations are not reliable because they are, in Defendants' telling, based entirely on the Hindenburg Report. But the Hindenburg Report is highly reliable (*see infra* Part VI.F), and so even standing alone would serve as a sufficient basis to allege falsity. *See Snellink v. Gulf Res., Inc.*, 870 F. Supp. 2d 930, 939 (C.D. Cal. 2012) ("It is permissible for Plaintiffs to rely on a short seller report to allege falsity at the pleading stage"). And Defendants' premise is facially incorrect—they simply choose to ignore the AC's myriad corroborating allegations including Plaintiff's investigator's interviews with Tom Gage and multiple former Mullen employees, and the letter from Qiantu to Mullen regarding the termination of their relationship (*see* Dkt No. 42-2). On these facts, it can hardly be said that "the adequacy of the disclosure

is so obvious that reasonable minds could not differ," and so Defendants' motion should be denied. *Todd*, 642 F.3d at 1220.

**B.     Defendants' Statements Were Not Mere "Corporate Optimism"**

Defendants argue that Michery's March 30, 2022 statement about a "major major Fortune 500 company," "that is going to buy a lot of these vehicles," were mere "corporate optimism." MTD at 15. However, "[s]tatements . . . capable of objective verification are not 'puffery' and can constitute material misrepresentations." *Or. Pub. Emps. Ret. Fund v. Apollo Grp., Inc.*, 774 F.3d 598, 606 (9th Cir. 2014). "[T]he question is whether a reasonable investor could understand them, in context, to communicate only a general optimism, or a factual representation about the actual condition of [the] business." *Cutler v. Kirchner*, 696 F. App'x 809, 814 (9th Cir. 2017). Michery stated that a major company had committed to buy a large number of vehicles, and that Mullen would supply them imminently—both of which are factual assertions, and both of which were false.

Defendants also argue that these statements were Michery's mere opinions, but his statements were unequivocal representations of fact. ¶198 ("it is a very large company that is going to buy a lot of these vehicles"); *id.* ("No, no, we're actually building for them . . . This is a major major Fortune 500 company"). Even if Michery's statements were opinions (they were not), they are nevertheless actionable because they did not "fairly align" with information known to Michery that severely undermined his claims. *See In re Atossa Genetics Inc Sec. Litig.*, 868 F.3d 784, 801-02 (9th Cir. 2017) ("[A] reasonable investor expects not just that the issuer believes the opinion (however irrationally), but that it fairly aligns with the information in the issuer's possession at the time.").

**C.     Neither The PSLRA Safe Harbor Nor The Bespeaks Caution Doctrine Protect Defendants' Misleading Statements**

Defendants claim that the PSLRA safe harbor (or the analogous bespeaks caution doctrine), insulate their misrepresentations from liability. MTD at 16-21.

Defendants are mistaken. *First*, the safe harbor applies only to "forward-looking" statements, and most of Defendants' statements here relate in whole or in part to past or current facts. *See In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1142 (9th Cir. 2017) ("where defendants make mixed statements containing non-forward-looking statements as well as forward-looking statements, the non-forward-looking statements are not protected."). The result of the battery test was a historical fact. *See QuantumScape*, 580 F. Supp. 3d at 736 ("Statement 3 describes the batteries compared to conventional technology; it says nothing about the future"). The non-existence of any relationship with NextMetals, and the breakdown of Mullen's relationship with Qiantu, were likewise present and historical facts. That UEC and Heights Dispensary were tiny businesses with no need or ability to purchase thousands of Mullen vehicles were presently existing facts. So too Mullen's lack of the EPA certification needed to sell *any* vehicles to a "major major Fortune 500 company." Defendants' decisions to conceal these existing facts do not fall within the protection of the safe harbor or bespeaks caution doctrine, even in the context of mixed statements relating in part to the future. *See In re Romeo Power Inc. Sec. Litig.*, 2022 WL 3701095, at *2 (S.D.N.Y. Aug. 25, 2022) ("It is misleading to disclose expectations of future revenue while concealing present reasons -- as opposed to future risks -- why that revenue may never be realized.").

*Second*, the safe harbor is independently inapplicable because Defendants made their statements with actual knowledge of their misleading nature (*see infra* Part VI.A), and these statements lacked "meaningful" cautionary language. "To be adequate under the cautionary-language prong, the caution must discredit the [allegedly misleading statements] so obviously that the risk of real deception drops to nil." *QuantumScape*, 580 F. Supp. 3d at 737. "As a result, it must precise[ly] and directly address the alleged misrepresentations." *Id.* "Boilerplate" disclosures are insufficient. *See Questcor*, 2013 WL 5486762, at *13. Here, the language Defendants rely on from their press releases was pure boilerplate that utterly failed to address their

misrepresentations. That "forward-looking statements involve significant risks and uncertainties that could cause actual results to differ materially from those expressed or implied," says nothing unique to Mullen, its customer orders, its battery technology, or its commercial partnerships. *See* MTD at 18.

The disclaimers Defendants cite in two SEC filings were also mere boilerplate. *See, e.g.*, MTD at 19 ("As a new entrant into its industry, Mullen [Tech] will face significant risks and challenges to its business and prospects"). None of Defendants' cited "disclosures" even mention Mullen's fake customer orders, battery test result, or non-existent commercial partnerships. And Defendants fail to carry their burden to show that the SEC filing disclaimers sufficiently dispelled the falsity of Defendants' promotional press releases. *See Provenz v. Miller*, 102 F.3d 1478, 1492–93 (9th Cir. 1996) ("the defendants must prove that the information that was withheld or misrepresented was transmitted to the public with a degree of intensity and credibility sufficient to effectively counterbalance any misleading impression"). None of Defendants' highly misleading statements are excused by the PSLRA safe harbor or the bespeaks caution doctrine.

