UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | CV 22-3026-DMG (AGRx) | Date | September 28, 2023 |
|---|---|---|---|

| Title | *In re Mullen Auto. Sec. Litig.* | Page | 1 of 20 |
|---|---|---|---|

Present: The Honorable    DOLLY M. GEE, UNITED STATES DISTRICT JUDGE

| KANE TIEN | NOT REPORTED |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorneys Present for Plaintiff(s) | Attorneys Present for Defendant(s) |
|---|---|
| None Present | None Present |

**Proceedings:  [IN CHAMBERS] ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS [52]**

On November 5, 2021, Net Element, Inc., a struggling publicly traded payment processing company, merged with Mullen Technologies, Inc. ("Mullen Tech"), a small, privately owned electric vehicle ("EV") startup company founded and led by David Michery.  The merger formed Mullen Automotive, Inc. ("Mullen Auto").

Lead plaintiff Mejgan Mirbaz brings this proposed securities class action against Mullen Tech, Mullen Auto, and Michery under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("the Act") and Rule 10b-5, on behalf of those who acquired securities of Net Element and Mullen Auto between June 15, 2020 and April 18, 2022.  Mirbaz alleges that during this period, Defendants issued a stream of misleading press releases and other information to cause shareholders to believe that Defendants were on the cusp of revolutionizing battery technology and becoming one of the most successful EV companies in the industry and to mislead shareholders as to the demand for Defendants' EVs and their production capacity.

Defendants move for dismissal of the claim.  MTD [Doc. # 52].  For the reasons discussed below, the Court **GRANTS IN PART** and **DENIES IN PART** the MTD.

**I.**
**BACKGROUND**[1]

On June 15, 2020, Net Element announced the plan to merge with Mullen Tech, subject to Net Element's shareholders' approval.  Consolidated Amended Class Action Complaint ("AC") ¶ 5 [Doc. # 42].  Mullen Tech was allegedly then a failing private company controlled by Michery— its CEO, founder, president, chairman, largest shareholder, and public face.  *Id.* ¶¶ 9, 27.  By

---

[1] The facts in this section are derived from the allegations of the operative complaint, which are assumed to be true solely for the purpose of deciding the MTD.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | CV 22-3026-DMG (AGRx) | Date | September 28, 2023 |
|---|---|---|---|

| Title | *In re Mullen Auto. Sec. Litig.* | Page | 2 of 20 |
|---|---|---|---|

engaging in a "reverse merger" with Net Element, Mullen Tech could backdoor its way into a public stock market listing without having to complete a traditional IPO. *Id.* ¶ 6.

Mirbaz alleges that, during the class period, she purchased shares of Mullen Auto, and suffered damages as a result of the securities law violations that she alleges. *Id.* ¶ 24; *see also* Doc. # 42-3 at 2–4. Mullen Tech, later Mullen Auto, was an "extremely small" (*Id.* ¶ 229) company that lacked revenue, advanced battery technology, vehicle orders, or facilities usable for large-scale vehicle manufacturing. *Id.* ¶ 4. As of September 30, 2021, Mullen Tech employed only 44 full-time employees. *Id.* ¶ 34. For the period between September 30, 2019 and March 31, 2022, Mullen Tech, later Mullen Auto, realized no revenue and operated at a net loss. *Id.* ¶ 35. It relied upon financing activities, primarily the sale of securities, for cash. *Id.* ¶ 37. Nevertheless, Defendants issued a number of misleading press releases and Michery gave an interview that included false information about EV orders, grossly overstated unremarkable battery testing results, touted manufacturing facilities that were not actually usable, hyped unrealistic timelines, and promoted nonexistent commercial partnerships. *Id.* ¶ 60. These statements form the basis for Mirbaz's claims under the Act.

The first of these alleged misrepresentations were made on June 15 and 16 when Net Element[2] and Mullen Tech respectively issued press releases announcing their planned merger. *Id.* ¶¶ 136–44. They claimed that Mullen Tech expected to launch the Dragonfly K50, a luxury sports EV, in the first half of 2021 pursuant to its partnership with foreign EV manufacturer Qiantu Motor. *Id.* ¶ 137. The press releases also incorporated claims about Mullen Tech's advanced battery technology (and joint venture with foreign company NextMetals Ltd.) and its sale of an electric SUV to be produced in the United States and pre-launched in 2021. *Id.* ¶¶ 139–40. According to Mirbaz, however, the referenced corporate partnerships no longer existed at the time of the release, and the limited testing of Mullen Tech's battery did not support such exaggerated claims. *Id.* ¶ 144. In the weeks following the announcement of the merger, Net Element's publicly traded stock price rose to over $15 per share, when it had traded around $2 in the months leading up to the announcement. *Id.* ¶ 8.

Leading up to the merger, Mullen Tech continued to publish allegedly false information about its manufacturing capabilities, its battery's technical specifications, and its ability to manufacture and sell EVs. On August 10, 2020, a press release announced remarkable results from battery testing, which Mirbaz claims were false and simply exaggerated the results of the limited testing that had been performed. *Id.* ¶ 149. On September 24, 2020, Mullen Tech announced that it would be transforming its Monrovia, California facility into a state-of-the-art

---

[2] Although Net Element issued the June 15 press release, Mirbaz alleges Defendants supplied the pertinent information with the intent and understanding it would be published to Net Element's investors. AC ¶ 136.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | CV 22-3026-DMG (AGRx) | Date | September 28, 2023 |
|---|---|---|---|

| Title | *In re Mullen Auto. Sec. Litig.* | Page | 3 of 20 |
|---|---|---|---|

production facility for electric SUVs, with construction slated for completion in April 2021 and the first SUVs to be delivered to customers by the second quarter of 2022. *Id.* ¶ 151. That press release also claimed that Dragonfly pre-orders continued, notwithstanding that the partnership with Qiantu had long since dissolved. *Id.* ¶ 152. Mirbaz claims that these statements, too, were false because Mullen Tech did not have the ability to convert the facility so quickly or to complete regulatory and testing requirements for the SUV in time. *Id.* ¶ 155.

On October 1, 2020, Mullen Tech issued another press release, announcing that it was accepting preorders for the SUV, the MX-05. *Id.* ¶ 156. This press release doubled down on the aggressive timeline in the September 24, 2020 release, claiming that the Monrovia facility would be fully operational in mid-2021 and that first deliveries would occur in the second quarter 2022. *Id.* ¶¶ 157–58. In addition, the press release made claims about the SUV's capabilities that Mirbaz alleges were unsupported by any testing. *Id.* ¶¶ 159–60. On December 30, 2020, Mullen Tech claimed that the company Unlimited Electrical Contractors Corp. ("UEC") had executed a non-binding letter of intent to purchase up to 10,000 of the SUVs. *Id.* ¶ 162. The initial purchase order was estimated at $75 million and provided for delivery of the vehicles by 2025. *Id.* ¶ 163. Mirbaz claims that this pre-order was entirely false, as UEC was a small company that never had the ability or intent to purchase 10,000 EVs. *Id.* ¶ 165.

