Robert V. Prongay (SBN 270796)
Casey E. Sadler (SBN 274241)
Garth Spencer (SBN 335424)
**GLANCY PRONGAY & MURRAY LLP**
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Email: rprongay@glancylaw.com
Email: csadler@glancylaw.com
Email: gspencer@glancylaw.com

*Counsel for Lead Plaintiff Mejgan Mirbaz
and the Settlement Class*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE MULLEN AUTOMOTIVE, INC. SECURITIES LITIGATION | Case No. 2:22-cv-03026-DMG-AGR |
| | Honorable Dolly M. Gee |
| | **DECLARATION OF GARTH SPENCER IN SUPPORT OF: (I) LEAD PLAINTIFF'S MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION; AND (II) LEAD COUNSEL'S MOTION FOR AN AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES** |
| | Hearing Date: June 20, 2025 Hearing Time: 10:00 a.m. Location:     350 West 1st Street Courtroom:    8C |

DECLARATION OF GARTH SPENCER

## TABLE OF CONTENTS

I.    INTRODUCTION ...........................................................................................3

II.   PROSECUTION OF THE ACTION ..............................................................8

    A.   Commencement of the Action and Appointment of Lead Plaintiff and Lead Counsel ...................................................................................8

    B.   The Comprehensive Pre-Filing Investigation and Preparation of the Complaint ..........................................................................................8

    C.   Defendants' Motion to Dismiss the Complaint and Lead Plaintiff's Opposition .............................................................................9

    D.   Fact Discovery ...................................................................................10

    E.   Mediation Efforts and Settlement Negotiations...................................11

    F.   The Court Grants Preliminary Approval of the Settlement, and Lead Plaintiff Succeeds in Compelling Defendants' Overdue Payment of the Full Settlement Amount.................................................12

III.  THE RISKS OF CONTINUED LITIGATION ..............................................14

    A.   Ability to Pay Risk.............................................................................14

    B.   Risks to Proving Liability ...................................................................17

    C.   Risk of Proving Loss Causation and Damages.....................................18

    D.   Risks Faced in Obtaining and Maintaining Class Action Status .........20

    E.   Other Risks, Including Trial And Appeals ...........................................20

    F.   The Settlement is Reasonable in Light of the Range of Potential Recovery in the Action ........................................................................21

IV.   LEAD PLAINTIFF'S COMPLIANCE WITH THE COURT'S PRELIMINARY APPROVAL ORDER REQUIRING ISSUANCE OF THE NOTICE.................................................................................................22

V.    ALLOCATION OF THE NET PROCEEDS OF THE SETTLEMENT ........25

VI.   LEAD COUNSEL'S REQUEST FOR ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES...................................28

A.      The Fee Application.................................................................................29

        1.      The Outcome Achieved is the Result of the Significant
                Time and Labor that Lead Counsel Devoted to the Action........29

        2.      The Risks of Litigation and the Need to Ensure the
                Availability of Competent Counsel in High-Risk
                Contingent Securities Cases .....................................................32

        3.      The Experience and Expertise of Lead Counsel, and the
                Standing and Caliber of Defendants' Counsel ..........................33

        4.      The Reaction of the Settlement Class Supports Lead
                Plaintiff's Counsel's Fee Request.............................................35

        5.      Lead Plaintiff Supports Lead Counsel's Fee Request ................35

B.      Reimbursement of the Requested Litigation Expenses is Fair and
        Reasonable ..............................................................................................36

VII.    CONCLUSION ...................................................................................................38

## **TABLE OF EXHIBITS TO DECLARATION**

| **EX.** | **TITLE** |
|---|---|
| 1 | Declaration of Adam D. Walter Concerning: (A) Mailing and Emailing of Notice; (B) Publication of Summary Notice; and (C) Report on Requests for Exclusion and Objections Received to Date ("Walter Declaration") |
| 2 | Excerpts of Edward Flores and Svetlana Starykh, *Recent Trends in Securities Class Action Litigation: 2024 Full-Year Review* (NERA Jan. 22, 2025) ("NERA Report") |
| 3 | Excerpts of Mullen Automotive Inc. Form 10-Q for the quarterly period ending December 31, 2024, as filed with the SEC on February 19, 2025 |
| 4 | Mullen Automotive Inc. Form 8-K, as filed with the SEC on February 28, 2025 |
| 5 | Table of Peer Law Firm Billing Rates |
| 6 | Glancy Prongay & Murray LLP Firm Résumé |
| 7 | Table of Select Ninth Circuit Cases Awarding Attorneys' Fee of 33% or Above |
| 8 | Declaration of Lead Plaintiff Mejgan Mirbaz in Support of: (1) Lead Plaintiff's Motion for Final Approval of Class Action Settlement and Plan of Allocation; and (2) Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses |
| 9 | *In re Virgin Mobile USA IPO Litig.*, No. 07-cv-5619 (SDW), ECF No. 146 (D.N.J. Dec. 8, 2010) |

I, Garth Spencer, hereby declare and state as follows:

1.      I am an attorney admitted to practice before this Court.  I am a partner at the law firm Glancy Prongay & Murray LLP ("GPM"), the Court-appointed Lead Counsel in this Action.[1]  GPM represents the Court-appointed Lead Plaintiff Mejgan Mirbaz ("Lead Plaintiff") and the proposed Settlement Class.  I have personal knowledge of the matters set forth herein based on my participation in the prosecution and settlement of the claims asserted in the Action.

2.      I respectfully submit this declaration, together with the attached exhibits, in support of Lead Plaintiff's forthcoming motion for final approval of class action settlement and plan of allocation (due to be filed by May 9, 2025, *see* ECF No. 114 at 6).  As will be set forth in the final approval memorandum, Lead Plaintiff intends to seek final approval of the $7.25 million Settlement for the benefit of the Settlement Class, as well as final approval of the proposed Plan of Allocation of the Net Settlement Fund to eligible Settlement Class Members.

3.      I also respectfully submit this Declaration in support of Lead Counsel's concurrently filed Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses (referred to herein as the "Fee and Expense Application") and the accompanying Memorandum of Law ("Fee Memorandum").  The Fee and Expense Application seeks an award of attorneys' fees in the amount of 30% of the Settlement Fund (*i.e.*, $2,175,000, plus interest earned at the same rate as the Settlement Fund), and reimbursement of Litigation Expenses in the total amount of $110,280.79, which consists of out-of-pocket litigation expenses in the amount of $85,280.79, plus $25,000 to Lead Plaintiff pursuant to the Private Securities Litigation Reform Act of 1995 (15 U.S.C. § 78u-4(a)(4); "PSLRA") for her costs, including lost wages, incurred in connection with representation of the Settlement Class.  As discussed in

---

[1] All capitalized terms, unless otherwise defined herein, have the same meaning as set forth in the Stipulation and Agreement of Settlement dated August 14, 2024 (the "Stipulation").  ECF No. 91-1.

detail in the Fee Memorandum, the requested 30% fee is well within the range of percentage awards granted by courts in this Circuit in comparable securities class actions, and is a fair and reasonable amount in light of the work performed and the result obtained.  Moreover, the expenses were necessarily incurred by Lead Counsel in litigating this Action and are of the type that Courts routinely reimburse to counsel.

4.     The Court granted preliminary approval of the proposed Settlement by its original Order Preliminarily Approving Settlement and Providing for Notice dated September 13, 2024, which was subsequently revised to correct a typographical error in an order dated September 13, 2024 and docketed on September 23, 2024 ("Preliminary Approval Order"; ECF Nos. 98 and 99).[2] Pursuant to the Preliminary Approval Order, A.B. Data Ltd. ("A.B. Data"), the Court-approved Claims Administrator, implemented a comprehensive notice program whereby notice was given to potential Settlement Class Members by mail or email and by publication.  *See* ¶¶68-76, *infra* (detailing notice program); *see also* Ex. 1 (Declaration of Adam D. Walter Concerning: (A) Mailing and Emailing of Notice; (B) Publication of Summary Notice; and (C) Report on Requests for Exclusion and Objections Received to Date) (the "Walter Decl.") at ¶¶2-18.

5.     In total, as of April 1, 2025, notice of the Settlement has been disseminated to 118,024 potential Settlement Class Members and nominees which includes 43,844 Postcard Notices and 27 Notice Packets[3] mailed and 74,153 emailed links to copies of the Notice and Claim Form.  *See* Ex. 1 (Walter Decl. at ¶¶10, 12). To date, only four requests for exclusion have been received by Lead Counsel or the Claims Administrator.  Moreover, only two objections, which generally express the

[2] Certain deadlines set forth in Preliminary Approval Order were modified by Court order on January 13, 2025, in the Order Re Plaintiff's Motion To Enforce Settlement Agreement.  ECF No. 114.

[3] The "Notice Packet" consists of the Notice and the Claim Form. Walter Decl. at ¶6 n.3.

2
DECLARATION OF GARTH SPENCER

objectors' desire for a higher Settlement Amount or a particular individual payment amount pursuant to the Settlement, have been received to date.[4]

## I. INTRODUCTION

6. Lead Plaintiff in this Action alleges claims pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder, arising from Defendants' alleged misrepresentations and omissions made between June 15, 2020 and April 17, 2022, inclusive (the "Settlement Class Period").