## VI.   THE AMENDED COMPLAINT PLEADS A STRONG INFERENCE OF DEFENDANTS' SCIENTER

Scienter is pled "if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Matrixx Initiatives*, 563 U.S. at 48. "[T]he court must review all the allegations holistically." *Id.* "[T]he [scienter] standard is not insurmountable and plaintiffs need not prove [their] case at the outset." *Strasburger v. Blackburne & Sons Realty Cap. Corp.*, 2020 WL 6128223, at *4 (C.D. Cal. June 25, 2020) (quoting *ESG Capital Partners, LP v. Stratos*, 828 F.3d 1023, 1035 (9th Cir. 2016)).

### A.   Defendant Michery Knew The Omitted Facts

The AC pleads numerous facts creating a strong inference of Defendant Michery's knowledge of the key information that he and Mullen concealed from

investors. *First*, Michery knew that Mullen had no battery partnership with NextMetals, because Michery himself participated in the meeting where NextMetals personnel walked out and told Michery that he was "nothing but a hustler" with "no substance." *See* ¶104. And as Mullen's all-controlling CEO, Michery necessarily knew that Mullen was embroiled in litigation with Qiantu. *See* ¶97; *Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1181 (9th Cir. 2009) ("the inference that high-level executives . . . would know that the company was being sued in a product liability action is sufficiently strong to survive a motion to dismiss"), *aff'd*, 563 U.S. 27 (2011). Moreover, in November 2019 Qiantu sent a letter discussing the termination of their relationship to Mullen's lawyer and its CTO. *See* ¶97; Dkt No. 42-2. On these facts it is simply not plausible that Michery was somehow unaware that the Qiantu relationship had ended and devolved into litigation.

*Second*, Michery knew the extremely limited nature of the battery testing conducted by EV Grid for Mullen. EV Grid performed just one test for Mullen in 2018 or 2019, and had no further contact with Mullen until the Hindenburg Report was published. ¶68. That was a simple charge and discharge test to measure ampere hours for a single prototype battery. *Id*. EV Grid provided the result to Mullen in a short two or three page report. *Id*. Michery had access to the report, as demonstrated by his own statements. *E.g.*, ¶195 ("we tested our 300 Ah (ampere hour) cell which yielded 343 Ah"); *see Sgalambo v. McKenzie*, 739 F. Supp. 2d 453, 482 (S.D.N.Y. 2010) (scienter alleged where "[t]he Officers surely relied on some sort of document or report . . . in reporting the test results contained in their public statements"). Therefore, Michery knew that the EV Grid report did not support a 500+ mile driving range for any Mullen vehicle, or any of Defendants' other baseless claims.

*Third*, Michery was directly involved in announcing the Heights Dispensary and UEC "orders" (*see* ¶¶164, 185), and given Michery's deep involvement with all aspects of Mullen's business (*see supra* Part II.A), it would be absurd to suggest that he was unaware that these two "customers" were far too small to need, let alone to be

able to pay for, thousands of vehicles. *See In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 706 (9th Cir. 2021) (scienter inquiry may consider "the executive's access to the information, and, whether, given the importance of the information, it would be 'absurd' to suggest that management was without knowledge of the matter."); ¶61 (UEC had only 11 vehicles); ¶62 (Heights Dispensary operated a single strip mall storefront and a small online store). Similarly, Michery himself touted the "major major Fortune 500 company," that he claimed would "buy a lot of these vehicles" beginning in the second quarter of 2022, and it is absurd to suggest that Michery did not know that Mullen lacked the EPA certificates necessary to make those sales (in the highly unlikely event that order was even real to begin with). ¶¶89, 198; *see Berson*, 527 F.3d at 989 ("These facts were prominent enough that it would be absurd to suggest that top management was unaware of them").

## B.    At A Minimum, Michery Acted With Deliberate Recklessness

While scienter is clearly satisfied by the strong inference of Michery's actual knowledge, this is not necessary to plead scienter. "Recklessly turning a 'blind eye' to impropriety is equally culpable." *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 708 (9th Cir. 2012). As such, "a reckless omission of material facts satisfies the element of scienter," if it constitutes "deliberate recklessness." *Alphabet*, 1 F.4th at 701. Deliberate recklessness is defined as "an extreme departure from the standards of ordinary care, which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Id.*; *see also Matrixx*, 585 F.3d at 1183.

For example, in the highly unlikely event that Michery did not know that UEC and Heights Dispensary were tiny businesses with no need or ability to purchase thousands of Mullen vehicles, then it was nonetheless deliberately reckless for him to personally tout their "orders" in public press releases, without having conducted even a basic inquiry into those "customers" or their ability to follow through on the purported orders. *See Strasburger*, 2020 WL 6128223, at *5 ("by failing to conduct

any meaningful due diligence regarding the borrowers—[defendant]'s actions departed extremely from the standard of ordinary care.").

Similarly, if Michery *somehow* did not know that Qiantu had terminated its relationship with Mullen, then it was nonetheless incumbent upon him, before making his June 2020 statements touting Mullen's partnership with Qiantu, to inquire as to the state of that relationship, which Qiantu had terminated *more than eight months earlier. See Reese v. Malone*, 747 F.3d 557, 569 (9th Cir. 2014) ("[A]n actor is [deliberately] reckless if he had reasonable grounds to believe material facts existed that were misstated or omitted, but nonetheless failed to obtain and disclose such facts although he could have done so without extraordinary effort.") (overruled on other grounds by *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605 (9th Cir. 2017)).