On March 8, 2021, Mullen Tech issued a press release announcing that it would be using Nextech battery technology, with Nextech cells to be used in vehicles launched as early as late 2023. *Id.* ¶ 168. Mirbaz asserts that, in fact, Nextech was in only the early research and development stages with its batteries and that these claims were, again, false. *Id.* ¶ 169. Three days later, on March 11, 2023, Mullen Tech announced that it had entered into an agreement to purchase a facility in Tunica, Mississippi, which was "turn-key" and allowed Mullen to begin vehicle assembly "now." *Id.* ¶¶ 171, 174. The March 11 press release claimed that Mullen would hire 50 or more people at this facility in the first year, to expand to over 200 employees in three years. *Id.* ¶ 172. Michery stated that this facility made Mullen Tech one of the very few EV companies with a manufacturing presence in the United States. *Id.* ¶ 173. Mirbaz asserts that these claims were untrue because, in fact, the facility needed substantial work and additional equipment to be ready to manufacture vehicles, Mullen Tech did not have the resources to hire 50 employees within a year, and Mullen Tech depended on importing and re-branding vehicles from other countries. *Id.* ¶ 175.

On March 18, 2021, Mullen Tech announced that it intended to execute a lease on a Memphis, Tennessee facility, where it would manufacture SUVs. *Id.* ¶ 178. Mullen claimed to be in midstage design efforts for the SUV in California, that it would build prototypes in Tunica, and that it would spend the next 33 months building the Memphis facility out to support large-

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | CV 22-3026-DMG (AGRx) | Date | September 28, 2023 |
|---|---|---|---|

| Title | *In re Mullen Auto. Sec. Litig.* | Page | 4 of 20 |
|---|---|---|---|

scale EV production. *Id.* ¶ 189. Mirbaz claims that these statements were false because Defendants had not, in fact, ensured that the Memphis facility was in adequate condition, their timelines were unrealistic given regulatory and testing requirements, and Mullen Tech was "nowhere close to" beginning EV production in Tunica. *Id.* ¶ 181.

On August 3, 2021, Mullen Tech issued a press release regarding a second order, claiming that "Height Dispensary, LTD" had entered a letter of agreement to purchase 1,200 Mullen Tech electric vans, an order valued at more than $60 million. *Id.* ¶ 183. The first vans would be delivered by the end of the third quarter of 2023. *Id.* ¶ 184. Again, however, Mirbaz claims that this order was fabricated because Heights had no need or capacity to purchase so many vans and because Mullen was not capable of manufacturing such a van. *Id.* ¶ 186.

Notwithstanding the claims that it would manufacture the vans, on September 21, 2021, Mullen Tech issued a press release stating that it would, in fact, be simply importing electric cargo vans from China and rebranding them. *Id.* ¶ 188. Mullen Tech stated that it had an agreement with Tenglong Automotive to import, homologate, and assemble Tenglong's vans in its Tunica plant. *Id.* Following the admission that Mullen Tech would import, rather than manufacture, the vans, Net Element's stock fell 7.4%. *Id.* ¶ 190. Mirbaz alleges, however, that even claims that Mullen Tech would import and assemble another manufacturer's EVs were false, as Mullen Tech never fulfilled any such orders and imported only two electric cargo vans. *Id.* ¶ 191.

On November 5, 2021, the reverse merger completed. Mullen Auto's stock closed trading at $11.77 per share that day. *Id.* ¶ 11. At this point, Mirbaz alleges, Mullen Auto had neither revenue nor significant cash on hand, so that it had to rely on issuing common stock to raise funds—and on artificially inflating the price of that stock. *Id.* ¶ 12. Whereas Net Element had only 5.4 million common shares before the reverse merger, by May 2022, Mullen had over 23 million outstanding shares. *Id.* ¶ 118. Mullen Auto raised over $100 million in net cash from financing activities in the six months ending March 31, 2022, including $40 million from the issuance of common stock. *Id.* ¶ 119. In addition, during the class period, Michery allegedly sold over $1 million of stock he personally held. *Id.* ¶ 12.

Mullen Auto and Michery continued to make what Mirbaz alleges were false claims about its battery technology and demand for its vehicles. On February 28, 2022, Mullen Auto issued a press release claiming to be an "update" regarding its battery technology, stating that testing revealed impressive technical specifications. *Id.* ¶ 194. Mirbaz claims that these results were exaggerated and there was still no new testing to support such claims. *Id.* ¶ 196. On March 30, 2022, Michery gave an interview in which he made vague claims that a mystery company had placed an order for "a lot of these vehicles [the vans]," which Mullen Auto was "actually building

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | CV 22-3026-DMG (AGRx) | Date | September 28, 2023 |
|---|---|---|---|

| Title | *In re Mullen Auto. Sec. Litig.* | Page | 5 of 20 |
|---|---|---|---|

for them." *Id.* ¶ 198. Michery refused to identify the company but claimed it was a "major major Fortune 500 company." *Id.* He further asserted that the pilot vehicles would be delivered in the second quarter of 2022. *Id.* Mirbaz alleges that these claims were entirely false and that Michery invented the order. *Id.* ¶ 199.

On April 6, 2022, Hindenburg Research LLC published "Mullen Automotive: Yet Another Fast Talking EV Hustle" ("the Hindenburg Report"), a 32-page report claiming to be an exposé of fake orders, over-hyped battery technology, unusable manufacturing facilities, unrealistic production timelines, and defunct commercial partnerships. *Id.* ¶ 14. Mullen Auto's stock price fell by 2.6% and then by 10.2% over the next two days, closing at $2.38 per share on April 7, 2022. *Id.*

In response, on April 18, 2022, Mullen Auto issued a final press release revealing that it would resort to manufacturing its own batteries and that it would use its Monrovia, California facility to do so—apparently abandoning the previously touted plans to manufacture SUVs at that site. *Id.* ¶ 16. Mullen Auto's stock fell to $1.41 per share by April 20, 2022. *Id.* ¶ 17. This represented an 88% loss from the November 5, 2021 stock price.

Mirbaz brings suit on the basis of the press releases and other statements noted above, claiming that these misrepresentations and omissions caused the precipitous decline in the value of Mullen Auto's securities. She relies on the Hindenburg Report as well as various statements by confidential witnesses who are former Mullen Tech employees. *Id.* ¶¶ 28–30.