7. The proposed Settlement presented to the Court for final approval provides for the resolution of all claims in the Action in exchange for a cash payment of $7,250,000 (the "Settlement Amount") for the benefit of the Settlement Class. As detailed herein, Lead Plaintiff and Lead Counsel submit that the proposed Settlement represents an extremely favorable result for the Settlement Class in light of the significant risks of continued litigation of the Action, as well as serious questions concerning Defendants' ability to pay a potential judgment or settlement following further litigation.

8. Lead Counsel, in consultation with a damages expert, estimates that *if* the Court certified the same class period as the Settlement Class Period, *if* the class had prevailed on its claims at both summary judgment and after a jury trial, *and if* the Court and jury accepted Lead Plaintiff's damages theory, including proof of loss causation as to each of the corrective disclosure dates reflected in the Plan of Allocation (*i.e.*, what Lead Counsel believe is the best-case scenario based on the arguments they anticipated making if the case continued to be litigated), estimated total class wide damages would be approximately $84.3 million. Under this best-case scenario, the $7.25 million Settlement Amount represents approximately 8.6% of

---

[4] Lead Plaintiff and Lead Counsel will address these objections and any subsequent objections in the reply memorandum that is scheduled to be filed by June 6, 2025, after the objection and exclusion deadline. *See* ECF No. 114 at 6.

class-wide damages. *See infra* ¶¶62-64.  This recovery compares favorably to the median recovery of 3.8% for similar securities class actions.  *See* Ex. 2 (Edward Flores and Svetlana Starykh, *Recent Trends in Securities Class Action Litigation: 2024 Full-Year Review* (NERA Jan. 22, 2025)) ("NERA Report"), at p. 26 (Fig. 23) (between January 2015-December 2024 the median settlement value as a percentage of "NERA-Defined Investor Losses" was 3.8% for securities class actions with estimated losses between $50-$99 million).  When viewed in this context, the percentage recovery achieved here is fair and reasonable, even putting aside the considerable risks of establishing liability and damages and ability to pay to issues.

9.    Thus, the Settlement provides a substantial, certain, and immediate recovery, while avoiding the significant risks and expense of continued litigation, including the risk that the Settlement Class could recover less than the Settlement Amount (or nothing at all) after years of additional litigation and delay.

10.    The Settlement was only achieved after a hard-fought litigation, during which Lead Counsel became well informed of the relative strengths and weaknesses of Lead Plaintiff's claims in the Action.  In prosecuting the Action, Lead Counsel expended great efforts and resources on behalf of the Settlement Class, including, *inter alia*:

 a.    conducting a detailed and substantive investigation into the allegedly wrongful acts, which included, among other things: (i) review and analysis of (a) Mullen's and Net Element's filings with the U.S. Securities and Exchange Commission ("SEC"),[5] (b) public reports, press releases, and news articles concerning Mullen, and (c) court filings and

---

[5] Defendants are Mullen Automotive Inc. ("Mullen Auto"), Mullen Technologies Inc. ("Mullen Tech," and together with Mullen Auto, "Mullen"), and their CEO David Michery. Mullen Auto was formerly named Net Element Inc. ("Net Element"), but changed its name following a reverse merger between Mullen Tech and Net Element during the Settlement  Class Period.

other publicly available material related to Mullen; (ii) retaining and working with a private investigator who conducted an investigation that involved, *inter alia*, contacting and interviewing former Mullen employees and other sources of relevant information; and (iii) consultation with an expert in loss causation and damages;

b.    drafting the comprehensive and factually detailed 71-page[6] Consolidated Amended Class Action Complaint for Violations of the Federal Securities Laws (the "Complaint," ECF No. 42), which incorporated the foregoing research and investigation efforts;

c.    researching and drafting an opposition to Defendants' motion to dismiss and request for judicial notice (ECF Nos. 52 through 53-20), which were filed by Lead Plaintiff on January 13, 2023 (ECF Nos. 56 through 58), as well as a notice of recent decision (ECF No. 59);

d.    substantially overcoming Defendants' motion to dismiss (ECF No. 68);

e.    conducting discovery, including holding a Rule 26(f) conference, serving Lead Plaintiff's initial disclosures and reviewing Defendants' initial disclosures, propounding interrogatories and comprehensive requests for production on Defendants and analyzing Defendants' responses and objections thereto, responding to Defendants' interrogatories and requests for production, engaging in several meet and confers concerning discovery, negotiating search terms, date ranges, and document custodians for Defendants to search their electronically stored information, drafting and negotiating a confidentiality order and a discovery protocol, producing Lead Plaintiff's relevant documents to Defendants, issuing subpoenas to 11 non-parties, reviewing and analyzing 2,923 documents (totaling 15,232 pages) produced by

---

[6] This page length does not include the exhibits that were attached to the Complaint.

Defendants and 2,146 documents (totaling 10,316 pages) produced by subpoena recipients, and taking the deposition of a non-party;

f.  preparing for and participating in an adversarial mediation process and extensive settlement negotiations, which involved, (i) preparing a detailed mediation statement addressing liability, loss causation, and damages along with exhibits, (ii) reviewing and analyzing Defendants' mediation statement with exhibits, and (iii) participating in a full-day mediation session with an experienced and highly respected mediator, Robert A. Meyer, Esq. of JAMS, where the Parties and counsel engaged in full and frank discussions concerning the merits of the Action. The mediation culminated in Mr. Meyer making a mediator's recommendation to resolve the Action for $7,250,000 in cash for the benefit of the Settlement Class, which the Parties accepted;

g.  preparing and negotiating a term sheet that set out the preliminary terms of the Settlement;

h.  preparing the initial draft, and negotiating the terms, of the Stipulation (including the exhibits thereto) and the Supplemental Agreement;

i.  working with a consulting damages expert to craft a plan of allocation that treats Lead Plaintiff and all other members of the proposed Settlement Class fairly;

j.  drafting the preliminary approval briefing;

k.  negotiating with counsel for Defendants when they indicated that Mullen Auto wanted an extension of time to pay part of the Settlement Amount, which resulted in joint notices filed with the Court (ECF Nos. 100 and 101);

l.  while continuing to negotiate with Defendants concerning timing for payment of the Settlement Amount, moving the Court to enforce the

Settlement (ECF Nos. 102-104 and 107), resulting in the Court's order granting in part the motion to enforce the Settlement (ECF No. 114);

m.    after Defendants failed to provide sufficient information concerning potential assets and sources of funds that they could use to meet their settlement obligations, filing an *ex parte* application seeking documents and deposition testimony from Defendant Michery (ECF No. 117), and then withdrawing that application four days later upon Defendants' full funding of the Settlement Amount (ECF No. 118); and

n.    overseeing the implementation of the notice program.

11.    Based on the foregoing efforts, Lead Plaintiff and Lead Counsel are well informed of the strengths and weaknesses of the claims and defenses in the Action and believe the Settlement represents a favorable outcome for the Settlement Class and is in the best interests of the Settlement Class Members.  For all the reasons set forth herein and in the accompanying memorandum and declarations, Lead Plaintiff and Lead Counsel respectfully submit that the Settlement is "fair, reasonable, and adequate" in all respects, and that the Court should grant final approval pursuant to Federal Rule of Civil Procedure 23(e).

12.    In addition, Lead Plaintiff intends to seek approval of the proposed Plan of Allocation as fair and reasonable.  As discussed in further detail below, Lead Counsel developed the Plan of Allocation with the assistance of a consulting damages expert. *See* ¶¶83-88.  The Plan of Allocation provides for the distribution of the Net Settlement Fund to each Authorized Claimant on a *pro rata* basis based on their Recognized Loss amounts.  No Settlement Class Member, including Lead Plaintiff, or segment of the Settlement Class, receives preferential treatment under the plan.

13.    Finally, Lead Counsel seeks approval of the request for attorneys' fees, and reimbursement of Litigation Expenses, as set forth in the Fee Memorandum.  As discussed in detail in the accompanying Fee Memorandum, the requested 30% fee is within the range of percentage awards granted by courts in this Circuit, and

DECLARATION OF GARTH SPENCER

nationwide, in comparable securities class actions. Additionally, the fairness and reasonableness of the request is confirmed by a lodestar cross-check, and is warranted in light of the extent and quality of the work performed and the substantial result achieved. The requested litigation expenses of $85,280.79 to Lead Counsel and the requested PSLRA award of $25,000 to Lead Plaintiff are likewise fair and reasonable. Accordingly, as set forth in the Fee Memorandum and for the additional reasons set forth below, I respectfully submit that Lead Counsel's request for attorneys' fees and reimbursement of Litigation Expenses of $110,280.79 should be approved.

## II.   PROSECUTION OF THE ACTION

### A.   Commencement of the Action and Appointment of Lead Plaintiff and Lead Counsel

14.   Beginning on May 5, 2022, two class action complaints were filed in the United States District Court for the Central District of California (the "Court"), styled *Schaub v. Mullen Automotive, Inc.*, No. 2:22-cv-03026-DMG-AGR; and *Gru v. Mullen Automotive Inc.*, No. 8:22-cv-00976-DMG-AGR.