### C.    Defendant Michery's Scienter Is Imputed To Mullen

"[T]he scienter of the senior controlling officers of a corporation may be attributed to the corporation itself to establish liability as a primary violator of § 10(b) and Rule 10b-5 when those senior officials were acting within the scope of their apparent authority." *Alphabet*, 1 F.4th at 705 (9th Cir. 2021). Defendant Michery was Mullen's CEO and acted within the scope of his apparent authority concerning the matters alleged in this action. His scienter is attributed to Mullen.

### D.    Defendants Had Strong Financial Motives To Hide The Truth From Investors

"[C]ourts consider the defendants' motive to commit fraud as one factor that may support a strong inference of scienter." *Questcor*, 2013 WL 5486762, at *19; *see also Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 325 (2007) ("personal financial gain may weigh heavily in favor of a scienter inference"). Mullen and Defendant Michery had strong financial motives for their fraud.

Prior to the November 2021 reverse merger, Mullen was in a precarious and deteriorating financial position, and desperately needed investor cash to continue

operations, adding to the already strong inference of Defendants' scienter. *See* ¶¶35-38, 109-16; *Abdo v. Fitzsimmons*, 2021 WL 616324, at \*13 (N.D. Cal. Feb. 17, 2021) (defendants "knew that the Company was in a desperate financial situation and was in need of a sudden infusion of cash, which could easily be seen as a motive"). Defendants needed to complete the reverse merger to obtain Net Element's NASDAQ stock market listing, in order to sell Mullen stock to public investors. And Defendants needed to persuade Net Element shareholders to vote in favor of the reverse merger, which gave Defendants strong motives to mislead investors about the dire condition of Mullen's business. *See* ¶¶111-14.

Following the reverse merger's completion, Defendant Michery personally sold over 500,00 Mullen shares at inflated prices, pocketing over \$1.1 million. *See* ¶¶124, 128, 130-31. While Defendants quibble that Michery *could have* sold *more* than he did, "there is no brightline rule for how much or what percentage of shares sold is necessary to support an inference of scienter," and Michery's large sales substantially contribute to the already strong inference of his scienter. *Questcor*, 2013 WL 5486762, at \*15. Other Mullen insiders likewise made incriminating sales of Mullen stock. *See* ¶¶129, 133. For example, on March 31, 2022, the very next day after Michery misleadingly announced that a "major major Fortune 500 company" would soon "buy a lot of these vehicles," causing a dramatic surge in Mullen's share price, Mullen director Jonathan New sold 10,000 shares, *more than half* of his holdings at the time. ¶¶133, 198; Hindenburg Report at 10. The highly suspect timing of this sale further supports a strong inference of scienter. *See Quality Sys.*, 865 F.3d at 1146 ("Unusual or suspicious stock sales by corporate insiders may constitute circumstantial evidence of scienter").

In addition, Mullen itself sold large amounts of inflated stock after the completion of the reverse merger. Mullen continued to burn through money and earn zero revenue, obtaining all its cash from investors. *See* ¶¶35-38. From August 2021 to May 2022 Mullen's common stock share count of rocketed from 5.4 million to 332

million, an increase of over 6,000%. *See* ¶118. From October 2021 through March 2022, Mullen raised over $100 million in financing, including $40 million from issuance of common stock, dwarfing its previous totals. *See* ¶¶37, 119. *See QuantumScape*, 580 F. Supp. 3d at 741 (that defendant company "raised hundreds of millions of dollars" during the class period "helps support the inference of scienter"); *see also In re MannKind Sec. Actions*, 835 F. Supp. 2d 797, 813 (C.D. Cal. 2011). And Michery had a pressing need to cause Mullen to obtain this money from investors, as he was personally liable for at least $5 million of Mullen's borrowing, thus further contributing to the strong inference of his scienter. ¶12.

### E. The Amended Complaint Pleads Further Evidence Adding To The Strong Inference Of Defendants' Scienter

In addition to Defendant Michery's first-hand knowledge and Defendants' financial motives, the AC pleads still further evidence adding to the already strong inference of Defendants' scienter. *First*, while Defendants did not dare to publicly respond to the Hindenburg Report, Defendants did orchestrate a clandestine effort to have a related party try to discredit it. *See* ¶¶231-39. Mullen called Tom Gage, asking him to appear on the investing podcast of Todd Ault, one of Mullen's largest shareholders. *See* ¶¶232-35. During the podcast, Ault repeatedly asserted without substantiation that the Hindenburg Report "misquoted" Gage, and repeatedly asked leading questions to attempt to get Gage to say that Hindenburg Research "misquoted" him, which Gage refused to do. ¶236. In fact, Gage confirmed to Plaintiff's investigator that he "was not misquoted" in the Hindenburg report. ¶238. Nonetheless, Ault persisted in claiming that Hindenburg misrepresented Gage's statements, and further claimed, without evidence, to "debunk" the Hindenburg Report. ¶237. That Defendants would secretly and misleadingly attempt to discredit Hindenburg provides further evidence of their intent to mislead investors.

*Second*, a senior Mullen executive left the company around May 2021 due to disagreements with Michery over misleading public statements. *See* ¶¶240-42.

According to Mullen's former VP of Marketing, Mullen's CTO Frank McMahon "was constantly saying to David [Michery], you're not doing things right or you need to think twice before you say things. And David went and got mad at it." ¶241. According to FE1, McMahon left Mullen following an argument with Defendant Michery, which occurred in a meeting that FE1 heard about from McMahon and another Mullen employee. ¶242. McMahon asked whether Mullen could follow through on its statements, and Defendant Michery responded by forcing McMahon out of the company. *See id.* This remarkable confrontation with a senior Mullen executive is yet additional proof of Defendant Michery's scienter.