On November 22, 2022, Defendants filed the pending MTD. The Court took the matter under submission on April 13, 2023. [Doc. # 67.] Defendants also request that the Court take judicial notice of various SEC filings and the press releases. [*See* Doc. # 61.] The request is unopposed, and the Court accordingly **GRANTS** it.

## II.
## DISCUSSION

### A.    Standing

Defendants argue that Mirbaz, who purchased shares of Mullen Auto, lacks standing as to statements made by Mullen Tech, a private company whose stock Mirbaz never purchased.[3] MTD

---

[3] Mullen Tech issued ten of the press releases at issue and as noted above, allegedly supplied the information for one of Net Element's press releases. *See* AC ¶ 136, 141, 145, 150, 156, 161, 166, 170, 176, 182, 187.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | CV 22-3026-DMG (AGRx) | Date | September 28, 2023 |
|---|---|---|---|

| Title | *In re Mullen Auto. Sec. Litig.* | Page | 6 of 20 |

at 20.  They rely on the Second Circuit's articulation of the "purchase seller rule" in *Menora Mivtachim Insurance Limited v. Frutarom Industries Limited*, 49 F.4th 790 (2022), *opinion withdrawn and superseded*, 54 F.4th 82 (2022), and on the Supreme Court's opinion in *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 747 (1975).

In *Blue Chip*, however, the Supreme Court considered whether *offerees* of a stock offering had standing—that is, persons who had neither purchased nor sold the relevant stock.  421 U.S. at 754–55.  The Court held that the plaintiffs did not have standing because merely abstaining from purchasing a stock offering is not a "purchase or sale."  *Id.*  Relying principally on policy considerations (in lieu of clear statutory language), the Court limited the judicially created private right of action in this situation.  *See Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 80 (2006).  The Court noted the longstanding acceptance of the purchaser seller rule in the lower courts, the conjectural nature of proving a claim and damages relating to abstaining from a purchase, and the "danger of vexatiousness [inherent to Rule 10b-5 litigation] different in degree and in kind from that which accompanies litigation in general."  *See Blue Chip*, 421 U.S. at 731–39 (noting that such litigation frustrates normal business activity of the defendant).  Without the purchase seller rule, "an action under Rule 10b-5 will turn largely on which oral version of a series of occurrences the jury may decide to credit, and therefore no matter how improbable the allegations of the plaintiff, the case will be virtually impossible to dispose of prior to trial other than by settlement."  *Id.* at 742.

This case, however, does not concern abstention from purchasing and does not fit within the rule articulated by *Blue Chip* or raise the same concerns regarding the speculative nature of a claim of abstention from purchase.[4]  This class is defined to require class members to have

---

[4] Defendants seize on the italicized language from *Blue Chip* quoted below as supporting their arguments (MTD at 21), but it is clear from context that this language addresses the distinction between purchasing a security and hypothesizing that but for certain misrepresentations, one would have purchased the security:

> The very real risk in permitting those in respondent's position to sue under Rule 10b-5 is that the door will be open to recovery of substantial damages on the part of one who offers only his own testimony to prove that he ever consulted a prospectus of the issuer, that he paid any attention to it, or that the representations contained in it damaged him.  The virtue of the *Birnbaum* [purchaser seller] rule, simply stated, in this situation, is that it limits the class of plaintiffs *to those who have at least dealt in the security to which the prospectus, representation, or omission relates*.  And their dealing in the security, whether by way of purchase or sale, will generally be an objectively demonstrable fact in an area of the law otherwise very much dependent upon oral testimony.

421 U.S. 723, 746–47 (emphasis added).  Similarly, Defendants cite the following language, but the Supreme Court did not explain what it meant by "stock in question"—a phrase that could equally be interpreted to mean Plaintiffs'

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | CV 22-3026-DMG (AGRx) | Date | September 28, 2023 |
|---|---|---|---|

| Title | *In re Mullen Auto. Sec. Litig.* | Page | 7 of 20 |
|---|---|---|---|

purchased or otherwise acquired a security.  *See* AC ¶ 1.  And contrary to the general acceptance of the purchase seller rule at the time of the *Blue Chip* opinion, Defendants fail to point to any Ninth Circuit authority—let alone a generally settled rule—barring a purchaser from bringing suit based on material misstatements made by a corporate predecessor to the company whose securities the plaintiffs acquired.  The Court further finds persuasive the conclusions of a judge in the Northern District of California who rejected arguments similar to Defendants'.  *See In re CCIV/Lucid Motors Sec. Litig.*, No. 4:21-CV-09323-YGR, 2023 WL 325251, at *1 (N.D. Cal. Jan. 11, 2023).

Defendants also rely on the Second Circuit's holdings in *Menora* and *Ontario Public Service Employees Union Pension Trust Fund v. Nortel Networks Corporation* ("*Nortel*"), 369 F.3d 27 (2004).  *Nortel*, decided first, held that standing does not exist to bring a claim "for making a material misstatement when the individual purchased the security of a company other than the one that made the misstatement."  369 F.3d at 28.  There, purchasers of stock of a fiber optic component manufacturer sued based on allegations that a telecommunications services company, the manufacturer's largest client, made misrepresentations about the telecommunications services company's prospects that were inaccurate.  *Id.* at 29.  When the true state of the company's business was revealed, both businesses' stocks tumbled.  *Id.*  *Nortel* represents an extension of *Blue Chip*'s holding, as the Second Circuit recognized:  "[w]hile plaintiffs correctly identify the factual context of *Blue Chip Stamps*, the Court's reasoning is nonetheless valuable in analyzing plaintiffs' claim."  *Id.* at 32.  *Nortel* applied the policy of restricting standing under Rule 10b-5 and discouraging potentially abusive litigation.  *Id.* at 32–33.

*Menora* reached the issue left open in *Nortel*—whether the same rule applies if the business that made the misstatements later was acquired by the business whose securities the plaintiffs owned—and again held that the plaintiffs had no standing.  54 F.4th at 84.  There, investors in a U.S. seller alleged that a foreign company concealed a long-running bribery scheme.  *Id.* at 84.  After the U.S. seller acquired the foreign company, the scheme came to light, causing the seller's share price to drop.  *Id.* at 84–85.  Again, the Second Circuit narrowly interpreted the private right of action in this context, citing *Blue Chip* and concluded that allowing standing under *Menora*'s circumstances would "erode" the purchaser seller rule.  *Id.* at 87.  *Menora* relied on *Nortel*'s citation of the language from *Blue Chip* regarding "plaintiffs . . . who have at least dealt in the security to which the prospectus, representation, or omission relates."  *See id.* at 88.  As noted above, the Court does not agree with Defendants' characterization of this language.