15.   By Order dated August 4, 2022, the Court ordered that the cases be consolidated and recaptioned as *In re Mullen Automotive, Inc. Securities Litigation*, Case No. 22-3026-DMG (AGRx); appointed Mejgan Mirbaz to serve as lead plaintiff for the consolidated action; and approved Lead Plaintiff's selection of Glancy Prongay & Murray LLP ("GPM" or "Lead Counsel") as lead counsel for the putative class. ECF No. 28.

### B.   The Comprehensive Pre-Filing Investigation and Preparation of the Complaint

16.   As discussed above, Lead Counsel conducted an extensive and detailed pre-filing investigation of Defendants, which included, among other things: (i) review and analysis of (a) Mullen's and Net Element's filings with the U.S. Securities and Exchange Commission ("SEC"), (b) public reports, press releases, and news articles concerning Mullen, and (c) court filings and other publicly available material related

to Mullen; (ii) retaining and working with a private investigator who conducted an investigation that involved, *inter alia*, contacting and interviewing former Mullen employees and other sources of relevant information; and (iii) consultation with a loss causation and damages expert.

17.    On September 23, 2022, Lead Plaintiff filed and served her 71-page Complaint asserting claims against: (i) defendants Mullen Auto, Mullen Tech, and David Michery, under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder; and (ii) defendant Michery under Section 20(a) of the Exchange Act.  ECF No. 42.  Among other things, the Complaint alleged that before and after Mullen Tech's reverse merger with Net Element the Defendants materially misled investors regarding Mullen Auto and Mullen Tech's electric vehicle business with respect to its customer orders, battery testing, manufacturing facilities, and commercial partnerships. The Complaint further alleged that the prices of Mullen Auto's and Net Element's publicly traded securities were artificially inflated during the putative class period as a result of Defendants' allegedly false and misleading statements, and declined when the truth was allegedly revealed.

**C.    Defendants' Motion to Dismiss the Complaint and Lead Plaintiff's Opposition**

18.    On November 22, 2022, Defendants filed a motion to dismiss the Complaint, and a request for judicial notice with multiple exhibits. ECF Nos. 52-53. On January 13, 2023, Lead Plaintiff filed her papers in opposition to the motion to dismiss and request for judicial notice. ECF Nos. 56-58. On January 20, 2023, Lead Plaintiff filed a request for leave to file notice of recent decision, which was granted by the Court. ECF Nos. 59-60.  On February 13, 2023, Defendants filed their reply papers. ECF No. 62.

19.    On April 13, 2023, the Court took Defendants' motion to dismiss under submission, and on September 28, 2023, issued an order granting in part and denying in part the motion to dismiss.  ECF Nos. 67-68; *In re Mullen Auto. Sec. Litig.*, 2023

WL 8125447 (C.D. Cal. Sept. 28, 2023).

20. On October 24, 2023, Defendants filed their answer to the Complaint. ECF No. 71.

### D. Fact Discovery

21. Discovery in the Action was initially stayed pending the outcome of Defendants' motion to dismiss, pursuant to the PSLRA. *See* 15 U.S.C. § 78u–4(b)(3)(B). Following the Court's partial denial of Defendants' motion to dismiss, on October 25, 2023, the Parties held their Rule 26(f) conference, and thereafter commenced discovery.

22. On October 25, 2023, Lead Plaintiff served on Defendants a first set of interrogatories and a first set of requests for production. On November 8, 2023, the Parties served their initial disclosures on each other. On November 10, 2023, Defendants served their first set of interrogatories and first set of requests for production on Lead Plaintiff. On December 11, 2023, the Parties served their responses and objections to each other's first sets of interrogatories and requests for production. On January 4, 2024, Lead Plaintiff served her second set of requests for production on Defendants. Defendants served their responses and objections on February 5, 2024.

23. The Parties engaged in extensive correspondence and discussions concerning their discovery requests and objections. The Parties also negotiated over date ranges, search terms, and custodians for Defendants' electronically stored information. The Parties negotiated a Stipulation and Proposed Confidentiality Order, and a Stipulation and Proposed Order Regarding the Production of Discovery, which the Court entered, as modified, on December 29, 2023. ECF Nos. 78-79.

24. On December 11, 2023, Lead Plaintiff produced 60 documents to Defendants, totaling 78 pages. On January 25, 2024, Lead Plaintiff produced an additional four documents to Defendants, totaling four pages. Lead Plaintiff's productions included, among other things, brokerage account documents, records of

transactions in Mullen stock, and her relevant social media posts. Beginning on March 6, 2024, Defendants made rolling productions totaling approximately 2,923 documents, consisting of 15,232 pages, including emails and other business records.

25. Beginning on October 25, 2023, and over the following months, Lead Plaintiff issued subpoenas *duces tecum* to 11 non-parties, including Mullen business partners and prospective customers, and a former Mullen officer. Following the receipt of objections from certain subpoena recipients, and negotiations over the scope of document productions, Lead Plaintiff received from subpoena recipients approximately 2,146 documents, totaling 10,316 pages. Lead Plaintiff promptly produced these documents to Defendants. Pursuant to a subpoena, Lead Plaintiff also took the deposition of a non-party.

26. Lead Counsel was prepared to continue vigorously pressing discovery if the Parties' planned mediation was not successful.

### E.      Mediation Efforts and Settlement Negotiations

27. On April 2, 2024, Lead Plaintiff, Lead Counsel and Defendants' Counsel participated in a full-day, in-person mediation session before Robert A. Meyer, Esq. of JAMS. In advance of that session, the Parties exchanged, and provided to Mr. Meyer, detailed mediation statements and exhibits, which addressed issues including liability, damages, and class certification. The mediation culminated in Mr. Meyer making a mediator's recommendation to resolve the Action for $7,250,000 in cash for the benefit of the Settlement Class, which the Parties accepted.

28. After substantial further negotiations, the agreement in principle to settle the Action was memorialized in a term sheet dated May 16, 2024 (the "Term Sheet"). The Term Sheet sets forth, among other things, the Parties' agreement to settle and release all claims asserted against Defendants in the Action in return for a cash payment by or on behalf of Defendants of $7,250,000 for the benefit of the Settlement Class, subject to certain terms and conditions, and the execution of a customary "long form" stipulation and agreement of settlement and related papers.

DECLARATION OF GARTH SPENCER

29.     Lead Counsel sent defendants initial drafts of the Stipulation and its exhibits. Over the following months, the Parties exchanged multiple drafts and engaged in further extensive negotiations over the terms of the Stipulation and related documents, and executed the finalized Stipulation on August 14, 2024. The Parties also executed a confidential agreement that establishes certain conditions under which Defendants, provided they unanimously agree, may terminate the Settlement if Settlement Class Members who purchased or otherwise acquired shares of Mullen Auto Common Stock eligible to participate in the Settlement that represent more than a certain percentage of the total number of shares of Mullen Auto common stock outstanding at the end of the Settlement Class Period request exclusion (or "opt out") from the Settlement (the "Supplemental Agreement").

**F.      The Court Grants Preliminary Approval of the Settlement, and Lead Plaintiff Succeeds in Compelling Defendants' Overdue Payment of the Full Settlement Amount**

30.     On August 16, 2024, Lead Plaintiff filed her Unopposed Motion For Preliminary Approval Of Class Action Settlement and supporting papers.  ECF Nos. 89-91. On September 13, 2024, the Court held a hearing on the preliminary approval motion. The Court granted preliminary approval of the proposed Settlement by its original Order Preliminarily Approving Settlement and Providing for Notice dated September 13, 2024, which was subsequently revised to correct a typographical error in an order docketed on September 23, 2024 and dated September 13, 2024 ("Preliminary Approval Order"; ECF Nos. 98 and 99).

31.     After the Court entered the Preliminary Approval Order and Lead Counsel provided to Defendants' Counsel the information necessary to effectuate a transfer of funds to the Escrow Account, the deadline to pay the Settlement Amount under the Settlement Agreement was October 18, 2024. *See* ECF No. 100. By that date, only $2,312,500 of the $7.25 million Settlement Amount had been paid. Defendants' counsel contacted Lead Counsel to request an extension of time to pay,

and the Parties jointly notified the Court on October 21, 2024. *Id.* By November 15, 2024, Defendants had caused an additional $37,500 to be funded, but informed Lead Counsel that they expected further delays in their ability to fund the full Settlement Amount. ECF No. 101.

32. On November 22, 2024, Lead Plaintiff filed her Motion to Enforce Settlement Agreement, seeking prompt payment of the overdue portion of the Settlement Amount. ECF Nos. 102-104. The Parties continued to negotiate over payment timing, and on December 20, 2024, Defendants caused an additional $900,000 to be paid into the Escrow Account, bringing total payments to $3,250,000, with a remaining outstanding balance of $4,000,000. *See* ECF No. 107 at 4. Defendants opposed Lead Plaintiff's motion to enforce the Settlement on December 20, 2024. ECF No. 106. Lead Plaintiff filed her reply papers on December 27, 2024. ECF Nos. 107-108. Lead Plaintiff then sought, and was granted, leave to file a notice of new facts regarding new fundraising that Mullen Auto had recently disclosed. ECF Nos. 109-111.