*Third*, the inference of Defendants' scienter is strengthened because the subjects of their misstatements related to Mullen's core operations. *See S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 785 (9th Cir. 2008) ("Allegations regarding management's role in a corporate structure and the importance of the corporate information" add to scienter inference). Selling electric vehicles was Mullen's *only* material business plan, and the customer orders, battery technology, and commercial partnerships for this business were the subjects of Defendants' misstatements. *See Faraday*, 2022 WL 13800633, at *10 (that sales and production of electric vehicle were defendant's "core business operations" supported strong inference of scienter). The core operations inference is even stronger here because Mullen had fewer than 50 employees, Michery held himself out as knowledgeable on the subjects of the misrepresentations, and Michery was intimately involved in all aspects of Mullen's operations. *See Batwin v. Occam Networks, Inc.*, 2008 WL 2676364, at *12 (C.D. Cal. July 1, 2008) ("relatively small size" of company "with 80 to 100 employees" supported inference of scienter); *Questcor*, 2013 WL 5486762, at *19 (similar).

### F.    Plaintiff's Scienter Allegations Are Highly Reliable

Contrary to the Supreme Court's instruction to review *all* scienter allegations "holistically," Defendants ignore many of the AC's scienter allegations and attack others in isolation. *Matrixx Initiatives*, 563 U.S. at 48; *see* MTD at 24-27. Each of the

AC's scienter allegations is highly reliable even when standing alone, and multiple distinct sources for these allegations independently corroborate each other, further adding to the strong inference of Defendants' scienter.

*First*, Defendants claim that investment research issued by short selling firms is *per se* unreliable. However, Defendants' argument is contrary to the weight of authority, as courts routinely view short seller research as sufficiently reliable at the pleading stage. *E.g.*, *Snellink*, 870 F. Supp. 2d at 939 ("It is permissible for Plaintiffs to rely on a short seller report to allege falsity at the pleading stage"); *Henning v. Orient Paper, Inc.*, 2011 WL 2909322, at *8 (C.D. Cal. July 20, 2011) (crediting allegations sourced from short seller report to deny motion to dismiss). As the case law makes clear, there is no "bright-line rule of exclusion" for allegations based on short seller research, rather courts conduct a "broader contextual analysis" that focuses on the "nature of the revelation." Q*uantumScape*, 580 F. Supp. 3d at 731.

The Hindenburg Report is highly reliable because it is based on documentary evidence and multiple interviews with Mullen "customers," business partners, former employees, and industry expert Tom Gage. *See id.* at 732; Dkt No. 42-1. Further "indicia of reliability" include the facts that Defendants did not deny Hindenburg's claims, and the market deemed them credible as evidenced by the substantial decline in Mullen's stock price following their publication. *See In re XL Fleet Corp. Sec. Litig.*, 2022 WL 493629, at *5 (S.D.N.Y. Feb. 17, 2022). And while Defendants claim that a boilerplate disclaimer contained in the Hindenburg Report proves it is unreliable, that is no substitute for an actual analysis of the Report's factual content, and courts have repeatedly rejected their argument. *E.g.*, *In re China Educ. All., Inc. Sec. Litig.*, 2011 WL 4978483, at *5 (C.D. Cal. Oct. 11, 2011) ("neither the [] Report's authorship nor its allegedly self-interested disclaimer provides grounds to dismiss the [complaint]").

*Second*, Defendants fare no better in their attempt to preclude consideration of allegations based on Plaintiff's interviews with former Mullen employees. Such

witnesses need only be "described with sufficient particularity to establish their reliability and personal knowledge." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 995 (9th Cir. 2009). This requirement can be met by describing information such as the witnesses' job responsibilities and dates of employment, as Plaintiff has done here. *See In re Daou Sys., Inc.*, 411 F.3d 1006, 1016 (9th Cir. 2005); *e.g.*, ¶¶28-30. The former Mullen employees' accounts at issue here are highly reliable. For example, the former VP of Marketing would certainly know the details of projects he worked on (¶77), or the content of his conversations with Mullen's CTO (¶¶73, 241-42).[3]  In any event, "arguments as to the credibility of the witnesses' statements, which must be taken as true . . . raise issues of fact that are better addressed at a later stage of litigation." *Faraday*, 2022 WL 13800633, at *10.

*Third*, Tom Gage is a highly reliable source. Gage is a Stanford-trained engineer who previously worked for Chrysler on electric vehicles, and was described by the *Los Angeles Times* as an electric vehicle "guru" and "pioneer." ¶40. Gage's company, EV Grid, performed Mullen's sole battery test. *See* ¶68. Gage gave a highly reliable account of his company's test for Mullen, which was perfectly consistent across two separate interviews, one for Hindenburg and one for Plaintiff. *See* ¶¶66-72. Defendants ignore all of this and myopically focus on two minor admissions made by Gage about the limits of his knowledge, which, if anything, serve to make his statements *even more* reliable due to his candor. *See* MTD at 27.

*Fourth*, Defendants simply ignore that each of Plaintiff's scienter allegations corroborate and reinforce one another. For example, Defendants' scienter as to the

---

[3] Contrary to Defendants' claims, employees within one function often have reliable knowledge of other aspects of a company's operations. *See Workhorse*, 2021 WL 5768479, at *5 (HR director's knowledge of manufacturing facility). The mere fact that witnesses were not employed at the defendant company "during the *entire* Class Period does not in itself render their statements unreliable." *Roberts v. Zuora, Inc.*, 2020 WL 2042244, at *11 (N.D. Cal. Apr. 28, 2020). And "the fact that a confidential witness reports hearsay does not automatically disqualify his statement from consideration." *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1208 (9th Cir. 2016).

battery statements is supported by the Hindenburg Report (*see* Dkt No. 42-1 at 5-9), the comments of Mullen's former VP of Marketing (¶73), statements made by Tom Gage (¶¶66-72), and Mullen's own belated disclosure that it would have to resort to trying to manufacture its own batteries (¶¶207-11). Defendants advance no sound reason to disregard such reliable and mutually corroborating allegations, which holistically give rise to a strong inference of Defendants' scienter.