---

stock, here:  "[t]he *Birnbaum* rule, on the other hand, permits exclusion prior to trial of those plaintiffs who were not themselves purchasers or sellers of the stock in question."  *Id.* at 742; Reply at 10 [Doc. # 62].

**CIVIL MINUTES—GENERAL**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | CV 22-3026-DMG (AGRx) | Date | September 28, 2023 |
|---|---|---|---|

| Title | *In re Mullen Auto. Sec. Litig.* | Page | 8 of 20 |
|---|---|---|---|

The Court is not bound by *Menora* or *Nortel*, and the Court finds these decisions' extrapolations from *Blue Chip* unpersuasive. The rule in the Second Circuit is not uniformly adopted outside of that circuit. Indeed, the out-of-circuit cases discussing *Menora* reject it. *See In re CCIV/Lucid Motors Sec. Litig.*, 2023 WL 325251. In the CCIV/Lucid Motors Securities Litigation, Judge Rogers noted that although simple to apply, the rule in the Second Circuit failed to ensure "confidence in the markets," ignored that the Supreme Court has also rejected limitations on the Section 10(b) right of action in some circumstances, and overlooked that limiting standing in such a manner would be redundant with Section 10(b)'s materiality analysis. *See id.* at *9–*10; *see also In re Robinhood Ord. Flow Litig.*, No. 4:20-CV-9328-YGR, 2023 WL 4543574, at *1 (N.D. Cal. Jan. 18, 2023) (relying on the same analysis).

Similarly, the only other court in this circuit to address *Nortel* has rejected its reasoning. *Zelman v. JDS Uniphase Corp.*, 376 F. Supp. 2d 956, 962 (N.D. Cal. 2005) ("The Court also hesitates to apply *Nortel* to the present case because the Second Circuit's rationale in that decision is problematic. . . . Moreover, the conclusion reached in *Nortel* is not compelled by *Blue Chip Stamps*. . . . [T]he proof problems the *Blue Chip Stamps* Court described in connection with claims of harm resulting from decisions not to act are not present in situations such as the present case or *Nortel*, where documentary proof of transactions is available."). Other district courts that have adopted the holding in *Nortel* have done so with little explanation, and the Court does not find their analysis persuasive. *See, e.g.*, *In re: Altisource Portfolio Sols., S.A. Sec. Litig.*, No. 14-81156 CIV-WPD, 2015 WL 12001262, at *4 (S.D. Fla. Sept. 4, 2015) ("Plaintiffs have been unable to cite any case in which a court has found standing in similar circumstances. . . ."); *see also In re CCIV/Lucid Motors Sec. Litig.*, 2023 WL 325251, at *8 n.14 (discussing other cases).

In short, the Court is not persuaded by the nonbinding authority cited by Defendants. The Court denies the request to dismiss certain claims for lack of standing.

**B.    Failure to State a Claim**

Defendants further argue that Mirbaz's claims should be dismissed because (1) she fails to allege falsity, scienter, or loss causation as to some or all claims, (2) the statements fall within the protections of the PSLRA's safe harbor or the "bespeaks caution" doctrine, and (3) the section 20(a) claim is not adequately alleged. These arguments are addressed in turn.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | CV 22-3026-DMG (AGRx) | Date | September 28, 2023 |
|---|---|---|---|

| Title | *In re Mullen Auto. Sec. Litig.* | Page | 9 of 20 |
|---|---|---|---|

**1.      Legal Standard**

**a.      Elements of a Claim under the Act and Rule 10b-5**

To recover damages for violations of section 10(b) and Rule 10b-5, a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.

*Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014) (internal citations and quotation marks omitted).

Federal Rule of Civil Procedure 9(b) requires a plaintiff to "state with particularity the circumstances constituting fraud." "Averments of fraud must be accompanied by the who, what, when, where, and how of the misconduct charged." *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009) (internal citations and quotation marks omitted). "[T]he PSLRA extended Rule 9(b)'s particularity requirement to allegations of scienter. Thus, to adequately plead scienter, a complaint must 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Prodanova v. H.C. Wainwright & Co., LLC*, 993 F.3d 1097, 1106 (9th Cir. 2021) (quoting 15 U.S.C. § 78u-4(b)(2)(A)). "To support a 'strong inference' of scienter under the PSLRA, a complaint must allege that the defendant made false or misleading statements with an 'intent to deceive, manipulate, or defraud,' or with deliberate recklessness." *Id.* (internal citation omitted). Deliberate recklessness "is 'an extreme departure from the standards of ordinary care . . . which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.'" *Id.* (internal citation omitted).

"[I]n determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 323 (2007). "A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324. The allegations of the complaint must be considered collectively. *Id.* at 325; *see also Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 766 (9th Cir. 2023) ("Falsity is subject to a particularity requirement and the *reasonable inference* standard of plausibility set out in *Twombly* and *Iqbal*, and scienter is subject to a particularity requirement and a *strong inference* standard of plausibility.").

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | CV 22-3026-DMG (AGRx) | Date | September 28, 2023 |
|---|---|---|---|

| Title | *In re Mullen Auto. Sec. Litig.* | Page | 10 of 20 |
|---|---|---|---|

### b.      Use of Confidential Witnesses

When assessing the adequacy of a pleading in the PSLRA context, the Ninth Circuit has held that confidential witness testimony is adequate in two circumstances:

> First, if a complaint relies on a confidential witness and other factual information, the confidential witness need not reveal his sources provided the other facts provide an adequate basis for believing the defendant's statements were false. . . .  Second, if the complaint relies on a confidential witness and no other information, the complaint must describe the confidential witness with "sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged.". . .  In determining whether the complaint has "provide[d] an adequate basis for determining that the witnesses in question have personal knowledge of the events they report," the court considers the level of detail provided by the confidential witnesses, the plausibility of the allegations, the number of sources, the reliability of the sources, corroborating facts, and similar indicia of reliability.

*Glazer Cap. Mgmt., L.P.*, 63 F.4th at 767 (internal citations omitted).

### 2.      Falsity

### a.      June 15, 2020 Press Release

Defendants assert that the June 15, 2020 merger announcement by Net Element is not actionable because (1) it merely announced a planned reverse merger and future business objectives and (2) it contained none of Net Element's own false statements.  MTD at 22–23.