33. On January 10, 2025, the Court held a hearing on Lead Plaintiff's motion to enforce the Settlement. On January 13, 2025, the Court granted the motion in part, ordering: (a) the Parties to "meet and confer to discuss potential assets and sources of funds that Defendants could use to meet their settlement obligations"; (b) authorizing Lead Plaintiff to "file an *ex parte* application requesting expedited discovery into Defendants' and their D&O Insurers' assets and funds" if Defendants did not provide sufficient information; (c) setting a February 3, 2025 deadline for Defendants to fully fund the Settlement Amount; and (d) making corresponding adjustments to other scheduled dates relating to administration and final approval of the Settlement. ECF No. 114 at 5-6.

34. On January 22, 2025, the Parties filed a joint status report wherein Lead Plaintiff explained her position that Defendants had not provided sufficient information about their assets, with Defendant Michery providing no information

DECLARATION OF GARTH SPENCER

whatsoever. ECF No. 116. On January 23, 2025, Lead Plaintiff filed an *Ex Parte* Application for Expedited Discovery, seeking documents and deposition testimony from Defendant Michery on an expedited basis. ECF No. 117. Before the Court had ruled on the *ex parte* application, on January 27, 2025, Defendants caused the outstanding $4 million to be paid into the Escrow Account, and Lead Plaintiff withdrew her *ex parte* application. ECF No. 118.

## III.   THE RISKS OF CONTINUED LITIGATION

35.   The Settlement provides an immediate and certain benefit to the Settlement Class in the form of a cash payment of $7,250,000.  As explained more fully below, there were significant risks that the Settlement Class might recover substantially less than the Settlement Amount—or nothing at all—if the case proceeded through additional years of litigation to a potentially litigated verdict, followed by the inevitable appeals.  Indeed, Mullen Auto's precarious financial condition and Defendants' limited insurance, which would be significantly reduced by defense costs, created the very real risk that Lead Plaintiff would not be able to recover on a judgment as large as the Settlement after trial and appeal.  Defendants also had, or potentially had, substantial arguments with respect to liability, loss causation, and damages in this case.  In addition to continuing to challenge the elements of falsity and scienter, Defendants indicated that they intended to challenge class certification, loss causation and damages.  Lead Counsel and Lead Plaintiff carefully considered these risks, among many others, in evaluating whether the Settlement was in the Settlement Class's best interests.  There was simply no guarantee that Lead Plaintiff and the Settlement Class would achieve any recovery, let alone one greater than $7.25 million, through continued litigation—especially given Defendants' precarious financial condition.

### A.   Ability to Pay Risk

36.   The most immediate risk facing Lead Plaintiff and Lead Counsel was the Defendants' ability to pay a judgment.

37.     During the Settlement Class Period, Mullen was a small startup with no saleable electric vehicles, no ability to mass produce vehicles, no revenue, and, at all relevant times its financial statements included a note stating that there is substantial doubt about the Company's ability to continue as a going concern. *See* ECF No. 42 (Complaint), at §V.A.

38.     Moreover, Mullen Auto's published financial statements have continued to express "substantial doubt about its ability to continue as a going concern." Mullen Auto's most recently published financial statements, in its Form 10-Q filed with the SEC on February 19, 2025, for the quarter ended December 31, 2024, reveal only $2.3 million in unrestricted cash on hand, liabilities far exceeding assets, and a quarterly operating loss of over $50 million. *See* Ex. 3 (Mullen Auto Form 10-Q excerpts).

39.     On March 31, 2025, Mullen Auto's publicly traded common stock closed at $0.11 per share. In a Form 8-K filed with the SEC on February 28, 2025, Mullen Auto disclosed that it had recently received a written notice from The Nasdaq Stock Market LLC that it did not meet certain requirements for continued listing of its stock, and that "if the Company fails to timely regain compliance . . . by August 25, 2025, the Company's common stock will be subject to delisting from Nasdaq." *See* Ex. 4 (Mullen Auto Form 8-K).

40.     In sum, Mullen Auto is in dire financial shape.  As such, continued litigation may have led to Mullen Auto not even having the funds that it ultimately was forced by Court order to pay. If the case continued to be litigated through trial and appeals, there was a very real risk that Mullen Auto could declare bankruptcy, further jeopardizing any potential recovery for the Settlement Class.

41.     The other corporate Defendant, Mullen Tech, is a privately held company, and was Mullen Auto's predecessor—Mullen Auto assumed most of Mullen Tech's assets and operations in the Reverse Merger. Based on information provided by Defendants in connection with Lead Plaintiff's motion to enforce the

Settlement, it does not appear that Mullen Tech has any substantial assets or sources of income that could have contributed to payment of a judgment or a settlement.

42.     The extent to which the third and final Defendant, Mullen Auto's CEO David Michery, could have contributed to payment of a judgment or a settlement remains unclear. Despite the Court's order for the Parties to "discuss potential assets and sources of funds that Defendants could use to meet their settlement obligations," (ECF No. 114 at 5), "Defendant Michery . . . refused to provide any information to Lead Plaintiff" (ECF No. 117 at 1). As such, even if Defendant Michery could have made a substantial payment, which is far from certain, it appears likely that he would have strongly resisted doing so. Such resistance, even if it could ultimately be overcome, would at a minimum have increased the risk, delay, and expense of further litigation.

43.     Lead Counsel had no knowledge of whether Defendants had D&O coverage when initially undertaking this litigation. The insurance policies potentially available to contribute to a judgment or settlement in this Action were limited, wasting, and may have denied coverage if Defendants were found by a final judgment to have committed fraud.  Such policies were also potentially subject to competing claims from other pending or threatened litigation, which would further erode the funds available to contribute to resolution of this Action.  Indeed, Lead Counsel is aware of at least two other class action lawsuits naming Mullen Auto and Mr. Michery as defendants. *See Crume v. Mullen Automotive, Inc., et al.*, No. 2:25-cv-2620-CAS-JDE (C.D. Cal.); *Maloney v. Mullen Automotive, Inc., et al.*, No. 2:25-cv-01187-MCS-JDE (C.D. Cal.). Lead Counsel is also aware of multiple derivative lawsuits naming Mr. Michery and other Mullen Auto directors and officers as defendants. *E.g.*, *In re Mullen Automotive, Inc. Derivative Litigation*, Case No. 2:22-cv-05336-DMG-AGR (C.D. Cal.); *Trinon Coleman v. David Michery*, Case No. 2023-1228 (Delaware Court of Chancery).

DECLARATION OF GARTH SPENCER

44. As set forth above, the full $7.25 million Settlement Amount was due to be funded by October 18, 2024, however, the majority of the Settlement Amount was not paid until January 27, 2025, following a Court order requiring Defendants to fund the Settlement Amount, and after Lead Plaintiff moved for expedited discovery into Defendant Michery's assets and sources of income that could be used to fund the Settlement.

45. For the foregoing reasons, it is highly unlikely that Lead Plaintiff could have recovered more than the Settlement Amount by continuing to litigate the Action.

**B.    Risks to Proving Liability**

46. While Lead Counsel believes that the claims of Lead Plaintiff and the Settlement Class are meritorious, Lead Counsel also recognized from the outset that there were a number of substantial risks in the litigation and that Lead Plaintiff's ability to succeed at trial and obtain a large judgment was far from certain. For evidence of this risk, the Court needs to look no further than its own Order dismissing claims with respect to certain of Defendants' allegedly misleading statements, pursuant to Defendants' motions to dismiss. *See* ECF No. 68.

47. Defendants had challenged, or would likely challenge, virtually every element of Lead Plaintiff's Exchange Act claims. For example, Defendants forcefully argued, and would likely continue to maintain at summary judgment and trial, that the challenged statements were accurate, and were protected by the PSLRA safe harbor provision (15 U.S.C. § 78u-5(c)(1)(A)) because they were forward-looking in nature and accompanied by meaningful cautionary language. *See* ECF No. 52 (Defendants' motion to dismiss) at 13-21, 32-34. Lead Counsel similarly expects that Defendants would continue to argue that they did not act with scienter, but rather were simply "addressing, and promptly disclosing, any challenges faced in [their] business." *Id.* at 22. While Lead Plaintiff substantially prevailed on the motion to dismiss based on the allegations of the Complaint, there is no guarantee that the Court or a jury would find evidence produced in discovery sufficient to prove all elements of her claims. Falsity

and scienter were, therefore, an open question, and the trier of fact could have determined that the evidence supported Defendants' version of the events.

48.     In their motion to dismiss, Defendants further argued that Lead Plaintiff lacked statutory standing as to the allegedly misleading statements made before Mullen Tech's reverse merger with Net Element (*i.e.*, the majority of the statements at issue), relying on *Menora Mivtachim Ins. Ltd. v. Frutarom Indus. Ltd.*, 49 F.4th 790 (2d Cir. 2022), *amended and superseded by* 54 F.4th 82 (2d Cir. 2022).  *See* ECF No. 52 at 11-13. While the Court rejected those arguments (*see* ECF No. 68 at 5-8), at the time the Parties were negotiating the Settlement the Ninth Circuit followed the reasoning of *Menora Mivtachim* in its decision in *In re: CCIV / Lucid Motors Sec. Litig.*, 110 F.4th 1181 (9th Cir. 2024). Although Lead Counsel continues to believe that this Court's analysis of the statutory standing issue was correct, Defendants were highly likely to raise this issue again at summary judgment or class certification, which would have presented a formidable obstacle that threatened to substantially reduce the scope of this Action.