## VII.   DEFENDANTS' FRAUD CAUSED INVESTORS' LOSSES

To plead loss causation, "[t]he plaintiff must plausibly allege a causal connection between the defendant's misstatements and the plaintiff's economic loss." *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 794 (9th Cir. 2020), *cert. denied*, 142 S. Ct. 71 (2021). "That effort should not prove burdensome, for even under Rule 9(b) the plaintiff's allegations will suffice so long as they give the defendant notice of plaintiffs' loss causation theory and provide the court some assurance that the theory has a basis in fact." *Id.* In response to Hindenburg's revelations and Defendants' own admissions, Mullen's publicly traded stock price repeatedly fell by substantial amounts, causing losses to investors. *See BofI*, 977 F.3d at 790 ("a disclosure followed by an immediate drop in stock price is more likely to have caused the decline"). When Hindenburg published its report revealing Defendants' fraud, over the following two days Mullen's stock price fell by 12.5%, with independent stock market observers and Defendants' own affiliates attributing large price declines to the Hindenburg Report. *See* ¶¶203-05. And on April 18, 2022, when Mullen published a press release inadvertently confirming key allegations from the Hindenburg Report, Mullen's stock fell by 14.8%, and continued its free fall over the next two days. ¶¶207-11; *see, e.g.*, *Mauss v. NuVasive, Inc.*, 2016 WL 3681831, at *10 (S.D. Cal. July 12, 2016) (loss causation alleged for revelation followed by stock price declines of 12% and 5.4%).

The Hindenburg Report was a corrective disclosure giving rise to loss causation because it contained highly material information that was not previously known to

public investors, including the content of Hindenburg's interviews with Mullen's purported "customers," business partners, former employees, and industry expert Tom Gage. *See Snellink*, 870 F. Supp. 2d at 942 ("A short seller report may be used to establish loss causation."). Defendants argue that the Hindenburg Report cannot serve as a corrective disclosure because it contained a boilerplate disclaimer that it was based information from public sources. *See* MTD at 30-31; Dkt No. 42-1 at 33. However, such a generic disclaimer (apparently included in such research reports as a matter of course to show that the author is not engaged in prohibited insider trading) says nothing about whether the report's factual content was previously known to the market. *See Lea v. TAL Educ. Grp.*, 837 F. App'x 20, 28 (2d Cir. 2020) (loss causation adequately pled based on short seller's report despite similar "public sources" disclaimer). Prior to the publication of the Hindenburg Report, it was certainly *not* public knowledge that Mullen never had a battery partnership with NextMetals, that a customer Mullen claimed would soon buy hundreds of vehicles had only 11 trucks, or that EV Grid had only conducted a single test for Mullen which said nothing about the driving range of any vehicle.[4]

Defendants argue that their April 18, 2022 press release cannot be a corrective disclosure because "it was never *intended* to update prior disclosures" and does not explicitly "confirm[] that [Mullen]'s prior announcements about battery partnerships were fake." MTD at 32. That is not the standard for loss causation. A corrective disclosure "need not . . . consist of an admission of fraud . . . [nor] precisely mirror

---

[4] As such, Defendants' reliance on *Hunt v. Bloom Energy Corp.*, 2021 WL 4461171 (N.D. Cal. Sept. 29, 2021), is misplaced. In that case, while acknowledging that a report by Hindenburg *could* constitute a corrective disclosure if it provided "additional" information not already reflected in the company's stock price, the court found that the specific report at issue "appears based on public utility data from California and New York," and did not supply additional, non-public facts. *Id.* at *19-20. Here, the relevant allegations in the Hindenburg Report derive not from mere aggregation of widely available data, but from facts previously unknown to the market, revealed for the first time on April 6, 2022. *See* ¶¶201-05.

the earlier misrepresentation." *BofI*, 977 F.3d at 790. That press release revealed to investors that Mullen would have to resort to trying to make its own batteries. *See* ¶209 ("Mullen is undertaking this effort to reduce dependency on third-party suppliers"). This effectively confirmed that, as Hindenburg had shown only two weeks earlier, Mullen's battery "partnerships" were defunct or fake. The market responded immediately, with Mullen's stock price falling by 14.8%. ¶211. This more than suffices to plead loss causation, and Mullen's argument that this decline merely reflects "the market reacting to external news" is completely unsupported by any mention of what such "external news" might have been. Regardless, this is a premature attempt to assert fact-specific arguments not appropriately resolved on the pleadings. *See In re CytRx Corp. Sec. Litig.*, 2017 WL 5643161, at *11 (C.D. Cal. Aug. 14, 2017) ("Because loss causation is a 'fact-specific' inquiry, it is normally inappropriate to rule on loss causation at the pleading stage").

## VIII.  DEFENDANT MICHERY CONTROLS MULLEN

"Whether a defendant is a controlling person is an intensely factual question, involving scrutiny of the defendant's participation in the day-to-day affairs of the corporation and the defendant's power to control corporate actions." *Questcor*, 2013 WL 5486762, at *24. Here, that test is easily met. At all relevant times Defendant Michery has been Mullen's CEO, founder, President, Chairman, largest shareholder, and public face, closely controlling all aspects of Mullen's business, and establishing an "authoritarian" office environment. *See, e.g.*, ¶¶2, 25-27, 241. Defendant Michery controlled Mullen's public statements, as evidenced by the inclusion of his own quotes in almost every misleading press release published by Mullen. *See* ¶¶138-39, 148, 154, 164, 168, 173-74, 179, 185, 189, 195, 198; *see also* ¶56 ("Every single press release was David [Michery] saying, 'I need to say this, put it out tomorrow.' And, almost every single time, it was not true.").