But the announcement goes beyond merely discussing plans and objectives that later proved to be unfounded.  *Cf. Ronconi v. Larkin*, 253 F.3d 423, 430 (9th Cir. 2001) ("[F]raud by hindsight is not actionable." (internal citation and quotation marks omitted)), *overruled on other grounds as recognized in Glazer Cap. Mgmt., L.P.*, 63 F.4th at 766.  It incorporates specific assertions of then-present fact.  The announcement touts the Qiantu Motors partnership, which the AC otherwise alleges had already been terminated due to Mullen Tech's default, and claims that Mullen Tech had "unique" battery technology notwithstanding the allegedly unexceptional results of battery testing.  *See* AC ¶¶ 137, 139.  Moreover, while Net Element is not a defendant in this action, Mullen Tech is, and the AC alleges that *Mullen Tech* supplied this information to Net Element with the intent that Net Element publish the information to investors.  *Id.* ¶ 136.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | CV 22-3026-DMG (AGRx) | Date | September 28, 2023 |
|---|---|---|---|

| Title | *In re Mullen Auto. Sec. Litig.* | Page | 11 of 20 |
|---|---|---|---|

Defendants' arguments are not persuasive as to claims against Mullen Tech regarding the June 15, 2020 merger announcement.

**b.      February 28 and April 18, 2022 Press Releases**

Defendants claim that Mirbaz has not alleged any reliable fact to support that statements in the February 28 and April 18, 2022 press releases regarding battery testing results were false and that Mirbaz improperly relies on the Hindenburg Report for support. MTD at 23–24. The press releases in question purport to provide updates on Mullen Auto's battery technology. They assert that testing showed a range of up to 600 miles from a single charge of a cell (AC ¶ 195), Mullen Auto planned to begin battery pack production in Monrovia, California, and as of April 18, 2022, the company was in the process of retrofitting the facility for battery production. *Id.* ¶ 209.

As for the February 28 press release, it is not *per se* improper for a short-seller report to be incorporated into and form the basis of a securities class action complaint's allegations regarding falsity. *See, e.g.*, *Snellink v. Gulf Res., Inc.*, 870 F. Supp. 2d 930, 939 (C.D. Cal. 2012); *In re China Educ. All., Inc. Sec. Litig.*, No. CV 10-9239 CAS (JCx), 2011 WL 4978483, at *4 (C.D. Cal. Oct. 11, 2011). Disputes about the reliability of the Hindenburg Report are factual disputes to be resolved at a later stage. And while allegations of confidential witness testimony are subject to special standards in securities fraud litigation (*see supra* part II(B)(1)(b)), the Hindenburg Report does not rely on confidential witness testimony as to Defendants' battery technology. The Report cites the statements of the CEO of the company (EV Grid, Inc.) that tested the battery, Tom Gage.[5] Gage allegedly stated that Defendants' representations about the battery were unfounded, he completed a charge/discharge test of a cell in 2018 or 2019, and the test results did not support claims about charge/recharge time or advancement over current technology. *See* AC ¶¶ 68–71. The AC alleges that Gage stated the test results showed "300 or 320" ampere hours from a cell, the cell appeared "handmade" and "like a prototype cell," and claims about the results showing the ability of an EV to travel up to 640 miles at 55 mph "don't equate" with the test results. *See id.* ¶ 70 ("Gage explained . . . that several additional variables would need to be taken into consideration in order to reach the conclusion set forth in Mullen's statement."). Gage's opinion as to the meaning of the test is a plausible basis for the complaint's allegations. While Gage disclaimed that he lacked expertise regarding battery production or Defendants' research capabilities, his alleged statements go beyond these matters and discuss the battery's technical specifications—the subject of the alleged misrepresentations. *See* Reply at 16–17. Moreover, other allegations in the AC support that Defendants lacked the ability to produce batteries for use

---

[5] Mirbaz asserts that no additional testing was completed after EV Grid's testing.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | CV 22-3026-DMG (AGRx) | Date | September 28, 2023 |
|---|---|---|---|

| Title | *In re Mullen Auto. Sec. Litig.* | Page | 12 of 20 |
|---|---|---|---|

in EVs, such as that notwithstanding their claims about their own battery technology in 2020, in 2021 they claimed that they would use another company's technology instead.  AC ¶ 168.

The Court agrees with Defendants, however, that Mirbaz has not plausibly alleged the falsity of statements in the April 18, 2022 press release.  Mirbaz does not explain which parts of the press release are false or why.  Rather, she alleges that the press release—"Mullen Automotive to Begin Construction for EV Battery Pack Production at High Voltage R&D Facility in Monrovia, California"—"confirmed certain key aspects of the Hindenburg Report."  *Id.* ¶ 208.  Claims about the April 18, 2022 press release will accordingly be dismissed, with leave to amend.

  **c.**  **March 30, 2022 Interview**

Mirbaz alleges that Michery made false statements regarding the mystery Fortune 500 customer who placed an order for electric vans.  Defendants argue that these statements are mere "textbook corporate optimism," so that they are not actionable.  MTD at 24.

But as alleged, Michery claimed to actually be building electric vans to fulfill a large order from a "major major Fortune 500 company" that he refused to identify.  AC ¶ 198.  Mirbaz alleges that these statements were blatant lies.  Thus, the alleged statements go well beyond the mere corporate puffery that was not actionable in Defendants' cited authority.  *See* Reply at 18 (citing *In re LeapFrog Enterprises, Inc. Sec. Litig.*, 527 F. Supp. 2d 1033, 1050 (N.D. Cal. 2007)).  Michery further allegedly claimed that Mullen Auto would be able to deliver the vans by the second quarter of 2022—claims that Mirbaz has plausibly alleged were unfounded when Mullen Auto imported only two electric vans and did not have regulatory authorization to begin selling the vans.  *See id.* ¶¶ 198–99.  As noted above, the Hindenburg Report may be relied upon at this stage for the allegations that the EPA had no record of Mullen obtaining appropriate certificates for importing EV vans.  *See id.* ¶ 89; *see also* Reply at 16.

  **3.**  **Scienter**

  **a.**  **Contemporaneous Allegations of Scienter**

Regarding scienter, Defendants argue that there are no particularized facts creating a strong inference that Michery was personally aware the information in the press releases was false.  *See* MTD at 32.  They rely on the rule that "corporate management's general awareness of the day-to-day workings of the company's business does not establish scienter—at least absent some additional allegation of specific information conveyed to management and related to the fraud."  *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1068 (9th Cir. 2008).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | CV 22-3026-DMG (AGRx) | Date | September 28, 2023 |
|---|---|---|---|

| Title | *In re Mullen Auto. Sec. Litig.* | Page | 13 of 20 |
|---|---|---|---|

The rule from *Metzler* is qualified, however, by the rule that bare allegations of falsely reported information can be probative of scienter if "the information is readily apparent to the defendant corporation's senior management." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1001 (9th Cir. 2009). The falsity must be patently obvious: the facts must be so prominent that it would be *absurd* to suggest top management was unaware of them. *Id.* That theory supports the AC here. For instance, Mirbaz alleges that at the time that Michery personally touted the existence of the Qiantu Motors partnership (*see* AC ¶ 138), Qiantu Motors had not only terminated the agreement but there was litigation between the parties. *Id.* ¶¶ 96–97. As alleged in the AC, the partnership with Qiantu was critical to the sale of the Dragonfly—a core business objective of Mullen Tech at this time. The Court agrees with Mirbaz that it is simply not plausible and would be absurd for Michery, the CEO, founder, and public face of a small EV company, not to know of the partnership's breakdown.