49.     Although Lead Plaintiff believes she has strong arguments in response to each of Defendants' arguments, their contentions nevertheless pose significant risks to establishing liability had the litigation continued.  Indeed, while believing that this Action is meritorious, Lead Plaintiff and Lead Counsel are well aware of the high hurdles they would have to surmount in order to *prove* that Defendants violated the Exchange Act.

**C.     Risk of Proving Loss Causation and Damages**

50.     Even assuming Lead Plaintiff overcame the above risks and successfully established Defendants' liability, Lead Plaintiff would have confronted considerable challenges in establishing loss causation and class-wide damages.

51.     Defendants argued, and would likely continue to contest, loss causation and damages.  For instance, Defendants argued in their motion to dismiss that the Hindenburg Report could not serve as a corrective disclosure, and that Mullen Auto's

April 18, 2022, press release likewise did not reveal any fraud. ECF No. 52 at 29-32. While Defendants were unsuccessful at the motion to dismiss stage on these arguments, there is no assurance that they would not be successful at summary judgment or trial by, for example, refuting allegations made in the Hindenburg Report. Lead Counsel also expects that Defendants would argue that loss causation and damages could not be proven because Mullen's stock was volatile and its price movement following all but one of the alleged corrective disclosures was not statistically significant.

52.    While Lead Counsel believe they have strong arguments regarding loss causation and damages, to *prove* loss causation and damages, Lead Plaintiff would have to proffer expert testimony demonstrating: (a) what the "true value" of Mullen Securities would have been had there been no alleged material misstatements and omissions; (b) the amount by which Mullen Securities were inflated by the alleged material misstatements and omissions; and (c) the amount of artificial inflation removed by the corrective disclosures.  Defendants would almost certainly present their own damages expert(s) to present conflicting conclusions and theories regarding the reasons for Mullen Securities' price declines on the alleged disclosure dates, requiring a jury to decide the "battle of the experts" – an expensive and intrinsically unpredictable process.

53.    Moreover, expert testimony can often rest on many assumptions, any of which risks being rejected by a jury.  A jury's reaction to such expert testimony is highly unpredictable, and Lead Counsel recognized that, in such a battle, there is the possibility that a jury could be swayed by Defendants' expert(s) and could find only a fraction of the amount of damages Lead Plaintiff contended were suffered by the Settlement Class, or none at all.  Thus, the amount of damages that the Settlement Class would recover at trial, even if successful on liability issues, was uncertain. Similarly, there was no assurance that favorable documents and testimony relating to loss causation and damages could be obtained or would be admitted as evidence by

DECLARATION OF GARTH SPENCER

the Court at trial. These issues could have seriously impaired Lead Plaintiff's ability to successfully prosecute the allegations in this case.

54. In sum, had any of Defendants' loss causation and damages arguments been accepted at summary judgment or trial, they could have dramatically limited—if not eliminated—any potential recovery.

**D.     Risks Faced in Obtaining and Maintaining Class Action Status**

55. The Parties reached the Settlement before Lead Plaintiff filed a motion for class certification. While Lead Counsel is confident that all of the Rule 23 requirements are met, and that the Court would have certified the proposed class, Defendants would have almost certainly raised arguments challenging the propriety of class certification.

56. Defendants would likely argue that: (a) Mullen Auto stock traded in an inefficient market, so Lead Plaintiff would not be entitled to a fraud-on-the-market presumption of reliance; and (b) there was a lack of impact on the price of Mullen Auto stock. Defendants would have likely asserted, *inter alia*, that there was extensive volatility in Mullen Auto's stock price, the stock moved in tandem with other EV companies, and the stock price reaction was not always statistically significant. Lead Counsel further expected Defendants to argue that individual issues predominate over class-wide issues on these grounds.

57. While Lead Plaintiff believes she had the better arguments on these issues, prevailing on class certification and proving class-wide damages was far from certain. If the Court accepted any of Defendants' anticipated arguments in opposition to class certification, that would have created significant hurdles for the proposed class to overcome.

**E.     Other Risks, Including Trial And Appeals**

58. Lead Counsel know from painful experience that despite the most vigorous and competent of efforts, attorneys' success in contingent litigation such as this case is never assured. For instance, GPM lost a six-week antitrust jury trial in the

Northern District of California after five years of litigation, which included many overseas depositions, the expenditure of millions of dollars of attorney and paralegal time, and more than a million dollars in hard costs. *See In re: Korean Ramen Antitrust Litigation*, Case No. 3:13-cv-04115 (N.D. Cal.).

59. And, even if Lead Plaintiff had prevailed at trial, she would have had to succeed on the post-trial appeals that would have surely followed. Lead Counsel expects that Defendants would likely appeal any verdict and award in Lead Plaintiff's favor. This process could have extended for years and might have ultimately led to a smaller recovery—or no recovery at all. Indeed, considering the ability to pay issues, even prevailing at trial would not have guaranteed a recovery larger than the $7.25 million Settlement. In fact, with Mullen Auto's current financial condition it is highly likely that any post-trial recovery would be less.

60. Given these significant litigation risks, I believe that the Settlement represents an excellent result for the Settlement Class.

**F.      The Settlement is Reasonable in Light of the Range of Potential Recovery in the Action**

61. In addition to the attendant risks of litigation discussed above, the Settlement is also fair and reasonable in light of the potential recovery of available damages.

62. The $7.25 million recovery represents 8.6% of Lead Counsel's estimate, developed in consultation with a damages expert, of $84.3 million in damages for the corrective disclosures reflected in the proposed Plan of Allocation. This estimate depends on a number of assumptions, including when and in what quantities certain shares of stock registered for public trading by Mullen toward the end of the Settlement Class Period first entered the public market. While Lead Counsel believes the $84.3 million damages estimate to be based on the most reasonable assumptions, using different assumptions as to when the newly registered Mullen shares entered the market, and holding all else equal, resulted in a range of estimated damages

21

DECLARATION OF GARTH SPENCER

calculated by Lead Counsel's expert from $35.2 million to $108.8 million (under which the $7.25 million Settlement would range from 20.6% to 6.7% of damages).

63. While, in addition to the corrective disclosure dates reflected in the Plan of Allocation (September 21, 2021; April 7, 2022; and April 18, 2022), the Amended Complaint alleged price declines on April 6, 2022 and April 19-20, 2022, Lead Counsel believes that proving loss causation and damages would be more difficult for those dates, and so they are not reflected in the Plan of Allocation and damages figures herein.

64. Obtaining a judgment equal to Lead Counsel's $84.3 million damages estimate would require, among other things, that: (a) the Court certified the same class period as the Settlement Class Period; (b) Lead Plaintiff survived summary judgment on all elements and also convinced a jury that liability was proven; and (c) the trier of fact accepted Lead Plaintiff's loss causation and damages theory, including with respect to each of the corrective disclosure dates reflected in the Plan of Allocation. This outcome was far from certain.

65. Having evaluated the relative strengths and weaknesses of the Action in light of Defendants' arguments, the stage of the litigation, and Defendants' ability to pay, it is the informed judgment of Lead Counsel, that the proposed Settlement is fair, reasonable, and adequate and in the best interests of the Settlement Class.

## IV. LEAD PLAINTIFF'S COMPLIANCE WITH THE COURT'S PRELIMINARY APPROVAL ORDER REQUIRING ISSUANCE OF THE NOTICE

66. The Court issued the Preliminary Approval Order dated September 13, 2024, and extended certain of its deadlines on January 13, 2025. *See* ECF Nos. 98-99 & 114. The currently scheduled dates include a deadline of April 25, 2025, for submission of claims, objections, and exclusion requests, and a final fairness hearing date of June 20, 2025 (the "Settlement Hearing").

67. The Court-approved Claims Administrator is A.B. Data. Lead Counsel selected A.B. Data as the proposed Claims Administrator after a competitive bidding process in which A.B. Data provided the lowest cost estimate. A.B. Data estimated, based on certain assumptions and not including nominee reimbursements, that Notice and Administration Costs would total $235,000 to $255,000. A.B. Data's cost estimate included a maximum cost cap of $285,000, based on the underlying assumptions of 150,000 notices mailed, 37,500 claims filed, and 22,500 payments not being exceeded. A.B. Data has reliably administered other securities class actions for Lead Counsel.

68. Pursuant to the Preliminary Approval Order, Lead Counsel instructed A.B. Data to begin mailing and emailing notice of the Settlement and to publish the Summary Notice. Contemporaneously with the mailing and emailing of the Notice and Claim Form, Lead Counsel instructed A.B. Data to post downloadable copies of the Notice, Claim Form, Stipulation, Preliminary Approval Order, and certain other relevant documents, online at www.MullenSecuritiesSettlement.com (the "Settlement Website").