## IX.   PLAINTIFF HAS STANDING TO BRING CLAIMS AGAINST ALL DEFENDANTS

Defendants argue that the proposed class lacks standing to challenge most of their misstatements, due to mere technicalities of corporate form relating to Mullen's November 2021 reverse merger. *See* MTD at 11-13. Not so. Investors have standing against defendants where, as here, their misrepresentations bear a direct relationship to the purchased securities. Defendants fail to acknowledge that they are asking this Court to impose a sweeping change in law that would arbitrarily limit the scope of investor protections under the federal securities laws. Defendants' argument hinges on a single out-of-circuit opinion, which is inapposite, is not persuasive, and conflicts with better-reasoned in-circuit authority. Defendants' proposed rule would have the disastrous consequence of authorizing all private companies going public via mergers to knowingly lie to investors. Defendants' proposed rule is not the law, and this Court should not be the first in the Ninth Circuit to adopt it.

### A.   Investors Have Standing Against Defendants Whose Misstatements Directly Relate To The Purchased Securities

The Supreme Court has long held that defendants other than the issuer of the securities purchased by plaintiffs may be held liable under Exchange Act §10(b) for fraud relating to those securities. *See Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 191 (1994) ("Any person or entity, including a lawyer, accountant, or bank, who . . . makes a material misstatement (or omission) on which a purchaser or seller of securities relies may be liable as a primary violator under 10b–5"). Indeed, unlike claims under certain other federal securities laws which "can only be brought against certain parties, a Section 10(b) action can be brought by a purchaser or seller of '*any* security' against '*any* person' who has used '*any* manipulative or deceptive device or contrivance' in connection with the purchase or sale of a security." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983). This is in keeping with the Supreme Court's and Ninth Circuit's repeated admonitions that §10(b) is to be interpreted broadly to protect investors from fraud. *E.g.*, *Affiliated*

*Ute Citizens of Utah v. United States*, 406 U.S. 128, 151 (1972) ("Congress intended securities legislation enacted for the purpose of avoiding frauds to be construed not technically and restrictively, but flexibly to effectuate its remedial purposes"); *McGann v. Ernst & Young*, 102 F.3d 390, 396 (9th Cir. 1996) (rejecting proposed rule that "would exempt from the remedial breadth of § 10(b) a broad range of misinformation and market manipulation").

Contrary to Defendants' misleading argument, the Supreme Court has never held that "plaintiffs must have 'dealt in' the securities of the entity *that made the challenged statement*." *See* MTD at 12. Rather, *Blue Chip Stamps v. Manor Drug Stores* merely held that plaintiffs must actually "purchase" or "sell" securities to have standing. 421 U.S. 723, 725, 731 (1975). As Defendants' own out-of-context quote shows, *Blue Chip* held that plaintiffs must have "*at least dealt* in the security to which the . . . representation, or omission *relates*," because unlike decisions *not* to transact, this "will generally be an objectively demonstrable fact." *Id*. at 747. Certainly, it is possible for a misrepresentation to *relate* to a security other than one issued by the maker of the statement, and transactions in such other securities are no less objectively demonstrable. The Supreme Court has never suggested otherwise.

Well-reasoned authority within the Ninth Circuit holds that defendants other than a security's issuer can properly be held liable under §10(b). Tellingly, Defendants' do not cite a single in-circuit authority supporting their standing argument, and Plaintiff's research has not revealed any. The leading case on point is *Zelman v. JDS Uniphase Corp.*, 376 F. Supp. 2d 956 (N.D. Cal. 2005). The *Zelman* plaintiff bought equity-linked debt securities issued by a third-party bank, payments on which depended on the price of JDS Uniphase stock. *Id*. at 958. She sued JDS Uniphase, arguing that its false statements caused the bank-issued securities to trade at inflated prices. *Id*. at 958-59. After conducting a detailed analysis of relevant case law and policy considerations, Judge Schwarzer concluded that the plaintiff had standing to sue JDS Uniphase, because its false statements bore a "direct relationship"

to the value of the third-party issued securities purchased by the plaintiff. *Id.* at 961, 963. The court also held that plaintiffs satisfied the "in connection with" requirement of §10(b), because under "the Ninth Circuit's flexible standard," the "fraud 'relate[d] to . . . some . . . factor with . . . [a] connection to the securities'." *Id.* at 965 (quoting *Ambassador Hotel Co. v. Wei-Chuan Inv.*, 189 F.3d 1017, 1026 (9th Cir. 1999)). Significantly, in discussing both the "standing" and "in connection with" prongs of his holdings, Judge Schwarzer analogized the facts of *Zelman* to the merger context at issue here. *See Zelman*, 376 F. Supp. 2d at 961, 965.

At least one other court in the Ninth Circuit has similarly rejected Defendants' argument. In *Plumley v. Sempra Energy*, 2017 WL 2712297, at *1 (S.D. Cal. June 20, 2017), plaintiffs sued publicly traded Sempra Energy, and its subsidiary Southern California Gas Company ("SCG"). *Id.* at *1. SCG argued that the plaintiffs lacked standing against it, because they only purchased Sempra stock. Judge Benitez rejected the argument, holding "[w]here, as here, a plaintiff alleges it relied upon a third-party's (i.e. SCG's) materially false statements or omissions in connection with the purchase or sale of securities (i.e. Sempra stock), he or she has sufficiently pled facts to demonstrate standing." *Id.* at *5. Courts around the country have reached similar results. *See, e.g.*, *Semerenko v. Cendant Corp.*, 223 F.3d 165, 177 (3d Cir. 2000) ("it is no defense that the alleged misrepresentations were made in the context of a tender offer and a proposed merger, or that they did not specifically refer to the investment value of the security that was bought or sold"); *Klein v. Altria Grp., Inc.*, 525 F. Supp. 3d 638, 658 (E.D. Va. 2021) ("JUUL . . . can face liability for its own statements that Altria investors may have relied upon.").