Similarly, multiple press releases claimed that Defendants were on the forefront of EV battery technology, making claims about remarkable results from the testing of Defendants' in-house prototype. But Mirbaz's allegations, credited as true, create a strong inference that Michery simply fabricated statements about battery technical specifications, such as "[w]e can say with almost certainty that this technology, once implemented . . . will deliver over 600 miles of range on a full charge." *Id.* ¶ 195. Inventing statements about the technical specifications of the Mullen battery without an underlying factual basis would, if true, clearly be an example of Michery intending to deceive investors. And again, where a core feature of Defendants' business was the claimed creation of its own groundbreaking battery technology, it would be absurd to suggest that Michery, Defendants' founder and CEO, simply restated false claims about Defendants' battery technology without scienter. *See Zucco Partners, LLC*, 552 F.3d at 1001.

Claims that Michery made about Defendants' American manufacturing presence and orders by a major Fortune 500 company are also supported by allegations that give rise to a strong inference of scienter. Mirbaz alleges, for instance, that on March 11, 2021, Mullen Tech issued a press release stating that a newly acquired Tunica, Mississippi facility was "turn-key," had the ability to assemble vehicles "now," and would employ 50+ people in the first year. Michery allegedly stated that *due to the Tunica facility*, "we are among the very few EV companies that have a manufacturing presence in the US." AC ¶¶ 171–73. The AC alleges, however, that the plant's previous owner closed it without ever producing a car (*id.* ¶ 82), the plant did not appear to have assembly lines or robotic manufacturing machines from a video posted on Mullen Tech's own website (*id.* ¶ 83), and according to a Tunica community partner, hiring was not planned to begin until mid-2022. *Id.* ¶ 91. The AC creates a strong inference that Michery deliberately misled the public when he claimed there was a present ability to manufacture in the U.S. at the Tunica factory because it would be absurd for the CEO not to be aware of such prominent facts. *See*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | CV 22-3026-DMG (AGRx) | Date | September 28, 2023 |
|---|---|---|---|

| Title | *In re Mullen Auto. Sec. Litig.* | Page | 14 of 20 |
|---|---|---|---|

*Zucco Partners, LLC*, 552 F.3d at 1001. Michery's vague claims in a March 2022 interview about a Fortune 500 company's order are also, as plausibly alleged in the AC, flat out lies. *See supra* part II(B)(2)(c). The nature of these allegations strongly implies scienter on Michery's part when he made the statements.

In short, the Court disagrees with Defendants' arguments that the AC contains no allegations of contemporaneous statements or conditions creating a strong inference of scienter.[6] *See* MTD at 32.

**b.      Confidential Witnesses**

Defendants further argue that the AC relies upon confidential witnesses to establish scienter without meeting the rigorous standard for such allegations. MTD at 34. Although the Court agrees that certain of the confidential witness-based allegations are inadequate and dismisses specific claims discussed below, the remainder of the allegations are adequate.[7]

Confidential witness statements form the sole basis for claims that (1) a partnership with NextMetals Ltd never existed (*see* AC ¶ 58) and (2) that the Monrovia, California and Memphis, Tennessee factories could not be used for manufacturing on the timelines claimed by Defendants. *See id.* ¶¶ 76–81, 103–05. As for the NextMetals partnership, the AC relies entirely on allegations by an unnamed "senior executive knowledgeable"—which is inadequate under *Zucco Partners, LLC*, 552 F.3d at 1001 (requiring confidential witnesses to be described with sufficient particularity to establish their reliability and personal knowledge). Regarding the Monrovia and Memphis facilities, the AC relies on statements made by a "former battery specialist" who worked at the California facility for an unspecified period (AC ¶¶ 52, 76–77), the statements of "FE1" about plans for Monrovia going "nowhere" (*id.* ¶ 77), and statements of "FE2" about the dilapidated condition of the Memphis facility. *Id.* ¶¶ 79–81.

---

[6] Defendants argue that the AC insufficiently alleges motive, based on Michery's stock sales and the timing of the reverse merger. MTD at 37–38. As the allegations regarding motive are supplemental to the other allegations of scienter in the AC (which are adequate), the Court does not address these arguments. *See Tellabs, Inc.*, 551 U.S. at, 325 (absence of allegations of motive not fatal if the complaint otherwise plausibly alleges scienter).

[7] While the Court agrees that certain confidential witness statements in the Hindenburg Report are not described with the specificity necessary to survive a motion to dismiss, the Court disagrees with the proposition that a short-seller report cannot be incorporated as support for allegations of scienter. Defendants' own cited authority supports that the Report may be considered to the extent it relies on identified witnesses and documentary evidence. *See Diaz v. N. Dynasty Mins. Ltd.*, No. 17-CV-1241 PSG (SS), 2018 WL 5099749, at *7–*8 (C.D. Cal. Apr. 30, 2018) (*cited in* MTD at 33).

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | CV 22-3026-DMG (AGRx) | Date | September 28, 2023 |
|---|---|---|---|

| Title | *In re Mullen Auto. Sec. Litig.* | Page | 15 of 20 |
|---|---|---|---|

With regard to the "former battery specialist," the details alleged about this person are inadequate to establish the witness's reliability and personal knowledge. *See Zucco Partners, LLC*, 552 F.3d at 995. FE1 is described with more particularity, as a person who "worked at Mullen during approximately January 2018 to 2020 as Vice President, Marketing & Creative. FE1 left Mullen for a time, then returned as a subcontractor in early 2021, leaving again in mid-2021." AC ¶ 28. However, as relevant to this issue, FE1 simply describes his frustration working on the design for a facility that went nowhere and speculates that Michery "probably" never intended to finish the project. *See* AC ¶ 77. While matters of design may well be within a marketing and creative executive's purview, these conclusory statements do not create a strong inference that Michery misrepresented plans for the Monrovia facility. *See Zucco Partners, LLC*, 552 F.3d at 995.

Similarly, FE2's alleged statements about what he overheard other employees say regarding the Memphis facility are inadequate. *See Zucco Partners, LLC*, 552 F.3d at 998 n.4 ("[A] hearsay statement, while not automatically precluded from consideration to support allegations of scienter, may indicate that a confidential witnesses' report is not sufficiently reliable, plausible, or coherent to warrant further consideration"). FE2 was a financial reporting consultant for the company, and his statements about the Memphis facility are not adequate to allege scienter in light of the lack of detail regarding his personal knowledge of these matters.[8] *See* AC ¶¶ 79–81.