69. The Notice contains, among other things, a description of the Action; the definition of the Settlement Class; a summary of the terms of the Settlement and the proposed Plan of Allocation; and a description of Settlement Class Members' right to participate in the Settlement, object to the Settlement, the Plan of Allocation and/or the application for attorneys' fees and expenses, or to exclude themselves from the Settlement Class. The Notice also informs Settlement Class Members of Lead Counsel's intent to apply for an award of attorneys' fees in an amount not to exceed 33⅓% of the Settlement Fund, and for reimbursement of Litigation Expenses in an amount not to exceed $136,000, which may include an application for reimbursement of the reasonable costs and expenses incurred by Lead Plaintiff directly related to her representation of the Settlement Class. *See* Walter Decl., Ex. B (Notice) at ¶¶5, 77.

70.    To disseminate the Notice, A.B. Data mailed, by first class mail, the Postcard Notice to purchasers of Mullen Securities during the Settlement Class Period, whose names and addresses were contained in a record holders list provided by Defendants' Counsel.  *See* Walter Decl., ¶¶3, 5.

71.    In addition, A.B. Data maintains a proprietary database with the names and addresses of the largest and most common banks, brokers, and other nominees. *See id.* at ¶4.  At the time of the initial mailing, A.B. Data's proprietary master mailing list consisted of 4,933 mailing records.  *Id.*

72.    On October 9, 2024, A.B. Data caused the Postcard Notice to be sent by First-Class Mail to the combined 6,692 mailing records contained in the Record Holder List and the Broker Mailing Database. As of April 1, 2025, A.B. Data had received 5,292 additional names and addresses of potential Settlement Class Members, as well as requests from brokers or other nominees for 31,150 Postcard Notices to be forwarded to their customers, and a request from Broadridge Financial Solutions for an email link to the Notice and Claim Form which it sent to 74,153 potential Settlement Class Members. *Id.* at ¶¶5, 9.

73.    As of April 1, 2025, A.B. Data had re-mailed 710 Postcard Notices to persons whose original mailings were returned by the USPS and for whom updated addresses were provided to A.B. Data by TransUnion, an information supplier to which A.B. Data subscribes to perform address skip tracing to locate a potential Class Member's current address when they have moved. *Id.* at ¶11.  Additionally, A.B. Data promptly re-mailed 12 Postcard Notices to potential Settlement Class Members for whom or which the USPS had returned Postcard Notices with forwarding addresses. *Id*.

74.    As of April 1, 2025, 118,024 potential Settlement Class Members were notified either by mailed Postcard Notice or Notice Packet, or by emailed link to the Notice Packet.  *Id.* at ¶12.

75. October 21, 2024, A.B. Data caused the Summary Notice to be published in *Investor's Business Daily* and to be transmitted once over the *PR Newswire*. *See id.* at ¶13 & Exs. E &F.

76. Lead Counsel also caused A.B. Data to establish the dedicated Settlement Website, which became operational on October 9, 2024, to provide potential Settlement Class Members with information concerning the Settlement, submit a claim online, and download copies of the Notice and Claim Form and other relevant documents. *Id.* at ¶16.

77. The deadline for Settlement Class Members to object to the Settlement, Plan of Allocation, and/or to the application for attorneys' fees and expenses, or to request exclusion from the Settlement Class is April 25, 2025. As of April 1, 2025, four requests for exclusion have been received. *Id.* at ¶20 & Ex. G. As of April 1, 2025, two objections have been received. *Id.* at ¶21 & Ex. H.

78. A.B. Data will file a supplemental affidavit after the April 25, 2025 deadline addressing whether any additional objections or requests for exclusion have been received. *Id.* at ¶22.

79. Apart from the two objections and four exclusion requests received by the Claims Administrator, no other objections or exclusion requests have been received by Lead Counsel. Lead Counsel will address these two objections (and any later received objections) in its reply papers that are due after the objection deadline has run.

**V.    ALLOCATION OF THE NET PROCEEDS OF THE SETTLEMENT**

80. Pursuant to the Preliminary Approval Order and as set forth in the Notice, all Settlement Class Members who want to participate in the distribution of

the Net Settlement Fund[7] must submit a valid Claim Form with all required information. *See* Ex. 1-B (Notice at pp. 2, 6-7 & ¶¶36, 38, 42).

81. Under the Preliminary Approval Order, claims were originally required to be submitted by February 6, 2025. ECF No. 99 at ¶10. Pursuant to the Court's Order Re Plaintiff's Motion To Enforce Settlement Agreement, the deadline for submission of claims was extended to April 25, 2025.  ECF No. 114 at 6. A.B. Data prominently posted to the Settlement Website the extended claims submission deadline. Walter Decl. at ¶16.

82. The Net Settlement Fund will be distributed among Authorized Claimants according to the proposed Plan of Allocation, as subject to approval by the Court. The Plan of Allocation is detailed in the Notice.  *See* Ex. 1-B (Notice, pp. 8-13). The Notice is posted on, and downloadable from, the Settlement Website, and it has been mailed or emailed along with the Claim Form to potential Settlement Class Members by A.B. Data upon request.  The Plan of Allocation's objective is to equitably distribute the Net Settlement Fund to those Settlement Class Members who suffered losses as a proximate result of the alleged violations of the Exchange Act as opposed to losses caused by market, industry, or company-specific factors or factors unrelated to the alleged violations of law.  Under the Plan of Allocation, each Authorized Claimant will receive his, her, or its *pro rata* share of the Net Settlement Fund based on his, her, or its total Recognized Loss Amount as compared to the total Recognized Loss Amounts of all Authorized Claimants.  *See* Ex. 1-B (Notice at ¶¶47-

---

[7] The "Net Settlement Fund" is the $7.25 million Settlement Amount plus any and all interest earned thereon less: (a) all federal, state and/or local taxes on any income earned by the Settlement Fund and the reasonable costs incurred in connection with determining the amount of and paying taxes owed by the Settlement Fund (including reasonable expenses of tax attorneys and accountants); (b) the costs and expenses incurred in connection with providing notice to Settlement Class Members and administering the Settlement on behalf of Settlement Class Members; and (c) any attorneys' fees and Litigation Expenses awarded by the Court. *See* Stipulation ¶1.24.

49). Calculations under the Plan of Allocation are not intended to be estimates of, nor indicative of, the amounts that Settlement Class Members might have been able to recover after a trial or estimates of the amounts that will be paid to Authorized Claimants pursuant to the Settlement. Instead, the calculations under the Plan of Allocation are a method to weigh the claims of Settlement Class Members against one another for the purposes of making an equitable allocation of the Net Settlement Fund. *Id.* at ¶48.

83. The Plan of Allocation, developed by one of Lead Plaintiff's damages consultants working in conjunction with Lead Counsel, is based on an out-of-pocket theory of damages consistent with Section 10(b) of the Exchange Act, and reflects Lead Counsel's assessment of the damages that Lead Plaintiff contends could have been recovered under the theories of liability and damages asserted in the Action. More specifically, the Plan of Allocation reflects, and is based on, Lead Plaintiff's allegation that the prices of Mullen Securities were artificially inflated due to Defendants' materially false and misleading statements and omissions.

84. The Plan of Allocation is based on the premise that the decreases in the prices of Mullen Securities that followed the alleged corrective disclosures that occurred on September 21, 2021; April 7, 2022; and April 18, 2022 (the "Corrective Disclosure Dates") may be used to measure the alleged artificial inflation in the price of Mullen Securities prior to these disclosures.

85. An individual Claimant's recovery under the Plan of Allocation will depend on a number of factors, including when the Claimant purchased, acquired, or sold Mullen Securities during the Settlement Class Period, in what amounts, as well as the number of valid claims filed by other Claimants.

86. If a Claimant has an overall market gain with respect to his, her, or its overall transactions in Mullen Securities during the Settlement Class Period, the Claimant's recovery under the Plan of Allocation will be zero.

DECLARATION OF GARTH SPENCER

87.     If the prorated payment to be distributed to any Authorized Claimant is less than $10.00, no distribution will be made to that Authorized Claimant.  Any prorated amounts of less than $10.00 will be included in the pool distributed to those Authorized Claimants whose prorated payments are $10.00 or greater.  In Lead Counsel's experience, processing and sending a check for less than $10.00 is cost prohibitive.

88.     In sum, the Plan of Allocation was designed to allocate the proceeds of the Net Settlement Fund fairly among Settlement Class Members based on the losses they suffered on transactions in Mullen Securities that were attributable to the conduct alleged in the Complaint.  Lead Counsel believes that the proposed Plan of Allocation will result in a fair and equitable distribution of the Net Settlement Fund among Settlement Class Members.

## VI.    LEAD COUNSEL'S REQUEST FOR ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES

89.     In addition to seeking final approval of the Settlement and Plan of Allocation, Lead Counsel are applying for a fee award of 30% of the Settlement Fund (*i.e.*, $2,175,000 plus interest accrued thereon), which is below the 33⅓% maximum potential attorney fee request contained in the Notice.  Lead Counsel also requests reimbursement in the amount of $85,280.79 for out-of-pocket expenses incurred by Lead Counsel in connection with the prosecution and resolution of the Action and an award of $25,000 for Lead Plaintiff for her costs, including for time spent, in connection to her role as a representative plaintiff in the Action.  The requested Litigation Expenses of $110,280.79 are below the maximum amount of $136,000 set forth in the Notice.