### B.    Old Mullen's Misleading Statements Have A Direct Relationship To The Price Of Net Element Stock

The "direct relationship" standard articulated in *Zelman* is easily met here, because Old Mullen's false statements directly, and by design, were the main driver of the price of the Net Element stock purchased by Class members. Leading up to

June 2020, Net Element was a struggling payments processing company, whose stock publicly traded on the NASDAQ exchange. *See* ¶¶6-8. On June 15-16, 2020, Old Mullen and Net Element announced that they had signed a binding letter of intent for Old Mullen to go public via a reverse merger with Net Element. ¶¶136-44. They announced that Net Element would divest its existing business, leaving Mullen as a standalone public company after completion of the reverse merger, which they said was "expected to occur in the third quarter," *i.e.* within the next 3.5 months. Dkt No. 53-5. The reverse merger was not a genuine merger of two businesses, but in essence a backdoor for Mullen to obtain a public stock market listing without having to attempt a traditional initial public offering (which has more investor protections). *See* ¶6. And on August 5, 2020, Net Element announced that it and Old Mullen had executed a formal merger agreement. *See* Spencer Decl. **Ex. E**. After the reverse merger, the only business of publicly traded New Mullen (f/k/a Net Element) would be Old Mullen's electric vehicle business.

The actual, and intended, result of this series of announcements, was that the market (correctly) expected the merger to be completed, and so treated Net Element's publicly traded stock as representing the right to acquire an interest in Old Mullen's business, with Net Element's stock price movements driven by news published by Old Mullen. In fact, over the weeks following the June 2020 announcement of the reverse merger, Net Element's publicly traded stock price increased by approximately *650%* to over $15 per share, and remained at elevated levels through the November 2021 completion of the reverse merger, despite having traded around $2 per share in the months prior to June 2020 (back when the market priced the stock based on Net Element's business). *See* ¶¶8, 11.

Defendants themselves wanted investors to perceive a direct relationship between their misleading statements and Net Element's publicly traded stock. Every single misleading press release issued by Old Mullen after the June 2020 reverse merger announcement through its completion began with a nearly identical first

sentence prominently featuring Net Element's NASDAQ stock ticker symbol. *E.g.*, Dkt No. 53-7 ("Mullen Technologies, Inc. . . . an emerging electric vehicle . . . manufacturer and technology company, which previously announced a definitive agreement to merge with Net Element, Inc. (*NASDAQ:NETE*), in a stock-for-stock reverse merger . . ."); Dkt No. 53-10 (same); Dkt No. 53-14 (same). And Defendants wanted investors to believe their misleading statements, purchase Net Element stock, and vote it in favor of the reverse merger. *See* ¶¶111-14.

Moreover, New Mullen, which is in fact the exact same corporation as Net Element (after a change of name and stock market ticker symbol), is for all intents and purposes a mere continuation of Old Mullen's business, just repackaged into a different corporate form. New Mullen succeeded to Old Mullen's electric vehicle business, the two companies share the same headquarters, and in Defendant Michery they share the same CEO, director, founder, and controlling shareholder. *See* ¶¶25-27. Indeed, the registration statement that Net Element (working with Mullen) filed with the SEC in support of the reverse merger frequently lumps Old Mullen and New Mullen together as a single business. *See* Dkt No. 53-4 at 16 ("When we refer to 'Mullen' in this proxy statement/prospectus, we mean Mullen Technologies or Mullen Automotive, as the context may require.").

On these facts, there is clearly a "direct relationship" between Old Mullen's falsehoods and Net Element's (a/k/a New Mullen's) stock, and so purchasers of Net Element or New Mullen stock have standing to assert claims against Old Mullen.

**C.     The Out-Of-Circuit *Frutarom* Opinion Is Not Persuasive**

Defendants' standing argument boils down to the contention that this Court should blindly follow the result of *Menora Mivtachim Ins. Ltd. v. Frutarom Indus. Ltd.*, 49 F.4th 790 (2d Cir. 2022). Although that opinion lacks any controlling effect in the Ninth Circuit, Defendants fail to explain why its reasoning should persuade the Court. *Frutarom* is not persuasive, its holding is contrary to the better-reasoned in-circuit authorities discussed *supra*, and it is factually distinguishable.

At the outset, it bears noting that the same Second Circuit panel that issued the *Frutarom* majority opinion cited by Defendants has recognized errors in its holdings requiring substantial revision. After that opinion issued on September 30, 2022, the plaintiffs petitioned for rehearing (later denied), and a group of prominent securities law scholars filed a supporting *amicus* brief detailing the problematic nature of *Frutarom*'s holdings. *See* 2d Cir. Case No. 21-1076, Dkt No. 140 (*amicus* brief). Shortly thereafter, on November 30, 2022, the panel withdrew its original opinion and issued a superseding opinion that materially changed key language in the majority's holdings. *See generally Menora Mivtachim Ins. Ltd. v. Frutarom Indus. Ltd.*, 54 F.4th 82, 84 (2d Cir. 2022). However, even the revised majority opinion remains unpersuasive and creates a confusing new rule, potentially imposing unfounded standing requirements on plaintiffs in the Second Circuit.