The AC—and, to the extent it incorporates the Hindenburg Report as evidence of scienter, the Report—do not rely solely on confidential witness statements. For the most part, confidential witness statements provide background information about corporate culture and company finances but are not the crux of the allegations of scienter. The Court accordingly dismisses the claims based on alleged misrepresentations about the Monrovia and Memphis facilities and about the NextMetals Ltd. Partnership, inasmuch as those claims derive from confidential witness statements. Dismissal is with leave to amend, as amendment to include more detail regarding these witnesses would not be futile.

---

[8] Although the AC includes an allegation of an unpaid licensing fee to secure the Memphis facility in November 2021, this does not necessarily contradict Mullen Tech's press release in March 2021 about its then-intent to execute a lease and overhaul the Memphis facility in the future. *See* AC ¶¶ 176–78; *see Glazer Cap. Mgmt., L.P.*, 63 F.4th at 767 (requiring that facts corroborating a confidential witness's statements are an "adequate basis for believing the defendant's statements were false").

**CIVIL MINUTES—GENERAL**   Initials of Deputy Clerk KT

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | CV 22-3026-DMG (AGRx) | Date | September 28, 2023 |
|---|---|---|---|

| Title | *In re Mullen Auto. Sec. Litig.* | Page | 16 of 20 |
|---|---|---|---|

**4.    Loss Causation**

Loss causation—a causal connection between the deceptive acts that form the basis for the claim of securities fraud and the injury suffered by the plaintiff—must be pleaded with particularity.  *See Oregon Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 605, 608 (9th Cir. 2014).  In fraud-on-the-market cases such as this, the plaintiff alleges that the stock price was higher than it would have been had the false statements not been made.  *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 789 (9th Cir. 2020).  To establish loss causation, the plaintiff must show that after purchasing her shares and before selling, the truth became known and the revelation caused the fraud-induced inflation in the stock's price to be reduced or eliminated.  *Id.*  This is most commonly done by identifying a corrective disclosure.  *Id.* at 790.  A corrective disclosure can come from "any" source, such as an investigative reporter.  *Id.*

Mirbaz depends on the Hindenburg Report as the corrective disclosure.  Defendants argue that her reliance is misplaced because the Report revealed only publicly available information and was not prepared by a qualified author.  MTD at 39–40.  Defendants' argument derives from the principle that the market price will already reflect "all publicly available information."  *See Basic Inc. v. Levinson*, 485 U.S. 224, 247 (1988); *see also Meyer v. Greene*, 710 F.3d 1189, 1197 (11th Cir. 2013) ("The efficient market theory . . . posits that all publicly available information about a security is reflected in the market price of the security. . . .  A corollary of the efficient market hypothesis is that disclosure of confirmatory information—or information already known by the market—will not cause a change in the stock price."  (Internal citations and quotation marks omitted)).  But the Report includes more than readily available public information.  For instance, the authors of the report recounted information they received from contacting Tom Gage, Nextech's CEO, the EPA press office, the president of the Tunica County Chamber of Commerce and Economic Development Foundation, various former employees and executives, and others. [*See* Doc. # 42-1 at 6].  The AC adequately alleges that this information would not have been readily available to investors and was not already known by the market.  Moreover, although the Report contains a disclaimer that the information is obtained from "public sources we believe to be accurate and reliable," this disclaimer is not tantamount to stating that all the information is available and known to investors already.  *See* Doc. # 42-1 at 32–33.

Defendants cite *Hunt v. Bloom Energy Corp.*, No. 19-CV-02935-HSG, 2021 WL 4461171, at *19–20 (N.D. Cal. Sept. 29, 2021), as authority that the authors of the Hindenburg Report are not qualified.  MTD at 40.  To the extent that ruling is considered for its persuasive value, it concerns a different scenario, in which the report at issue relied upon public utility data that appeared to simply be repackaged and failed to explain how the authors had the expertise to

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | CV 22-3026-DMG (AGRx) | Date | September 28, 2023 |
|---|---|---|---|

| Title | *In re Mullen Auto. Sec. Litig.* | Page | 17 of 20 |
|---|---|---|---|

aggregate the data in such a manner as to add new information.  The Court's review of this Hindenburg Report does not cause it to have similar concerns.

**5.    PSLRA Safe Harbor and "Bespeaks Caution" Doctrine**

Defendants allege that the PSLRA's safe harbor and the bespeaks caution doctrine bar liability here because all the claims arise from "forward-looking statements."  MTD at 25.

**a.    Safe Harbor**

"The PSLRA . . . provides an additional barrier at the pleading stage in the form of a safe harbor for 'forward-looking statements.'"  *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010).   Forward-looking statements include projections of revenue, expenditures, or other financial items; statements of plans and objectives of management for future operations; statements of future economic performance; and statements of assumptions underlying such matters.  *See* 15 U.S.C. § 78u–5(i)(1).  "[I]n order to establish that a challenged statement contains non-forward-looking features that avoid this definition, a plaintiff must plead sufficient facts to show that the statement goes beyond the articulation of 'plans,' 'objectives,' and 'assumptions' and instead contains an express or implied 'concrete' assertion concerning a specific 'current or past fact.'"  *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1191 (9th Cir. 2021) (internal citations omitted).

Defendants acknowledge that the safe harbor does not apply to statements by Mullen Tech, which was a private company.  *See* MTD at at 42 n.13 (citing 15 U.S.C. § 78u-5(a)(1)).  As for the statements made after Mullen Auto (a publicly traded company) was formed, the February 28, 2022 announcement about the results of battery testing is purely an assertion of present or past fact.  *See* AC ¶¶ 193–95.  And while some of Michery's statements in the March 30, 2022 interview are forward-looking, there is no accompanying cautionary language.  *See* AC ¶¶ 197–98.  As noted above, the Court dismisses claims about the April 18 press release with leave to amend.  Finally, Defendants' reliance on 2021 SEC filings (predating the press releases and interview at issue) cannot amount to a showing of "accompanying" cautionary language.  *See* MTD at 27–29 (quoting Doc. # 61-3 at 4–6, 19–41 (Mullen Automotive, Inc.'s 2021 Form 10-K) and 61-3 at 13–15, 25–55 (Net Element's 2021 Amendment to Form S-4).

**b.    Bespeaks Caution Doctrine**

Defendants rely on the "bespeaks caution" doctrine as to claims about statements made by Mullen Tech.  *See* MTD at 42 & n.13.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | CV 22-3026-DMG (AGRx) | Date | September 28, 2023 |
|----------|----------------------|------|-------------------|

| Title | *In re Mullen Auto. Sec. Litig.* | Page | 18 of 20 |
|-------|----------------------------------|------|----------|

The bespeaks caution doctrine allows a court to rule as a matter of law that a defendant has provided enough cautionary language or risk disclosure to protect itself against securities fraud. *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1413 (9th Cir. 1994) (internal citation and formatting omitted). Similar to the safe harbor, the doctrine applies only to forward-looking projections. *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 949 (9th Cir. 2005).