90.     As set forth in the accompanying Fee Memorandum, the requested 30% award is well within the range of fee awards in other comparable class action settlements, and the resulting multiplier on Lead Counsel's lodestar of approximately 2.22 strongly supports the reasonableness of the requested attorneys' fee.  The legal

authorities supporting the requested fees and expenses are set forth in the concurrently filed Fee Memorandum.  The primary factual bases for the requested fees and expenses are set forth below.

91.    I respectfully submit that, when viewed as a whole, those factors support an upward adjustment of the Ninth Circuit's benchmark 25% fee award to 30%, particularly in light of the strong result achieved for the Settlement Class, the significant risks to the Action, and Lead Counsel's skill in successfully achieving the Settlement.

**A.    The Fee Application**

**1.    The Outcome Achieved is the Result of the Significant Time and Labor that Lead Counsel Devoted to the Action**

92.    The work undertaken by Lead Counsel in investigating and prosecuting the Action and arriving at the present Settlement in the face of substantial risks has been time-consuming and challenging.  At all times throughout the pendency of the Action, for a period of over two years, Lead Counsel's efforts were driven and focused on advancing the Action to bring about the most successful outcome for the Settlement Class, whether through settlement or trial.  That work is summarized in ¶10 above.

93.    The following table summarizes Lead Counsel's hours and lodestar. The table indicates the amount of time spent by attorneys and professional support staff of my firm who, from inception of the Action through and including March 26, 2025, billed ten or more hours to the Action, and the lodestar calculation for those individuals based on Lead Counsel's current billing rates.  For personnel who are no longer employed by Lead Counsel, the lodestar calculation is based upon the billing rates for such personnel in his or her final year of employment. The table was prepared from contemporaneous daily time records regularly prepared and maintained by Lead Counsel.

DECLARATION OF GARTH SPENCER

| TIMEKEEPER | STATUS | HOURS | RATE | LODESTAR |
|---|---|---|---|---|
| **ATTORNEYS:** | | | | |
| Robert Prongay | Partner | 28.50 | 1,100.00 | 31,350.00 |
| Joseph Cohen | Partner | 68.50 | 1,225.00 | 83,912.50 |
| Kara Wolke | Partner | 15.80 | 1,100.00 | 17,380.00 |
| Casey Sadler | Partner | 63.70 | 1,050.00 | 66,885.00 |
| Garth Spencer | Partner | 750.40 | 1,000.00 | 750,400.00 |
| **TOTAL ATTORNEY** | **TOTAL** | **926.90** | | **949,927.50** |
| **PARALEGALS:** | | | | |
| Harry Kharadjian | Senior Paralegal | 45.75 | 350.00 | 16,012.50 |
| Paul Harrigan | Senior Paralegal | 23.50 | 325.00 | 7,637.50 |
| Michaela Ligman | Research Analyst | 11.10 | 400.00 | 4,440.00 |
| **TOTAL PARALEGAL** | **TOTAL** | **80.35** | | **28,090.00** |
| **TOTAL LODESTAR** | **TOTAL** | **1,007.25** | | **978,017.50** |

94.     I, and certain other attorneys involved in this Action, reviewed GPM's daily time records in connection with the preparation of this declaration.  The purpose of this review was to confirm both the accuracy of the records, as well as the necessity for, and reasonableness of, the time committed to the litigation.  As a result of this review, Lead Counsel made reductions to certain of the firm's time entries such that the time included in the table reflects that exercise of billing judgment.  Based on this review and the adjustments made, I believe that the time of Lead Counsel attorneys and staff reflected in the table was reasonable and necessary for the effective and efficient prosecution and resolution of the Action.  No time expended on the Fee and Expense Application has been included.

95.     The hourly rates for GPM's attorneys and professional support staff are similar to the rates that have been accepted in other securities or shareholder litigation in this District in the context of a lodestar cross-check.  Additionally, the rates billed by Lead Counsel's attorneys (ranging from $1,000 to $1,225 per hour for partners)

are comparable to, and in some cases lower than, peer plaintiff and defense firms litigating matters of similar magnitude.  *See* Ex. 5 attached hereto (table of peer law firm billing rates).  For example, as shown in Exhibit 5, Defendants' law firm in this Action, King & Spalding LLP, in a recent matter billed partners at rates of up to $1,920, and even billed associates at rates of up to $1,515.

96.    The total number of hours reflected in the above table is 1,007.25 hours.  The total lodestar reflected in the table is $978,017.50, consisting of $949,927.50 for attorneys' time and $28,090.00 for professional support staff time.  The requested fee amount of 30% of the Settlement Fund equals $2,175,000 (plus interest earned at the same rate as the Settlement Fund), and therefore represents a multiplier of 2.22 on Lead Counsel's lodestar.

97.    Moreover, Lead Counsel will move the Court for final approval of the Settlement and Plan of Allocation, and will continue to work towards effectuating the Settlement in the event the Court grants final approval.  Among other things, Lead Counsel will continue working with the Claims Administrator to resolve issues with Settlement Class Member claims, will continue responding to shareholder inquiries, will draft and file a motion for distribution, and will oversee the distribution process.  No additional compensation will be sought for this work.  Thus, the multiplier will be smaller by the time the case concludes.

98.    As detailed above, throughout this case, Lead Counsel devoted substantial time to the prosecution of the Action.  I personally devoted substantial time to this case and was involved in drafting and reviewing and editing the Complaint, Lead Plaintiff's motion to dismiss briefing, various discovery documents, Lead Plaintiff's mediation statement, the Stipulation and its exhibits, and Lead Plaintiff's filings concerning Defendants' failure to timely pay the full Settlement Amount, among other court filings. I also took the deposition of a non-party, and communicated with other lawyers about the case on a regular basis.    Other experienced attorneys were involved with drafting, reviewing and/or editing

pleadings, court filings, discovery-related materials, and the mediation submissions, participating in the mediation process, negotiating the terms of the Stipulation, and other matters. Throughout the litigation, Lead Counsel maintained an appropriate level of staffing that avoided unnecessary duplication of effort and ensured the efficient prosecution of this litigation.

99.    Based on the work performed and the quality of the results achieved, Lead Counsel respectfully submits that a 30% fee is fully merited under the "percentage of the fund" methodology.  Furthermore, as shown in Lead Counsel's accompanying Fee Memorandum, I also respectfully submit that the requested fee is fully supported by a "lodestar multiplier cross-check" because the requested multiplier of 2.22 is below the range of multipliers that courts often award in comparably complex securities class actions, which is a strong indication that the percentage request is fair and reasonable.

**2.    The Risks of Litigation and the Need to Ensure the Availability of Competent Counsel in High-Risk Contingent Securities Cases**

100.    The prosecution of this Action was undertaken by Lead Counsel on a pure contingency fee basis.  From the outset, Lead Counsel understood that they were embarking on a complex, expensive, and lengthy litigation with no guarantee of ever being compensated for the substantial investment of time and money the case would require.  In undertaking that responsibility, Lead Counsel were obligated to ensure that sufficient resources were dedicated to the prosecution of the Action, that funds were available to compensate attorneys and staff, and to cover the considerable litigation costs required by a case like this one.

101.    With an average lag time of many years for complex cases like this case to conclude, the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an ongoing basis.  Indeed, Lead Counsel received no compensation

during more than two years of litigation and incurred $85,280.79 in litigation-related expenses in prosecuting the Action.

102.   Lead Counsel also bore the risk that no recovery would be achieved.  As discussed above, from the outset, this case presented multiple risks and uncertainties that could have prevented any recovery whatsoever.  Despite the most vigorous and competent of efforts, success in contingent-fee litigation like this one is never assured.  As set forth above, Lead Counsel knows from experience that the commencement of a class action does not guarantee a settlement.  To the contrary, it takes hard work and diligence by skilled counsel to develop the facts and theories that are needed to sustain a complaint or win at trial, or to induce sophisticated defendants to engage in serious settlement negotiations at meaningful levels.  And, even when that effort is put forth, sometimes there is no recovery.

103.   Moreover, courts have repeatedly recognized that it is in the public interest to have experienced and able counsel enforce the securities laws and regulations pertaining to the duties of officers and directors of public companies.  *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 320 n.4 (2007) ("private securities litigation is an indispensable tool with which defrauded investors can recover their losses – a matter crucial to the integrity of domestic capital markets.") (internal quotation marks omitted).  As recognized by Congress through the passage of the PSLRA, vigorous private enforcement of the federal securities laws can only occur if private investors take an active role in protecting the interests of shareholders.  If this important public policy is to be carried out, the courts should award fees that adequately compensate plaintiffs' counsel, taking into account the risks undertaken in prosecuting a securities class action.

### 3. The Experience and Expertise of Lead Counsel, and the Standing and Caliber of Defendants' Counsel

104.   As demonstrated by Lead Counsel's firm résumé, Lead Counsel have extensive and significant experience in the specialized area of securities litigation.