In *Frutarom*, a U.S. publicly traded company named International Flavors & Fragrances Inc. ("IFF"), and an Israeli company named Frutarom, both operated in the fragrances industry. *Id.* at 84. IFF acquired Frutarom, with both businesses continuing to operate within the combined company after the merger. *Id.* at 84-85. IFF shareholders later sued Frutarom for misrepresenting its compliance with anti-bribery laws. *Id*. The *Frutarom* majority found no standing on these facts, on the basis of its newly created rule that plaintiffs must "have bought or sold the security *about which* a misstatement was made in order to have standing." *Id.* at 86.[5]

---

[5] The majority's reasoning was largely based on an over-extension of the Second Circuit's decision in *Ontario Pub. Serv. Emps. Union Pension Tr. Fund v. Nortel Networks Corp.*, 369 F.3d 27, 34 (2d Cir. 2004), which itself has been criticized in *Zelman* as not persuasive and "problematic." *Zelman*, 376 F. Supp. 2d at 962. The majority also made a policy argument that allowing the claims at issue would result in a slippery slope in which defendants with only a remote connection to a security would eventually be subjected to baseless litigation. *See Frutarom*, 54 F.4th at 87-88. However, the majority provides no convincing reason to think that courts are incapable of drawing a line between "remote" and "direct" relationships among the securities and false statements at issue in a given case.

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

33

As aptly pointed out by Judge Perez's concurring opinion, the *Frutarom* majority needlessly creates "new law," and "fails to explain how its new 'about which' standard is different from" the "relates" language employed by the Supreme Court in *Blue Chip*. *Id.* at 89-91. Judge Perez also noted Second Circuit precedent (brushed off by the majority) clarifying *Nortel*'s holding "as focusing on the significance of the relationship between alleged misstatements and plaintiff's purchase of the securities." *Id.*; *see also In re Turquoise Hill Res. Ltd. Sec. Litig.*, 2022 WL 4085677, at *17 (S.D.N.Y. Sept. 2, 2022) ("the Court rejects . . . Defendants' expansive reading of *Nortel* . . ."). The concurrence concludes by commenting on the majority's "judicial policymaking" and "disadvantages to [the] rigidity" of the majority's new formalistic rule. *Frutarom*, 54 F.4th at 94.

Regardless of *Frutarom*'s shortcomings, even if it were binding on this Court (it is not), it would not bar Plaintiff's claims. First, Old Mullen made misrepresentations "about" Net Element stock, satisfying even *Frutarom*'s unsupported rule. Unlike in *Nortel* and *Frutarom*, Net Element stock was essentially an empty vessel for Old Mullen's going public transaction, and *every* misleading Old Mullen press release prominently mentioned Net Element, its stock ticker symbol, and the planned reverse merger. *See supra* Part IX.B. Second, this case does not involve a merger of equals as in *Frutarom*, but a *de facto* IPO for Old Mullen's business in which all of Net Element's business and assets would be divested. Therefore, in misrepresenting its own business, Old Mullen was necessarily making misrepresentations about Net Element's (soon to be Mullen's) stock. Third, due to the *de facto* IPO context at issue here, the *Frutarom* majority's slippery slope concerns, unfounded though they were to begin with, are all the more inapplicable.

### D.    Defendants' Proposed Rule Would Authorize Blatant Fraud

Defendants ask this Court to adopt a formalistic rule that §10(b) plaintiffs can *only* bring claims against the issuer of the securities they purchased, no matter how direct the relationship with other defendants' fraud. Policy considerations weigh

heavily against Defendants' proposed rule. Under that rule, Old Mullen and Defendant Michery would be allowed to intentionally lie to investors, and defrauded investors would have no recourse against them. Worse still, all manner of securities fraud would escape liability, so long as defendants took the minimal precaution of using one legal entity to issue false statements, and another to issue securities.

Among the wide range of transactions that Defendants' rule may exempt from §10(b) liability are reverse mergers such as that undertaken by Mullen and numerous other companies. *See S.E.C. v. M & A W., Inc.*, 538 F.3d 1043, 1046-47 (9th Cir. 2008) (describing reverse mergers). Such transactions have a history of abuse, as demonstrated by the hundreds of foreign companies, many later revealed to be frauds, that went public via reverse mergers a decade earlier as a backdoor into U.S. public stock markets. *See* Spencer Decl. **Ex. F** (SEC's 2011 warning to investors about investing in foreign reverse mergers). Defendants' rule would have widespread consequences, with unscrupulous actors taking advantage to line their pockets at the expense of investors, the efficient operation of U.S. capital markets, and the broader functioning of the economy. The Court should reject Defendants' proposed rule as contrary to both policy and precedent.

## X.     PLAINTIFF REQUESTS LEAVE TO AMEND, IF NECESSARY

If the Court grants any part of Defendants' motion, Plaintiff requests leave to amend. *See* Fed. R. Civ. P. 15(a)(2); *Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003) ("Dismissal with prejudice and without leave to amend is not appropriate unless it is clear . . . that the complaint could not be saved by amendment"). While Plaintiff believes the AC more than sufficiently states a claim, she has not yet had the benefit of the Court's views on her pleading.

## XI.     CONCLUSION

Plaintiff respectfully requests that the Court deny the MTD in its entirety.

Dated: January 13, 2023

**GLANCY PRONGAY & MURRAY LLP**

By: *s/ Garth Spencer*
Robert V. Prongay (SBN 270796)
  *rprongay@glancylaw.com*
Charles Linehan (SBN 307439)
  *clinehan@glancylaw.com*
Garth Spencer (SBN 335424)
  *gspencer@glancylaw.com*
GLANCY PRONGAY & MURRAY LLP
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

*Lead Counsel for Lead Plaintiff*
*Mejgan Mirbaz*

**<u>PROOF OF SERVICE BY ELECTRONIC POSTING</u>**

I, the undersigned say:

I am not a party to the above case and am over eighteen years old. On January 13, 2023, I served true and correct copies of the foregoing document by posting the document electronically to the ECF website of the United States District Court for the Central District of California, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on January 13, 2023, at Wilmington, North Carolina.

*s/ Garth Spencer*
Garth Spencer