Each of the challenged press releases, however, incorporates assertions of present or historical fact, which are not protected by the bespeaks caution doctrine. *See* AC ¶¶ 136–41 (June 15, 2020 press release including assertions about the Qiantu Motors partnership and the current technical capacities of Mullen's battery technology), ¶¶ 142–43 (June 16, 2020 press release with similar assertions), ¶¶ 145–48 (August 10, 2020 press release with assertions about battery technology), ¶¶ 150–54 (September 24, 2020 press release with additional assertions regarding DragonFly partnership), ¶¶ 156–69 (October 1, 2020 press release with assertions about SUV capabilities), ¶¶ 161–64 (December 30, 2020 press release with assertions about the letter of intent UEC executed), ¶¶ 166–68 (March 8, 2021 press release with assertions about Defendants' battery technology), ¶¶ 170–74 (March 11, 2021 press release with assertions about agreement to purchase the Tunica factory and that factory's current state), ¶¶ 176–80 (March 18, 2021 press release with assertions that the company was in midstage design efforts for the SUV), ¶¶ 182–85 (August 3, 2021 press release regarding letter of agreement indicating agreement with Height Dispensary to purchase vans), and ¶¶ 187–91 (September 21, 2021 press release regarding agreement to import EV vans).

To the extent Defendants rely on the doctrine for dismissal of the portions of claims based on forward-looking statements within these press releases, "economic projections, estimates of future performance, and similar optimistic statements" are "not actionable when precise cautionary language elsewhere *in the document* adequately discloses the risks involved." *In re Worlds of Wonder Sec. Litig.*, 35 F.3d at 1413 (internal citation and formatting omitted, emphasis added). "It does not matter if the optimistic statements are later found to have been inaccurate or based on erroneous assumptions when made, provided that the risk disclosure was conspicuous, specific, and adequately disclosed the assumptions upon which the optimistic language was based." *Id.* (internal citation and formatting omitted). The Ninth Circuit has applied this doctrine narrowly: "[a] motion to dismiss for failure to state a claim [on the basis of the doctrine] will succeed only when the *documents containing defendants' challenged statements* include 'enough cautionary language or risk disclosure,'. . . that 'reasonable minds' could not disagree that the challenged statements were not misleading." *Fecht v. Price Co.*, 70 F.3d 1078, 1082 (9th Cir. 1995) (citations omitted and emphasis added).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | CV 22-3026-DMG (AGRx) | Date | September 28, 2023 |
|---|---|---|---|

| Title | *In re Mullen Auto. Sec. Litig.* | Page | 19 of 20 |
|---|---|---|---|

Defendants cite to language in Mullen Tech's press releases disclaiming liability for forward-looking statements.  But other than generic cautionary language, the specific language in the press releases addresses "statements relating to the proposed production date of the [SUV] and perceived advantages and future deployment of the solid-state polymer battery technology."  [*See* Doc. ## 61-6–61-15 (Mullen Tech's press releases incorporating similar specific cautionary language).]  This is simply not specific enough that the Court can say as a matter of law every reasonable reader would understand after reading the cautionary language that, as alleged in the complaint, corporate partnerships did not exist, assertions about the implications of battery technology testing (as opposed to "perceptions") were false, the SUV did not have the claimed technical specifications, the Tunica factory was not ready for manufacturing, customer orders had not been placed, and van production timelines were impossible.  *See also Worlds of Wonder*, 35 F.3d at 1415 (requiring that the language bespeaking caution relate directly to that as to which the plaintiff claims to have been misled).[9]

### 6.    Section 20(a) Claim

Defendants argue that the section 20(a) claim should be dismissed because there is no viable section 10(b) claim or because allegations about Michery's status as CEO are too barebones to state a section 20(a) claim.  MTD at 43.  Because there are viable section 10(b) claims, the Court focuses on the latter argument.

"Whether [the defendant] is a controlling person is an intensely factual question, involving scrutiny of the defendant's participation in the day-to-day affairs of the corporation and the defendant's power to control corporate actions."  *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000) (internal citation and quotation marks omitted).  Defendants rely on cases holding that merely pleading a person is a company's CEO and sole owner is inadequate.  *E.g.*, *Katz v. China Century Dragon Media, Inc.*, No. LA CV11-02769 JAK, 2011 WL 6047093, at *6 (C.D. Cal. Nov. 30, 2011).  Plaintiffs plead not only that Michery was the CEO, founder, president, chairman, largest shareholder, and public face of "Mullen" (AC ¶ 2), but that he controlled both Mullen Tech (AC ¶ 6) and Mullen Auto.  AC ¶ 11.  Moreover, the AC incorporates multiple statements made by Michery himself indicating that he regularly spoke on behalf of both companies.  [*See also* Doc. # 61-3 at 110 (Mullen Auto's SEC filing signed by Michery on behalf

---

[9] The Ninth Circuit has cautioned that where forward looking statements rely on non-forward looking statements, "virtually *no* cautionary language short of an outright admission that non-forward-looking statements were materially false or misleading would have been adequate."  *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1148 (9th Cir. 2017) (emphasis added).  Although this holding is in the context of the PSRLA's safe harbor, the Ninth Circuit has noted that the safe harbor and bespeaks caution doctrines are analogous.  *See Employers Teamsters Local Nos. 175 & 505 Trust Fund v. The Clorox Co.*, 353 F.3d 1125, 1131 (9th Cir.2004).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | CV 22-3026-DMG (AGRx) | Date | September 28, 2023 |
|---|---|---|---|

| Title | *In re Mullen Auto. Sec. Litig.* | Page | 20 of 20 |
|---|---|---|---|

of the company).]  As such, the allegations in this case go beyond those in Defendants' cited unpublished cases, and the Court finds that Mirbaz has adequately pleaded that Michery was a control person.

### III.
### CONCLUSION

The MTD is **GRANTED IN PART** and **DENIED IN PART**.  The following claims are dismissed with leave to amend:  claims based on the April 18, 2022 press release; claims based on the June 16, 2020 press release to the extent they are based on information about a partnership with NextMetals Ltd.; and claims about the September 24, 2020, October 1, 2020, and March 18, 2021 press releases to the extent they pertain to the Monrovia or Memphis facilities.  Plaintiff's amended complaint shall be filed by **October 19, 2023**.  Defendants' response shall be filed within 21 days after the filing of the amended complaint.

**IT IS SO ORDERED**.