*See* Ex. 6 (GPM firm résumé). The attorneys who were principally responsible for leading the prosecution of this case have years, in some cases decades, of experience prosecuting securities claims, and have recovered tens of millions of dollars on behalf of investors. This experience allowed Lead Counsel to develop and implement litigation strategies to address the complex obstacles that are inherent in securities class actions and those specific to this case that were raised by Defendants. I believe that the recovery achieved here for the Settlement Class reflects the high quality of Lead Counsel's representation.

105. For example, Lead Counsel's experience allowed them to obtain significant investigative materials despite the PSLRA's barriers to obtaining formal discovery, identify the complex issues involved in this case, prevail in large part against Defendants' motion to dismiss, and to formulate strategies to effectively and efficiently prosecute the Action. Lead Counsel used their substantial experience to, *inter alia*: (a) successfully oppose Defendants' arguments regarding the still-developing issue of statutory standing for Exchange Act Section 10(b) claims; (b) aggressively pursue discovery from Defendants and non-parties; (c) negotiate the Settlement at a time and under terms favorable to the Settlement Class; and (d) compel Defendants' overdue funding of the full Settlement Amount. I believe that each of these matters was critically important to Lead Counsel's ability to obtain the $7.25 million Settlement Amount for the benefit of the Settlement Class.

106. Additionally, the work performed by Lead Counsel in obtaining the Settlement should also be evaluated in light of the quality of the opposition. Here, the Defendants were represented by experienced securities class action litigators at King & Spalding LLP—a well-respected law firm that vigorously represented the interests of its clients throughout this Action. In the face of this experienced and formidable opposition, Lead Counsel were nonetheless able to persuade Defendants to settle the case on terms that I believe are favorable to the Settlement Class.

DECLARATION OF GARTH SPENCER

### 4. The Reaction of the Settlement Class Supports Lead Plaintiff's Counsel's Fee Request

107. As noted above, as of April 1, 2025, 118,024 potential Settlement Class Members were either mailed a Postcard Notice or Notice Packet, or emailed a link to the Notice Packet that advised Settlement Class Members that Lead Counsel would apply for an award of attorneys' fees in an amount not to exceed 33⅓% of the Settlement Fund. *See* Walter Decl. ¶12 & Ex. B (Notice at ¶5). In addition, the Court-approved Summary Notice has been published in *Investor's Business Daily* and transmitted once over the *PR Newswire*. *See* Walter Decl. ¶13 & Exs. E & F (confirmations of Summary Notice publications). To date, only two objections have been received. Lead Plaintiff will address these objections, and any others received after the date of this filing, in Lead Counsel's reply papers due to be filed by June 6, 2025.

108. In sum, Lead Counsel accepted this case on a fully contingent basis, committed significant resources to it, and prosecuted the case for more than two years without any compensation or guarantee of success. Based on the result obtained, the quality of the work performed, the risks of the Action, and the contingent nature of the representation, Lead Counsel respectfully submits that a fee award of 30%, resulting in a multiplier of 2.22, is fair and reasonable, and is supported by the fee awards courts have granted in other comparable cases. *See* Ex. 7 (table of select Ninth Circuit cases awarding attorneys' fee of 33% or above).

### 5. Lead Plaintiff Supports Lead Counsel's Fee Request

109. As set forth in the declaration submitted by Lead Plaintiff Mejgan Mirbaz, Lead Plaintiff has concluded that Lead Counsel's requested fee is fair and reasonable based on the work performed, the recovery obtained for the Settlement Class, and the risks of the Action. *See* Ex. 8 (Mirbaz Decl.) at ¶¶9-11. Lead Plaintiff has been closely involved in this case since its early stages, even travelling from her home in Sweden to attend the mediation in Los Angeles in person, and her

endorsement of Lead Counsel's fee request supports the reasonableness of the request and should be given weight in the Court's consideration of the fee award.

**B.    Reimbursement of the Requested Litigation Expenses is Fair and Reasonable**

110.    Lead Counsel seeks a total of $110,280.79 in Litigation Expenses to be paid from the Settlement Fund.  This amount includes $85,280.79 in out-of-pocket expenses reasonably and necessarily incurred by Lead Counsel in connection with commencing, litigating, and settling the claims asserted in the Action; as well as a total of $25,000 for Lead Plaintiff directly related to her representation of the Settlement Class.  I respectfully submit that the request for reimbursement of Litigation Expenses is appropriate, fair, and reasonable and should be approved in the amounts submitted herein.

111.    From the inception of this Action, Lead Counsel were aware that they might not recover any of the expenses incurred in prosecuting the claims against Defendants, and, at a minimum, would not recover any expenses until the Action was successfully resolved.  Lead Counsel also understood that, even assuming the Action was ultimately successful, an award of expenses would not compensate Lead Counsel for the lost use or opportunity costs of funds advanced to prosecute the claims against Defendants.  Thus, Lead Counsel were motivated to, and did, take significant steps to minimize expenses whenever practicable without jeopardizing the vigorous and efficient prosecution of the Action.

112.    In my opinion, the expenses paid were necessary and appropriate for the prosecution and resolution of this Action.  A list of the payments by category is set forth below:

DECLARATION OF GARTH SPENCER

| CATEGORY OF EXPENSE | AMOUNT PAID |
|---|---|
| COURIER AND SPECIAL POSTAGE | 66.70 |
| E-DISCOVERY VENDOR CHARGES | 2,252.80 |
| EXPERTS-ECONOMETRICS (LOSS CAUSATION, DAMAGES, PLAN OF ALLOCATION) | 35,528.00 |
| INVESTIGATIONS | 5,165.99 |
| LEAD PLAINTIFF AIRFARE TO ATTEND MEDIATION | 1,176.48 |
| MEDIATORS | 12,500.00 |
| ONLINE RESEARCH | 11,272.35 |
| SERVICE OF PROCESS | 6,532.61 |
| TRANSCRIPTS | 1,973.65 |
| TRAVEL AIRFARE | 6,145.79 |
| TRAVEL AUTO | 783.42 |
| TRAVEL HOTEL | 1,402.23 |
| TRAVEL MEALS | 440.77 |
| TRAVEL PARKING | 40.00 |
| **Grand Total** | **85,280.79** |

113. As set forth in the table above, the largest expense was for the retention of experts, amounting to $35,528.00 or 41.7% of the total expenses—two in the field of damages, loss causation and market efficiency. These experts were consulted at different points throughout the litigation, including on matters related to: (a) preparation of the Complaint; (b) negotiation of the Settlement; and (c) preparation of the proposed Plan of Allocation.

114. Another significant component of expenses (14.7%) is the $12,500.00 in mediation fees paid by Lead Counsel for the services of Mr. Meyer.

115. Online research accounted for $11,272.35, or 13.2% of the total expenses, which was expended on the use of online platforms such as WestLaw and

LexisNexis to research and support Lead Plaintiff's various factual allegations in the Complaint and legal arguments while engaged in motion practice.

116.   Travel costs for airfare, car transportation, hotels, meals, and parking, accounted for another $8,812.21, or 10.3% of total expenses, incurred in connection with Lead Counsel's travel arrangements for deposition, mediation, preliminary approval, the motion to enforce the settlement, and other matters.

117.   Service of process accounted for $6,532.61, or 7.7% of total expenses, for service on Defendants as well as on subpoena recipients, some of whom were difficult to serve and required repeated service attempts at different addresses.

118.   The retention of investigators was another $5,165.99, or approximately 6.1% of the total expenses.  The investigators conducted interviews with former Mullen employees and other relevant third parties and assisted Lead Counsel in conducting the factual investigation required to develop claims in the Action, as pled in the Complaint.

119.   Additional, smaller categories of expenses incurred by Lead Counsel include couriers and postage, e-discovery vendor charges, transcripts, and reimbursement of Lead Plaintiff's airfare for attendance at the mediation.

120.   Finally, Lead Plaintiff seeks reimbursement of her reasonable costs and expenses incurred directly in connection with representing the Settlement Class in the amount of $25,000.  The substantial effort devoted to this Action by Lead Plaintiff is detailed in her accompanying declaration.  *See* Ex. 8.  Based on the time and effort expended by Lead Plaintiff for the benefit of the Settlement Class, I respectfully request that the Court grant Lead Plaintiff's request in full.

## VII.   CONCLUSION

121.   In view of the significant recovery for the Settlement Class and the substantial risks of this Action, as described herein and as will be described in the forthcoming final approval memorandum, I respectfully submit that the Settlement should be approved as fair, reasonable, and adequate and that the proposed Plan of

DECLARATION OF GARTH SPENCER

Allocation should be approved as fair and reasonable. I further submit that the requested fee in the amount of 30% of the Settlement Fund should be approved as fair and reasonable, and the request for reimbursement of total Litigation Expenses in the amount of $110,280.79 (which includes $85,280.79 in Lead Counsel's out-of-pocket expenses, and $25,000 for Lead Plaintiff) should also be approved.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on this, the 4th day of April, 2025, at Wilmington, North Carolina.

*s/ Garth Spencer*
Garth Spencer

## PROOF OF SERVICE

I hereby certify that on this 4th day of April, 2025, a true and correct copy of the foregoing document was served by CM/ECF to the parties registered to the Court's CM/ECF system.

*s/ Garth Spencer*
Garth Spencer

DECLARATION OF GARTH SPENCER